# Exhibit 5

1    UNITED STATES BANKRUPTCY COURT

2    EASTERN DISTRICT OF NEW YORK

3    Case No. 8-16-74892-ast

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    OLYMPIA OFFICE LLC,

8            Debtor.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10   Case No. 8-16-75515-ast

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   In the Matter of:

13

14   WA PORTFOLIO LLC,

15           Debtor.

16   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

17   Case No. 8-16-75516-ast

18   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

19   In the Matter of:

20

21   MARINERS PORTFOLIO LLC,

22           Debtor.

23   - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

24

25

1    Case No. 8-16-75517-ast

2    - - - - - - - - - - - - - - - - - - - - - - - - - x

3    In the Matter of:

4

5    SEAHAWK PORTFOLIO LLC,

6              Debtor.

7    - - - - - - - - - - - - - - - - - - - - - - - - - x

8    Adv. Case No. 8-16-08167-ast

9    - - - - - - - - - - - - - - - - - - - - - - - - - x

10   OLYMPIA OFFICE LLC,

11                   Plaintiff,

12            v.

13   MLMT 2005-MCP1 WASHINGTON OFFICE PROPERTIES, LLC,

14                   Defendants.

15   - - - - - - - - - - - - - - - - - - - - - - - - - x

16                        United States Bankruptcy Court

17                        290 Federal Plaza

18                        Central Islip, New York 11722

19                        September 28, 2017

20                        2:14 PM

21   B E F O R E:

22   HON. ALAN S. TRUST

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  JAF / YM

1    HEARING re Adj Status Conference [23] Adj from 01/11/17

2

3    HEARING re Order Assigning Matter to Mediation; that the

4    Honorable Arthur B. Federman is hereby designated as mediator;

5    the Mediation Parties shall file a joint status letter as to

6    whether the Mediation resulted in a settlement by August 14,

7    2017. [314]

8

9    HEARING re Adj Motion to Substantively Consolidate Lead Case

10   16-64892 with 16-75515, 16-75516, 16-75517 Filed by Jordan

11   Pilevsky on behalf of Olympia Office LLC. [38]

12

13   HEARING re Hearing on Disclosure Statement Filed by Alan M Feld

14   on behalf of MLMT 2005-MCP1 Washington Office Properties, LLC

15   (RE: related document(s)266 Disclosure Statement filed by

16   Creditor MLMT 2005-MCP1 Washington Office Properties, LLC)

17   [332]

18

19   HEARING re Hearing on Disclosure Statement filed by Jordan

20   Pilevsky on behalf of Mariners Portfolio LLC, Olympia Office

21   LLC, Seahawk Portfolio LLC, WA Portfolio LLC (RE: related

22   document(s)132 Disclosure Statement filed by Debtor Olympia

23   Office LLC, Jointly Administered Debtor WA Portfolio LLC,

24   Jointly Administered Debtor Mariners Portfolio LLC, Jointly

25   Administered Debtor Seahawk Portfolio LLC) [132]

1    HEARING re Hearing on Disclosure Statement Filed by Jordan

2    Pilevsky on behalf of Mariners Portfolio LLC, Olympia Office

3    LLC, Seahawk Portfolio LLC, WA Portfolio LLC (RE: related

4    document(s) [243] Amended Disclosure Statement filed by Debtor

5    Olympia Office LLC, Jointly Administered Debtor WA Portfolio

6    LLC, Jointly Administered Debtor Mariners Portfolio LLC,

7    Jointly Administered Debtor Seahawk Portfolio LLC) (Entered:

8    06/06/2017) [255]

9

10   HEARING re Hearing on Disclosure Statement for Noteholders

11   Chapter 11 Plan of Liquidation Filed by Alan M Feld on behalf

12   of MLMT 2005-MCP1 Washington Office Properties, LLC. [266]

13

14   HEARING re Telephonic Conference - Motion for Adequate

15   Protection Motion or Order Requiring Adequate Protection Filed

16   by Alan M Feld on behalf of MLMT 2005-MCP1 Washington Office

17   Properties, LLC. [279]

18

19   HEARING re Ruling Conference - Hearing on (RE: related

20   document(s)95 Motion to Dismiss Case filed by Creditor MLMT

21   2005-MCP1 Washington Office Properties, LLC) [95]

22

23   HEARING re Ruling Conference - Motion to

24   Object/Reclassify/Reduce/Expunge Claims: Claim Number(s): 4-1.

25   Filed by Jordan Pilevsky on behalf of Olympia Office LLC. [127]

1    HEARING re Ruling Conference - Motion for Relief from Stay MLMT

2    2005-MCP1 Washington Office Properties, LLCs Motion for Relief

3    From the Automatic Stay Under Bankruptcy Code Sections

4    362(d)(1), 362(d)(2), and 362(d)(4). Filed by Alan M Feld on

5    behalf of MLMT 2005-MCP1 Washington Office Properties, LLC.

6    [94]

7

8    HEARING re 8-16-75515-ast Adj Status Conference [6]

9    Adj from 01/11/17

10

11    HEARING re 8-16-75515-ast Adj Motion to Substantively

12    Consolidate Lead Case 16-74892 with 16-75515, 16-75516, 16-

13    75517 Filed by Jordan Pilevsky on behalf of WA Portfolio LLC.

14    [14] Adj from 01/11/17

15

16    HEARING re 8-16-75516-ast Adj Status Conference [6]

17    Adj from 01/11/17

18

19    HEARING re 8-16-75516-ast Adj Motion to Substantively

20    Consolidate Lead Case 16-74892 with 16-75515, 16-75516, 16-

21    75517 Filed by Jordan Pilevsky on behalf of Mariners Portfolio

22    LLC. [14] Adj from 01/11/17

23

24    HEARING re 8-16-75517-ast Adj Status Conference [6]

25    Adj from 01/11/17

```
1    HEARING re 8-16-75517-ast Adj Motion to Substantively

2    Consolidate Lead Case 16-74892 with 16-75515, 16-75516, 16-

3    75517 Filed by Jordan Pilevsky on behalf of Seahawk Portfolio

4    LLC. [14] Adj from 01/11/17

5

6    HEARING re 8-16-08167-ast Order Assigning Matter to Mediation;

7    that the Honorable Arthur B. Federman is hereby designated as

8    mediator; the Mediation Parties shall file a joint status

9    letter as to whether the Mediation resulted in a settlement by

10   August 14, 2017. [57]

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde
```

```
1   A P P E A R A N C E S :

2

3   LAMONICA HERBST & MANISCALCO

4        Attorney for the Debtors

5        3305 Jerusalem Ave, Suite 201

6        Wantagh, NY 11793

7

8   BY:   JORDAN DAVID WEISS

9         JOSEPH S. MANISCALCO

10        JORDAN PILEVSKY

11

12  ALSTON COURTNAGE & BASSETTI LLP

13        Attorney for JSH Properties, Inc., Receiver

14        1420 Fifth Avenue, Suite 3650

15        Seattle, WA 98101

16

17  BY:   CHARLES E. SHIGLEY (TELEPHONICALLY)

18

19  COLE WATHEN LEID & HALL PC

20        Attorneys for Centrum Financial Services, Inc.,

21        Interested Party

22        333 S Hope Street, 43rd Floor

23        Los Angeles, CA 90071

24

25  BY:   THEODORE A. COHEN (TELEPHOINCALLY)
```

```
 1   KASOWITZ BENSON & TORRES LLP

 2         Interested Party

 3         1633 Broadway

 4         New York, NY 10019

 5

 6   BY:  EDWARD FILUSCH

 7

 8   UNITED STATES DEPARTMENT OF JUSTICE

 9         Attorney for the U.S. Trustee

10         Long Island Courthouse

11         560 Federal Plaza

12         Central Islip, NY 11722

13

14   BY:  ALFRED DIMINO

15

16   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

17         Attorneys for MLMT 2005-MCP1 Washington Office

18         Properties, LLC, Creditor

19         333 South Hope Street, 43rd Floor

20         Los Angeles, CA 90071

21

22   BY:  ALAN M. FELD

23         THOMAS MONAHAN

24

25   EDWARD VELTON, Receiver
```

1             P R O C E E D I N G S

2             CLERK:  Case #16-74892, Olympia Office LLC.

3             THE COURT:  Take appearances, please.  First in the

4    Courtroom.

5             MR. MANISCALCO:  Good morning, good afternoon, Your

6    Honor.  Joseph Maniscalco, LaMonica Herbst & Maniscalco on

7    behalf of the Debtors.

8             MR. PILEVSKY:  Good afternoon, Your Honor.  Jordan

9    Pilevsky, LaMonica Herbst & Maniscalco on behalf of the Chapter

10   11 Debtors.

11            MR. FELD:  Good afternoon, Your Honor.  Alan Feld and

12   Thomas Monahan of Sheppard, Mullin, Richter & Hampton on behalf

13   of the Noteholders.

14            MR. DIMINO:  Good afternoon, Judge.  Alfred Dimino

15   from the Office of the United States Trustee.

16            CLERK:  The parties on the phone, Judge.

17            THE COURT:  You mean on the telephone?  On the

18   telephone.

19            MR. WATHEN:  Good afternoon, Your Honor.  Rick Wathen

20   on behalf of Centrum Financial.

21            MR. FILUSCH:  Good afternoon, Your Honor.  Edward

22   Filusch on behalf of Oracle.

23            MR. SHIGLEY:  Charles Shigley on behalf of the

24   Receiver, JSH Properties.

25            MR. COHEN:  Good afternoon, Your Honor.  Ted Cohen on

1    behalf of Sheppard Mullin also on behalf of the Noteholder.

2         MR. VELTON:  Good afternoon, Your Honor.  Ernie

3    Velton, Receiver.

4         THE COURT:  All right.  Anyone else?  All right.  Let

5    me ask if the parties have been able to reach a settlement on

6    the issues up for ruling conference today.  Mr. Maniscalco, Mr.

7    Feld?

8         MR. MANISCALCO:  We have -- we've had a lot of robust

9    discussions, we're trying to resolve the asset protection

10   motion.  We're very close on getting that done.  We do not have

11   a resolution as we stand here today in writing done with

12   respect to the trial that we had during the summer.

13        THE COURT:  All right.  Mr. Feld, you concur?

14        MR. FELD:  I would agree with that, Your Honor.  I

15   mean, we've made a lot of efforts, including in the mediation,

16   and there's still some ongoing discussions, but there's been no

17   meeting of the minds yet.

18        THE COURT:  All right.  All right, then the Court

19   prepared and to announce its ruling in the narrative form on

20   various matters.  I'll delineate what those matters are and

21   what those rulings are.  This will be the Court's findings of

22   fact and conclusions of law stated in narrative form in

23   accordance with Bankruptcy Rule 7052 with respect to the

24   following matters.

25        The motion for relief from stay filed by MLMT 2005-

1    MCPI Washington Office Properties, LLC, which I'll be referring

2    to as Noteholder, is at docket 94.  Noteholder's motion for

3    dismissal or conversion -- motion for dismissal or conversion

4    of the bankruptcy cases under Section 1112(b); it's docket item

5    95.  Response and opposition from the Debtor to each of those

6    motions at docket items 107 and 110.  The Debtor's objection to

7    the noteholder's proof of claim at docket item 127, and the

8    response of the noteholders in opposition to the Debtor's claim

9    objection at docket item 152.

10            For the reasons to follow, the Court has determined

11    that the bankruptcy cases will be dismissed under Section 1112

12    for cause, but not as a bad faith filing.  In terms of

13    prepetition history, much of that has been set out by this

14    Court in its Order concerning the Debtor's standing to object

15    to the ML -- the noteholder's claim, which Order appears at

16    docket item 283, as well as the Court's Order denying the

17    noteholder's motion to reconsider that ruling, which appears at

18    docket item 350.

19            I will not restate the entire factual background of

20    this dispute; but, instead, refer the parties to the facts as

21    contained in the standing Order, but I will give brief context

22    and background for purposes of these rulings today.

23            In 2004, an entity known as CDC Properties I entered

24    into a series of loan agreements with Merrill Lynch.  Those

25    will be referred to as the loans and the original lender.

1          On November 28th, the remaining acquiring entities

2     filed for Chapter 11 relief before this Court, and those cases

3     were then administratively consolidated.  I'll collectively

4     refer to the acquiring entities as the debtors.  On December

5     1st of 2016, the Court entered the Order upon which -- under

6     which it determined that the automatic stay was in effect

7     because the properties were the property of the debtor's

8     bankruptcy estate.

9          Subsequently, the noteholder and the, respectively,

10     the debtors filed the various motions, which I listed at the

11     beginning of this ruling, which are the subject of the herein

12     conference today.  After extensive discovery was undertaken

13     between the parties and various discovery disputes were

14     resolved by the Court, on May 24th of this year, the Court

15     conduced an evidentiary hearing on those various motions.  The

16     Court made a number of evidentiary rulings at the time of trial

17     and issued some subsequent to trial in connection with the

18     standing Order.

19          I will today as I have noted in prior settings that

20     this case -- these cases have been marred by constant

21     disagreements, if not bickering, between the debtors and the

22     noteholders.  For a $40 million or so dispute, the docket

23     reflects extensive litigation history of these cases.  The

24     Court noted at the time of trial that in the aggregate, the

25     trial of the case -- at the trial of the case, the Court was

1  presented with some 6,000 pages of trial exhibits, which

2  included testimonial affidavits, appraisal reports, and

3  deposition excerpts.  As the record will reflect, the Court

4  also took live testimony from a number of witnesses.  The Court

5  scheduled and held closing arguments on the parties' motions on

6  July 12th.

7        I'll first turn to why this Court has determined that

8  cause existed to dismiss these cases.  It is centered upon the

9  inability of the debtors to obtain confirmation of the plan of

10  reorganization.  On May 31st, the debtor's filed their second

11  amended plan and second amended disclosure statement for the

12  plan at docket item 243.  The plan provides for three classes

13  of creditors -- well, two classes of creditors and one class of

14  interested owners.

15        The first is Class 1, the noteholder, which the

16  debtor estimated to hold the secured claim at just over $33

17  million.  The debtor proposed to market and sell the properties

18  over a period of 12 months after confirmation, either as a

19  portfolio group or as individual properties.  The debtor would

20  pay the noteholder from the proceeds of those sales and obtain

21  partial lien releases to the extent that properties were sold

22  individually and would pay the noteholder interest at 4 percent

23  pending final payoff.

24        As to Class 2, the debtor purportedly -- purported to

25  create a class of general unsecured creditors owed, by debtor's

1    the noteholder has its rights that it can enforce outside of

2    these cases.

3           The Court notes that at several junctures during

4    these cases, proposed to the parties and even suggested that

5    the estate's properties could be liquidated, converted to cash,

6    and the parties left to fight over who gets the cash proceeds.

7    But the noteholder has consistently been opposed to that

8    approach based on statements made on the record.

9           Finally, to the extent that the properties may be

10   worth less than the legitimate debts owed to the noteholders,

11   there'd be no equity available for other parties.  That's

12   particularly true once the cost of liquidating those properties

13   is considered, including if the cases were converted rather

14   than dismissed, potential Chapter 7 Trustee and other Chapter 7

15   administrative expenses.  In other words, the Court considered

16   in order to convert the cases to Chapter 7, that would simply

17   add another layer of administrative expenses beyond those

18   already incurred in the Chapter 11 estates.  And under no

19   reasonable circumstances would they create a dividend for

20   unsecured creditors if, in fact, there are any.

21          With respect to the issue of equity, equity in the

22   properties.  Because these issues have been raised and

23   extensively litigated, the Court will address -- briefly

24   address -- the values of the properties and the debts owed to

25   the noteholders.

1    First, with respect to the debt.  The debtors have

2    demonstrated to the Court through various exhibits and trial

3    testimony I'll refer to and has raised issues concerning

4    whether or not the noteholder or prior to it, really Midland,

5    when they were actually -- when the debt -- when the notes were

6    actually accelerated and whether or not they were properly

7    accelerated.  That issue relates to calculation of the

8    noteholder claim because it substantially impacts the amount of

9    default interest it was owed by CDC and by a position of the

10   properties of the debtors at the petition date.

11   The CDC plan provided certain waterfall provisions

12   governing how payments were to be made to creditors from the

13   income generated from the operation of the properties, and how

14   those payments would be distributed to creditors, and how funds

15   would need to be used to fund certain reserves and certain

16   (indiscernible).

17   That cash management agreement, which is referred to

18   in the CDC plan, which is Noteholder Exhibit 9 at Page 9,

19   actually refers to the deed of trust, which is a record and is

20   part of the proceedings before this Court.  The Court had asked

21   whether the cash management agreement was part of the trial

22   record and closing arguments.  Noteholders indicated no.  But

23   then the Court reviewed that the cash management agreement

24   appears to actually be the substantial provisions buried in the

25   CDC deed of trust started at Page 58, and that's at Exhibit A.

1    Following confirmation of the CDC plan, essentially

2  Midland as noteholder's predecessor, was in control of all CDC

3  revenues through a central account and had the authority to

4  direct funds to the ultimate payees, pursuant to the waterfall

5  provisions of the plan.  Even though the CDC plan directs the

6  debtor to make payments, it could not because those funds were

7  actually under the control of Midland.

8    The contract that was of interest as stated on Note A

9  was 5.45 percent, and the default rate was 9.45 percent.  The

10  contract noted interest on the B note was 12.75 percent, but

11  the default rate was 16.75 percent.  Given the substantial

12  millions of dollars that were owed throughout the life of the

13  CDC plan, the increase in the rate to accrue on the loans are 4

14  percent of the Note A or Note B obviously is a substantial

15  difference.  The debtor's positive that the noteholders claims

16  in these cases are inflated by several million dollars, because

17  the noteholders calculated default interest on both notes from

18  a time far too early.  With respect to the trial record, we'll

19  return to that in a moment.

20    The debtors attempted to introduce an accountant's

21  report that would attempt to tract those issues concerning when

22  the notes should have gone over default and had been

23  accelerated.  The noteholders objected to that report being

24  admitted, so the Court did not admit the report.  The

25  noteholders then attempted to settle post-trial to supplement

1    the record to rebuff the debtor's arguments concerning the

2    calculation of default interest, and the Court did not allow

3    that supplementation either.  Those decisions have been

4    published.

5          With the absence of any forensic accounting analysis,

6    the Court was then left to analyze the dispute over default

7    interest based upon bank statements, recreated (indiscernible),

8    and various correspondence between Midland and CDC, including a

9    variety of default notices.

10         The loan history and the record before this Court

11   gave no clear answer as to the profit made from which the Note

12   A and/or Note B should have been accelerated or, in fact, the

13   dates from which they were actually accelerated, while the

14   third parties as follows: Exhibits 111 and 112 constitute the

15   loan histories of the A note and the B note, and they do not

16   demonstrate that the notes had been treated as being in default

17   as early as the noteholder now asserts as of the petition date

18   or the exhibit prior to the petition date in Exhibit 79, the

19   Olympia petition date.

20         Exhibit 79 constitutes a default notice that Midland

21   sent to CDC on June 4th of 2014 stating that the B note was in

22   default for failing to make the required plan payment, the

23   required monthly payment, which was approximately $27,000.

24   Those payments were to have begun on January 1st of 2013.  The

25   June 4, 2014 default notice appears to assert that the B note,

1    while making default in January of 2013, although that default

2    letter is far from the height of clarity.  That to enforce the

3    2014 default letter also appears to state that Midland is

4    entitled to exercise any of the remedies provided in the loan

5    documents; but later on, states that CDC has 10 days to cure

6    these defaults or Midland was entitled to, quote, "pursue

7    remedies under the loan documents, which could include charging

8    default interest."

9         The Court was also provided with something of an

10   account reconciliation at Exhibit HH, showing apparently that

11   the B note was not paid by Midland starting with the April 2013

12   payment through September of 2014, but the payments resumed in

13   October of 2014.  The noteholder has consistently asserted that

14   the B note went into default in July of 2013 causing a cross-

15   default under the A note.  But based on Exhibit HH, it is

16   unclear how the noteholder came to that conclusion.  The

17   noteholder did concede that the trial record is absent of any

18   writing sent from Midland or any other party in connection with

19   the CDC loan that CDC was notified in or around July of 2013

20   that Note A or Note B had gone into default.

21        The noteholder referred the Court to the paid

22   histories in Exhibits 111 and 112 with respect to defaults

23   under Note A and Note B.  But with respect to the A note,

24   Exhibit 111 appears to show that the A note continued to

25   receive payments through May of 2016; but more importantly,

1   that the principal balance of the A note was continuing to

2   decrease each month as payments were being made.  There's no

3   indication that the accrual of default interest in Exhibit 111

4   from a date nearly as early as July of 2013 or even to May of

5   2014.

6           Similarly, the B notes paid history of Exhibit 112

7   indicates that CDC plan payments were being made through the

8   May 2014 principal with interest through the May 2014 payment.

9   And, again, principal is decreasing after each payment was

10  made, indicating that default interest on the B note was not

11  charged prior to May of 2014.

12          Both of those pay exhibits, 111 and 112, do appear to

13  include advances that Mr. (indiscernible) would testify to at

14  his deposition at docket 296, that Midland was making certain

15  advances on account of the CDC and its obligations under the

16  plan started sometime in 2013.  Those advances appear to

17  aggregate $1.08 million and appear to be reflected in Exhibits

18  156 and 152.

19          The paid histories, going back to Exhibits 111 and

20  112, appear to state that the current interest rate on the A

21  note of 5.45 percent, which is specified on the paid history,

22  was the rate being charged as of July 1, 2016, appearing to at

23  least indicate, as the debtor argued, that the A note was not

24  actually being charged default interest prior to July of 2016.

25  Similarly, the B note history shows the current interest rate

1   stated at 12.75 percent as being carried on the B note at least

2   as of the last payment date of May 1, 2014.

3            As if that series of information of the trial record

4   weren't adequately confusing, Midland sent a default notice on

5   September 4th of 2015 stating that the A note and the B note

6   both went into monetary default on September 1st of 2015.

7   That's Exhibit 80.  The debtors have consistently argued on

8   this point that, as I stated, their assertion that the claims

9   in these cases are overstated by the noteholders, number one;

10  and number two, that Midland had the ability through the

11  management of the debtor's cash to have precluded either note

12  from having gone into monetary default based upon Midland's

13  decision whether to fund reserves and sub-account reserves or

14  make plan note payments.

15           The debtors have argued that there was always

16  adequate cash to make the note payments, but that Midland

17  instead chose at some time to cause a plan payment default by

18  funding sub-reserve accounts rather than making plan payments.

19  The debtors refer to a series of bank statements that were

20  provided in the record.  And, again, no forensic account of the

21  analysis was provided to the Court for the reasons I've already

22  outlined.

23           The Court -- this Court was not able to reconcile all

24  of these raw bits of data to make a final determination of how

25  much the noteholder was actually owed as of the petition date.

1    That, as I'm sure you all know, is typically provided through

2    accounting forensic analysis with both sides bringing experts

3    who will go through the bank statements, go through the paid

4    histories, express their opinions based upon the raw data, and

5    the Court will then reconcile those opinions and the raw data.

6    But as I've stated for the last several minutes, the Court has

7    attempted to do so by analyzing what was included in the trial

8    record.

9         But for this Court to make a specific determination

10   of the date or dates upon which the A note and B note went into

11   default and then calculate the precise amount owing to the

12   noteholder as the petition date, is one not an available

13   exercise based upon the record created; but, more importantly,

14   not necessary for the ultimate conclusions that I've reached

15   that these cases will be dismissed.

16        There is no doubt though, based upon the trial record

17   including the prepetition foreclosure notice, which is at

18   Exhibit 3, that at least $33 million was owed to the noteholder

19   at the petition dates; and that if the properties were worth

20   more than $33 million at the petition dates, the noteholder was

21   over secured, but the debts continued to accrue interest at the

22   default rate post-petition, plus attorney's fees and other

23   reasonable charges.

24        The debtors have never contended that the notes were

25   not in default as of the petition date or entitled to post-

1                              I N D E X

2

3                              RULINGS

4                                        Page        Line

5

6     Bankruptcy Cases Dismissed          11          11

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                C E R T I F I C A T I O N

 2


 3        I, Sonya Ledanski Hyde, certified that the foregoing

 4    transcript is a true and accurate record of the proceedings.

 5
```

**Sonya Ledanski Hyde**

Digitally signed by Sonya Ledanski
Hyde
DN: cn=Sonya Ledanski Hyde, o, ou,
email=digital1@veritext.com, c=US
Date: 2017.10.04 17:05:16 -04'00'

```
 8    Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  October 4, 2017
```