# Exhibit 7



REDACTED



REDACTED

**From:** Charles Shigley [mailto:cshigley@alcourt.com]
**Sent:** Tuesday, November 28, 2017 4:38 PM
**To:** Scott Switzer <scott@snsll.com>
**Cc:** Ernie Velton <ErnieV@jshproperties.com>; Jennifer Bell <jenniferb@jshproperties.com>; Alan Feld (afeld@sheppardmullin.com) <afeld@sheppardmullin.com>
**Subject:** RE: October operating report

Mr. Switzer,

As you know the bankruptcy case has been dismissed and Olympia Office LLC and its affiliates are not parties to the state court receivership action. Your request should be directed to Alan Feld, counsel for the party that instituted the receivership action.

Chuck Shigley
Alston, Courtnage & Bassetti LLP
1420 Fifth Avenue, Suite 3650
Seattle, WA 98101-4011
Direct: 206-802-2161
Main: 206-623-7600
email: cshigley@alcourt.com

CONFIDENTIALITY NOTE: This email and any attachments are confidential and may be protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of this email or any attachment is prohibited. Neither this message nor any information contained in this message may be posted to any social networking site (e.g. Facebook, Myspace), blog or internet site. If you have received this email in error, please notify us immediately by returning it to the sender and delete this copy from your system. Thank you for your cooperation.

IRS CIRCULAR 230 DISCLOSURE: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing or recommending to another party any transaction or matter addressed herein.

Begin forwarded message:

**From:** Scott Switzer <scott@snsll.com>
**Date:** November 27, 2017 at 8:58:35 PM PST
**To:** Ernie Velton <ErnieV@jshproperties.com>, Jennifer Bell <jenniferb@jshproperties.com>
**Cc:** Kazu Yamaguchi <Kazu@snsll.com>
**Subject: October operating report**

Hi Ernie and Jennifer:

We have not seen the October operating statements. Would you please send them to me.

Thanks,

Scott

Scott G. Switzer | C.E.O. | Superior Note Solutions, LLC
scott@snsll.com | p: +1.**206.972.6050** | f: +1.425.698.1866
10900 NE 4ᵗʰ Street, Suite 2300 I Bellevue, WA 98004
CONFIDENTIALITY NOTICE: This electronic mail transmission may contain legally privileged, confidential information belonging to the sender. The information is intended only for the use of the individual or entity named above. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking any action based on the contents of this electronic mail is strictly prohibited. If you have received this electronic mail in error, please contact sender and delete all copies.

# Exhibit 8



REDACTED

**From:** Scott Switzer <scott@snsll.com>
**Date:** September 28, 2017 at 10:25:37 PM PDT
**To:** Ernie Velton <ErnieV@jshproperties.com>, Jennifer Bell <jenniferb@jshproperties.com>
**Cc:** Michael Pilevsky <mpilevsky@pihc.com>, Kazu Yamaguchi <Kazu@snsll.com>
**Subject: Changes in Status**

Good evening Ernie and Jennifer:

The were two significant events that happened today related to our properties.

First, the Moses Lake property sale closed today. I assume you know as you would have been involved in final cut off of services. As it was a bit of a slog the last few days, it did in fact close today, so it is offically off the books.

The second event was that in a hearing in court today the Judge dismissed the bankruptcy case related to our companies.

That means that you are now employed solely by our companies. The employment agreement approved by Judge Trust is now null and void and the Court and our lender now have no jurisdiction or input into our operations. The court is gone. Midland has no right to speak with you except as authorized by us.

I would propose that we speak tomorrow to discuss a new management agreement.

1

Please do not for at least the next few days communicate anything about the properties to Midland or their attorneys.

Do not transfer or pay any funds from the properties' accounts to them.

We will be meeting with Midland in the near future to discuss how we will work together. Until that time do not communicate with them about our properties. Do not give them any funds.

Thanks,

Scott Switzer
COO
WA Properties, LLC

Get Outlook for Android

Attention: This message is sent by a law firm and may contain information that is privileged or confidential. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

# Exhibit 9

# Merrill Lynch Mortgage Trust 2005-MCP1 (A Note)
# Mezz Cap Commercial Mortgage 2004-C2 (B Note)

## Foreclosure Bid Case and REO Business Plan





5000 Capitol – Ins Commission    645 Woodland Sq – Dept of Licensing    Lacey Prudential






Wenatchee 2-DSHS Dept.    Moses Lake-Vacant    Seattle West-Licensing Dept

637 Woodland Sq-Dept of Corrections    629 Woodland Sq-Vacant    640 Woodland Sq-DSHS Dept.

---

**CDC Properties I, LLC**
**9 Office Buildings**
**Various Locations**
**Lacey, Tumwater, Wenatchee, Seattle, and**
**Moses Lake, Washington**

---

**MLS Loan No. 030243254**
Merrill Lynch Mortgage Trust 2005-MCP1
Wells Fargo Bank, National Association, as Trustee
Midland Loan Services, a division of PNC Bank, National Association, as Primary & Master Servicer
Midland Loan Services, a division of PNC Bank, National Association, as Special Servicer
Sutherland Asset I, LLC c/o Waterfall Asset Management, as Controlling Class Representative

**MLS Loan No. 030264594**
Mezz Cap commercial Mortgage 2004-C2
LaSalle Bank, National Association, as Trustee
Wells Fargo Bank, National Association, as Master Servicer
Midland Loan Services, a division of PNC Bank, National Association, as Special Servicer
Mezz Cap, as Controlling Class Representative

Prepared By: David Bornheimer
Date: October 13, 2016

## CDC Properties I Collateral List

### CDC Properties I LLC, (collectively "Properties")

Attorney General Building
629 Woodland Square Loop
Lacey, WA  98503

Department of Corrections Building
637 Woodland Square Loop SE
Lacey, WA  98503

Department of Licensing Building
645 Woodland Square Loop SE
Lacey, WA  98503

Seattle West
8830 25th Avenue SW
Seattle, WA  98106

5000 Capitol Building
5000 Capitol Blvd.
Tumwater, WA  98502

Lacey Prudential
4565 7th Avenue
Lacey, WA  98503

Lacey-DSHS
640 Woodland Square Loop SE
Lacey, WA  98503

Moses Lake Building
1620 Pioneer Way
Moses Lake, WA  98837

Wenatchee Bldg #2
805 S. Mission Street
Wenatchee, WA  98801

## EXECUTIVE SUMMARY:

Midland is recommending to complete the nonjudicial foreclosure of the nine collateral Properties for the subject loan that total 318,055 sf. CDC Properties I, LLC ("Borrower" or "Reorganized Debtor") filed Ch. 11 BK on 2/10/11. The A Note and B Note (together "Notes") were modified pursuant to an approved BK Plan on 11/22/11. The Reorganized Debtor monetarily defaulted on both Notes. A workout with the Reorganized Debtor was unsuccessful so JSH Properties, Inc. was appointed Custodial Receiver on 5/19/16. Prior to the foreclosure sale, Midland will transfer the loan from the trust to MLMT 2005-MCP1 Washington Office Properties, LLC ("REO Entity"), a SPE entity created to hold title to the subject Properties with the trust as the sole member and Midland as the manager. The REO Entity will bid up to the appraised value for each individual property as detailed in the Recommendation Section of this proposal at the foreclosure sales which are scheduled to occur on 10/21/16. If the REO Entity is the winning bidder at the foreclosure sales, the REO Entity will engage JSH Properties, Inc. as the property manager and leasing agent for the Properties. The REO Business Plan is to continue leasing efforts over the next 6 months to attempt to increase occupancy prior to sale of the Properties. Midland will consider sales of the Properties in outlying areas that are not expected to bring value to a larger portfolio sale. Hyun J. Um, the carve-out ("Guarantor") filed for Ch. 11 BK in 2010 and had a plan approved in 2015 that extinguished any claim by the noteholders of both Notes. No further legal action will be taken against the Borrower or Guarantor.

## ASSET BACKGROUND / UPDATE:

The $40,700,000 A Note and $2,557,500 B Note were originated September 29, 2004 by Merrill Lynch Mortgage Lending, Inc. to CDC Properties I, LLC, to refinance existing debt. The Borrower is comprised of CDC Acquisition Company I, LLC, which is owned by Tom Price and Hyun Um, two Seattle area real estate investors. The Notes were originally scheduled to mature 10/1/14, however, the maturity date for the Notes was modified to 10/17/17 pursuant to a bankruptcy plan.

| LOAN DATA | | A Note | | B Note |
|---|---|---|---|---|
| Original Loan Amount | | $40,700,000 | | $2,557,500 |
| Current Loan Balance | | $30,556,354 | | $2,505,366 |
| Interest Rate | | 5.45% | | 12.75% |
| P&I Payment | | $229,814.95 | | $27,792.18 |
| Next Due | | 7/1/2016 | | 6/1/2014 |
| Origination Date | | 9/29/2004 | | 9/29/2004 |
| Maturity Date | | 10/17/2017 | | 10/17/2017 |
| Percentage of Portfolio | | 51.93% of $58,663,944 | | NA |
| Loan to Portfolio Rank | | 1 of 6 | | NA |
| Escrows | $ | (57,436) | $ | - |
| NOI 8/31/16 | $ | 1,635,753 | $ | 1,635,753 |
| Portfolio Occupancy 10/1/16 | | 78.1% | | 78.1% |
| DSCR-NOI (8/2016 ytd) | | 0.59 | | 0.53 |
| DSCR-NCF (2016 ytd) | | 0.48 | | 0.43 |

*All reserve and escrow funds have been swept and applied
**Midland does not have Trepp access for the Mezz Cap 2004-C2 portfolio to determine portfolio rank details.

## Borrower and Guarantor:

The Borrower is CDC Properties I, LLC, having CDC Acquisition Company I, LLC, as sole member, which is owned by principals Tom Price and Hyun Um, two Seattle area real estate investors who own Prium Companies. During the 2001-2005 period, Prium Companies acquired several portfolios of office buildings in Metro Seattle and Olympia, Washington with CMBS non-

recourse loans. When the economic downturn occurred in 2009-10, the sponsors defaulted on several debt portfolios, and filed Ch. 11 Bankruptcy. The Borrower acquired the subject Properties from Bob Bloom, with the subject A Note and B Note financing, totaling $43.3 million in 2004. Hyun Um, a Korean investor who solicited investors from the Korean community, is the Guarantor. Due to loss of several tenants and cash flow problems, the Borrower defaulted on the subject loans in 3Q 2010. The Borrower filed Ch. 11 Bankruptcy in February 2011, which triggered full recourse to the Guarantor on the subject loans. Debtor's Reorganization Plan ("Plan") was reviewed and approved by the Court November 22, 2011, simultaneously with Noteholder's Loan Modification closing. The Bankruptcy Trustee oversees the Plan, with a view toward collecting funds equitably for the creditors.

Midland became aware on 9/30/16 that the BK Trustee, Eric Orse, provided quit claim deeds to all nine Properties to the following entities on 9/23/16:

- Seahawk Portfolio, LLC, a Florida limited liability company, as a tenant in common with an undivided 30% interest;
- Mariners Portfolio, LLC, a Virginia limited liability company, as a tenant in common with an undivided 10% interest;
- WA Portfolio, LLC, a Delaware limited liability company, as a tenant in common with an undivided 30% interest;
- Olympia Office, LLC, a New York limited liability company, as a tenant in common with an undivided 30% interest;

Midland and its outside counsel are investigating the reason for the ownership transfer. The BK Trustee did not timely respond so Midland's outside counsel has noticed Mr. Orse for a deposition on 10/13/16. At this time it is not clear what, if any, compensation was paid to the BK Trustee for the Properties. The Receiver noted it has been contacted by Scott Switzer, a known local investor, requesting financial information and access to the Properties to conduct appraisals. Outside counsel has noted there was no court approval necessary for the transfer of the CDC properties, because CDC is not a debtor in bankruptcy (which would require court approval). The Trustee controls CDC by virtue of being the trustee of the Prium Companies, LLC, its manager. Under CDC's bankruptcy plan from 2011 (when it was a debtor), CDC is permitted to sell or transfer the properties, if the sale or transfer generates sufficient return to pay all creditors in full - so at a minimum, the transfer was contrary to what was allowed under the bankruptcy plan.

### Chapter 11 Bankruptcy

The Borrower had placed mezzanine debt on the collateral Properties with Equity Funding, LLC (d/b/a Centrum Financial Services), on which it defaulted in 2010. Equity Funding filed action against the Borrower. In response, the Borrower filed Ch. 11 Bankruptcy on February 10, 2011, and the loan was transferred to Special Servicing. After completing negotiations with creditors, the Borrower submitted its Plan of Reorganization ("Plan") in mid-2011. The Plan was approved by the creditors and entered into the Bankruptcy Court November 22, 2011. The Special Servicer obtained approval for a Loan Modification, with the same terms approved in the Plan. The Modification closed November 22, 2011, with the following terms:

### Debtor Plan-Loan Modification:

- Maturity Dates-A Note & B Note: Extended to November 17, 2017
- Prepayment: Prepayable at par, without premium, at any time
- Loan Modification & Bankruptcy related legal costs & fees ($549K) payment approved
- Class 1 & 2 Claims approved: $6,000,000 – Equity Funding claims & Bingo claim
- Class 3 Claim approved: $36,311,191 – Wells Fargo Bank, Trustee-A Note

- Class 4 Claim approved: $2,533,530, plus $361,298 Accumulated P&I Payments owing (13 pmts 10/2010-10/2011)– LaSalle Bank, Trustee-B Note
- Class 5 Claim approved: $150,000 – Unsecured Creditors
- Class 6 Claim approved: Equity Interests – Retained by Equity Funding.
- Debtor to make required payments property revenues & operating cash
- Debtor may sell or refinance the Properties, or any component thereof, provided that net sale or refinance proceeds are sufficient to repay Class 1-5 claims
- Trustee shall ensure all distributions are accomplished per the Plan

**Debtor Plan-Lock Box-Cash Management Modification**:
The Lock Box-Cash Management Agreement established at loan origination remained in place, subject to the following changes in the monthly Waterfall requirements:

a) Reserves: taxes, insurance; property operating expenses; administrative expenses-bank fees
b) Replacement Reserve; Re-letting Reserve
c) A Note Debt Service
d) B Note Debt Service
e) Class 5 Claim Payments: three payments of $50K – 01/12, 07/12, & 01/13
f) Misc. Reserve: Repayment of funds withdrawn for modification & bankruptcy legal fees
g) Accumulated B Note interest payments of $361,298.34 (*)
h) Class 6 Claim-Settlement Amount for Equity Funding & Bingo Lawsuit (*)
i) Remaining funds: to Debtor (*)
   *From available cash flow only

Upon closing of the Loan Modification and collection of three timely, consecutive loan payments, the Loan was returned to the Master Servicer.

**Current Special Servicing:**
The loan transferred back to the Special Servicer on April 15, 2013, due to payment default, when B Note payments became past due. Between 2012 and 2014, various State agency tenants missed rent payments on 6 different occasions, causing short term delinquency. In each case, however, the tenants made two rent payments the next month to catch up. In addition, over $160K in Property Protection Advances (appraisals, Phase I and PCA Reports, and legal expenses) and $150,000 in Class 5 creditor payments during 2012 and 2013 also reduced Net Cash Flow. The Special Servicer issued a Notice of Default for the B Note effective June 1, 2014. Per the Intercreditor Agreement, this caused a non-monetary default on the A Note. Special Servicer continued to process monthly Waterfalls, posting funds to escrows, reserves, A Note and B Note payments, and releasing operating expenses to Borrower.

On September 1, 2015, the Borrower missed the A Note payment, and a Notice of Default and Demand was issued. The delinquency was caused by two large tenant vacancies that decreased NOI. The Special Servicer directed outside counsel to engage a Successor Trustee, Schweet Linde, to file for non-judicial foreclosure. The Title Sale Guarantee has been received for each Property and Notice of Trustee's Sale were recorded for each Property on 7/5/16. The Borrower has until 10/16/16 to reinstate the loan to cause a discontinuance of the sale. The foreclosure sale is currently scheduled for 10/21/16.

**PROPERTY INFORMATION**
The portfolio collateral originally consisted of 11 Class B office buildings, built from 1973 through 2001, totaling 338,855 RSF, located in five markets throughout Washington: 1) Lacey-Tumwater (Olympia): 6-low rise and mid-rise office buildings (254,761 RSF); 2) Wenatchee: 2-1 story office buildings (39,183 RSF); 3) Moses Lake: 1-1 story building (25,307 RSF); 4) West Seattle:

1-1 story building 9,604 RSF), and 5) Chehalis: 1-1 story building (10,000 RSF). Of the 11 buildings, 7 were single tenant and 4 were multi-tenant. All buildings were primarily leased to State of Washington agencies – with leases averaging 5-year terms.

The Chehalis 1 office building located at 2025 NE Kresky Ave, Chehalis, WA, (10,000 RSF) was sold on 6/22/06 for $1,200,000 and a partial release of the collateral was approved. Net sale proceeds of $1,103,490 were wired to the Master Servicer and funds were held in a Miscellaneous Reserve account, established April 28, 2006; such reserve funds have since been applied per the loan documents and BK order.

The Wenatchee I office building located at 215 Bridge St., Wenatchee, WA, (10,800 RSF) was sold on 1/8/16 for $1,250,000 and a partial release of the collateral was approved. Net sale proceeds of $1,171,159 were wired to the Master Servicer and applied to the A Note as a principal curtailment per the loan documents.

The remaining collateral consists of nine office buildings (318,055 RSF), with 78.1% overall occupancy as of 10/1/16. The buildings were built between 1973 and 2001. The buildings range from Class C 1-story properties to Class A- mid-rise properties; with most being Class B, built in the 1980's. Six buildings are single tenant; three are multi-tenant. All tenants are State of Washington agencies and most are on 5-year leases. Average in-place rent is $17.18/sf modified gross, with tenants paying own utilities and janitorial for leased premises. The exception to the lease structure is the Employment Security Department's recent lease renewal for 82,149 sf at the Lacey DSHS building where the borrower negotiated a full service lease with the landlord paying all expenses including utilities and janitorial. The chart below details the remaining loan collateral:

| Property | Address | City | ST | Built | NRSF | Occup % | Descrip. | Suites | Major Tenants |
|---|---|---|---|---|---|---|---|---|---|
| Attorney General Building | 629 Woodland Square Loop SE | Lacey | WA | 1985 | 33,269 | 0.0% | Cl B, 4 story | 3 | Vacant |
| 5000 Capital Building | 5000 Capital Blvd. | Tumwater | WA | 1973 | 48,080 | 100.0% | Cl C, 2 story | 1 | Insurance Commissioner (100%) |
| Dept. of Corrections Building | 637 Woodland Square Loop SE | Lacey | WA | 1988 | 18,104 | 100.0% | Cl B, 2 story | 1 | Dept of Corrections (100%) |
| Dept. of Licensing Building | 645 Woodland Square Loop SE | Lacey | WA | 1985 | 5,746 | 100.0% | Cl B, 1 story | 1 | Dept of Licensing (100%) |
| Lacey Prudential | 4565 7th Ave SE | Lacey | WA | 2001 | 86,596 | 87.6% | Cl A-, 4 story | 9 | Gambling Commission (54.2%) |
| Lacey DSHS | 640 Woodland Square Loop SE | Lacey | WA | 2000 | 84,966 | 96.7% | Cl A-, 4 story | 3 | Employment Security (83%) |
| Moses Lake Building | 1620 Pioneer Way | Moses Lake | WA | 1980 | 25,307 | 0.0% | Cl B-, 1 story | 1 | Vacant |
| Seattle West | 8830 25th Ave, SW | Seattle | WA | 1977 | 9,604 | 100.0% | Cl C, 1 story | 1 | Dept of Licensing (100%) |
| Wenatchee Building #2 | 805 S. Mission St. | Wenatchee | WA | 1988 | 28,383 | 100.0% | Cl B, 1 story | 1 | DSHS (100%) |
| Totals | | | | | 318,055 | 78.1% | | 21 | |

*Lacey Prudential: Gambling Commission will be vacating its 42,745 sf space at lease exp of 2/28/17 which will decrease the portfolio occupancy to 64.7%.

JSH Properties, Inc. was appointed Custodial Receiver ("Receiver") of the nine collateral Properties on 5/19/16. The Receiver discovered that the Properties had generally been neglected by the Borrower. Below is a summary of the capital needs identified by the receiver.

- Attorney General Building: Heat pumps, boiler, and cooling tower replacement. The last full time tenant in the building was ten years ago and the HVAC system has not been maintained. The system is in disrepair and will need replaced to heat the building. The receiver has estimated $800,000 to replace the system. As an alternative, the receiver will purchase oil filled heaters and box fans to provide freeze protection until a tenant is found to occupy the building.
- Department of Licensing Building and Attorney General Building: The parking lot is shared between the buildings and it floods with heavy rains which has caused significant asphalt damage. The Receiver has cleared the drain lines and will monitor for future flooding to determine if drain lines need replaced. Once the flooding issue resolution is

confirmed the asphalt will be repaired as required under the Department of Licensing lease. Estimated cost $250,000.

- Lacey DSHS: The roof is leaking in the vacant area and has caused mold. The Receiver is replacing the lower roof and remediating the mold damage at an estimated cost of $600,000.
- Moses Lake: The roof is in need of replacement, cost to replace is $165,000. The receiver has a tenant prospect for this building. If a lease is signed the Receiver will replace the roof but, if not, the roof will be patched to extend the life through the winter until a tenant is found to occupy the building.
- Seattle West: Landscaping was overgrown and attracting homeless people; the Receiver cleaned up the landscaping.
- Wenatchee II: The roof is in need of replacement, which the Receiver is in the process of replacing at an estimated cost of $185,000.

The Receiver's June 2016-December 2016 budget includes the following which total $3,846,460. The projects are underway and projected to be completed by year end or early 1Q 2017:

- TIs: $360,000 for the Employment Security Department lease renewal for 82,149 sf at the Lacey DSHS building;
- LCs: $276,880 for the Employment Security Department and Insurance Commission lease renewals;
- Landlord Work: $1,592,843 for building repairs required under the Employment Security Department and Insurance Commission lease renewals;
- Immediate building improvements: $778,242;
- The remainder of the large HVAC, parking lot, and plumbing expenses of $838,495 are included in the Receiver's budgeted R&M.

The Receiver's budget also includes additional R&M of $4.82/sf and building engineer costs of $1.47/sf; total $6.29/sf. Midland expects these expenses to come down closer to IREM standards in 2017 and 2018 which is under $2/sf once the capital items are remediated and buildings are stabilized.

**Leasing Update:**

- Moses Lake Building: The DSHS tenant vacated its 25,307 RSF space at expiration on July 31, 2015 with a loss of $367K/yr of base rent.
- Seattle West: The Department of Licensing signed a lease with the Borrower for 9,604 sf on 12/22/15 at a rental rate of $21.80/sf.
- 5000 Capitol Building: The Receiver signed a five year lease extension with the Office of the Insurance Commissioner for 46,080 sf dated 6/7/16 at a rental rate of $18.41/sf. The TI allowance provided by the landlord was $4.12/sf.
- Department of Licensing Building: The Receiver is in negotiations to extend the 5,746 sf lease with Department of Licensing for five years which is scheduled to expire 1/31/18.
- Lacey DSHS: The Receiver signed a five year lease extension with the Employment Security Department for 70,449 sf dated 6/7/16 at a rental rate of $19.40/sf. The TI allowance provided by the landlord was $5.11/sf, additionally the landlord committed to certain building improvements of $19.10/sf. The landlord pays utilities and janitorial under this new lease, which was negotiated by the Reorganized Debtor and contrary to the other State agency lease structures.
- Lacey Prudential: Four leasing issues 1) The Receiver executed a six month lease extension dated 6/20/16 with the Gambling Commission for 42,745 sf which expires 2/28/17. The tenant has provided notice that it will be vacating during this extension

period. 2) The Receiver is in negotiations to extend the 10,124 sf lease with DSHS for five years which is scheduled to expire 9/30/16. 3) The Receiver is in negotiations to extend the 5,495 sf lease with Department of Services for the Blind for five years which is scheduled to expire 9/30/16. 4) The Receiver is negotiating a LOI with US Healthvest for 100% of the building for a 30 year lease for a mental hospital use which will require usage changes. The Receiver is in discussions with the city regarding the use and will wait to extend the DSHS and Services for the Blind until additional due diligence is completed with US Healthvest.

- Wenatchee Building 2: The Receiver is in negotiations to extend the 28,383 sf lease with the Department of Social and Health Services for five years which is scheduled to expire 11/30/18.

## Taxes:

Taxes are current and next due 10/31/16. Midland will advance $217,206.93 to pay the taxes prior to the 10/31/16 due date. In addition, Midland will review the taxes to determine any appeals for reductions are appropriate.

## Insurance:

The Receiver bound acceptable property and liability coverage for Properties for the period 9/29/16-9/29/17; the annual premium paid was $42,967.

## Environmental Reports:

The PSA requires an environmental assessment within six months of taking title to a mortgaged property. Midland obtained Phase I Environmental Site Assessments from Partner Engineering & Science, Inc. dated 6/28/16 for all nine collateral Properties. The reports were reviewed and opined on by McRoberts & Associates, P.C. on 8/18/16. McRoberts found that the mortgaged Properties are in compliance with applicable environmental laws and no additional investigation is recommended. The items below were noted in the reports:

- O&M Plans for ACM recommended for 5000 Capitol Blvd, Moses Lake, and Seattle West. Midland will obtain the recommended O&M Plans post foreclosure.
- 5000 Capitol Blvd: Property is located over deep groundwater which has been impacted by various solvent contaminants attributed to offsite properties. Groundwater monitoring wells are located at and near the property which are being monitored and area-wide groundwater remedial activities are being performed under US EPA oversight as part of the Palermo Well Field Superfund project. The onsite and offsite groundwater impacts are not anticipated to pose a material risk to human health. The Phase I report recommended no other actions, other than continued cooperation with regulatory officials to permit access to the onsite monitoring wells as part of ongoing groundwater remedial activities.

## COLLATERAL VALUATION:

|  | Appraisal (Draft) | JSH BOV | HFF BOV | SS Concluded |
|---|---|---|---|---|
| "As-Is" | $32,960,000 | $28,500,000 | $25,360,000 | $26,375,000 |
| "As-Stabilized" | $39,520,000 | $30,310,000 | $33,750,000 | $32,800,000 |
| Liquidation | $26,540,000 |  |  |  |

## Appraised Value:

Updated appraisals on all portfolio Properties were obtained from Butler Burgher Group dated 9/20/16 and are still in draft form. The draft appraisals conclude total as-is value of $32,960,000 ($104/sf) and stabilized value of $39,520,000 ($124/sf). Several errors and questionable items

were noted in the draft appraisals. Midland anticipates a slight downward adjustments in the values once finalized. The as-is value has decreased from the 1/15/16 Cushman & Wakefield conclusion of $38,075,000 ($120/sf). The decrease in value is attributed to occupancy decreases under the management of the Reorganized Debtor from 86.4% to the current occupancy of 78.1% which will further decrease to 64.7% after the Gambling Commission vacates in February 2017 which was factored into the update appraisals.

The appraiser concluded portfolio rents of $17.50/sf and vacancy of 10%. The majority of the leases are modified gross with the tenant paying janitorial and utility expenses directly and the landlord paying the remaining operating expenses. The appraiser included full janitorial and utility expenses with a reimbursement off-set to income to account for the lease structures. Total operating expenses are $6.22/sf which is significant reduction from the Receiver's budget of $11.12/sf primarily due to R&M expenses that include significant HVAC and parking lot repairs. In addition, the Properties are currently carrying significant building engineer costs. These expenses are projected to decrease more in-line with IREM levels once the immediate repairs are corrected. The appraiser concluded a combined NOI of $3,705,863 and blended cap rate of 9.31%. The stabilized value was reduced by rent loss, TI/LC, and capital costs which total $5.9MM. TIs range from $15-$30/sf depending on the condition of the space and class of the building. The chart below details the appraised values for each property:

| CDC Properties Port Property | As of 8/3/16 Occup | Size (RSF) | Allocation % | Cur. Allocated Loan Amount | Sep-16 As Is Value | PSF | Stab Value | PSF | Stab NOI | Cap Rate | Liquid Value |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Attorney General Bldg | 0.0% | 33,269 | 10.84% | $3,583,173 | $1,000,000 | $30 | $3,800,000 | $114 | $360,717 | 9.50% | $800,000 |
| Dept of Licensing | 100.0% | 5,746 | 1.84% | $608,383 | $970,000 | $169 | $970,000 | $169 | $82,743 | 8.50% | $780,000 |
| Dept of Corrections | 100.0% | 18,104 | 4.70% | $1,554,946 | $2,680,000 | $148 | $2,680,000 | $148 | $227,859 | 8.50% | $2,140,000 |
| Dept. of Insur. Comm. | 100.0% | 46,080 | 14.11% | $4,664,838 | $5,780,000 | $125 | $6,000,000 | $130 | $538,000 | 9.00% | $4,800,000 |
| Lacey Prudential | 87.6% | 66,596 | 22.50% | $7,437,400 | $6,330,000 | $95 | $7,700,000 | $116 | $703,360 | 9.50% | $5,060,000 |
| Lacey DSHS | 96.7% | 84,966 | 29.04% | $9,600,729 | $10,450,000 | $123 | $11,270,000 | $133 | $1,115,196 | 9.50% | $8,360,000 |
| Moses Lake-Dept DSHS | 0.0% | 25,307 | 5.73% | $1,893,126 | $650,000 | $26 | $2,000,000 | $79 | $183,503 | 9.50% | $520,000 |
| Wenatchee 2 | 100.0% | 28,383 | 7.77% | $2,569,485 | $3,600,000 | $127 | $3,600,000 | $127 | $353,411 | 9.50% | $2,880,000 |
| Seattle West | 100.0% | 9,604 | 3.48% | $1,149,640 | $1,500,000 | $156 | $1,500,000 | $156 | $137,580 | 9.00% | $1,200,000 |
| Total | 78.1% | 318,055 | 100.00% | $33,061,720 | $32,960,000 | $104 | $39,520,000 | $124 | $3,702,369 | 9.37% | $26,540,000 |

## Broker Opinions of Value:

### JSH Properties, Inc.

Midland obtained a BOV dated 7/29/16 and updated on 10/10/16 from JSH Properties, Inc. who is the current property manager and leasing agent for the Receiver. JSH valued the portfolio at $28,500,000 ($90/sf) which is based on individual property valuations. JSH concluded portfolio rents of $15.74/sf and a 4% vacancy rate; no vacancy reduction was included for the 100% occupied single tenant properties, the broker noted any vacancy loss is captured in the cap rate. JSH based its proforma on the operations and did not include an income set-off for the tenant paid operating expenses under the MG leases. JSH concluded operating expenses of $8.42/sf than includes significant R&M of $3.38/sf and engineer costs of $0.89/sf to conclude NOI of $2,332,103. The broker capped the NOI at a blended rate of 7.69%. The stabilized value was reduced by rent loss, TI/LC, and capital costs which total $6.8MM. TIs are projected at $30/sf. Midland is in discussions with the broker about the high operating expense conclusions, low vacancy rate, and low cap rate projections. The broker expects a 15% discount for a portfolio sale of $24,225,000 ($77/sf).

JSH recommends selling the portfolio in several stages:
- 5000 Capitol sell immediately. Property is 100% occupied and the State is pressuring the tenant to move to its campus.

- Seattle West sell immediately. Property is 100% occupied and a geographic outlier in Seattle.
- Moses Lake sell immediately. Property has been vacant for a long time and is a geographic outlier. If no buyer is found include in final portfolio sale.
- Wenatchee 2 sell immediately. Property is 100% occupied and a geographic outlier.
- Remaining properties as a Lacy portfolio or break-up into smaller Lacy portfolios.

### *HFF*
Midland obtained a BOV dated 7/22/16. HFF valued the portfolio at $25,360,000 ($80/sf) which is based on individual sales for Moses Lake ($840K), 5000 Capitol ($5.45MM) Seattle West ($1.43MM), Wenatchee 2 ($2.04MM), and the Lacy portfolio ($15.6MM). The total concluded NOI is $3,560,385 capped at a blended 10.55% cap rate and reduced by $5.4MM in stabilization costs. It is noted that HFF concluded op ex at $7.08/sf which includes R&M of $1.69/sf which is more in-line with IREM.

HFF also provided a note sale proposal with an expected note sale trade range of $23,290,000 - $26,500,000 with a midpoint of $24,840,000 ($78/sf).

### *Mission Capital*
Midland obtained a note sale proposal from Mission Capital on 7/27/16 that concluded Property values of $30,057,000 ($94.50/sf) and a note sale trade range of $26,288,000 - $28,602,000 with a midpoint of $27,500,000 ($84.50/sf).

### Special Servicer Value
Midland determined an as-is value of $26,375,000 ($83/sf) and stabilized value of $32,800,000 ($103/sf) for the portfolio. The Special Servicer value is based on stabilized NOI of $3,034,591 capped at a blended 9.25% cap rate and reduced by $6.4MM of stabilization costs and rent loss. Midland concludes in-place rents at the current levels and vacant space at market levels for total $16.29/sf. Reimbursements are included to off-set the janitorial and utility expenses which are paid directly by the tenants. A 10.2% blended vacancy rate is concluded. Taxes and insurance are per the current invoices and the management fee is 3.5%. Total operating expenses are $6.65/sf which includes R&M of $1.75/sf.

### RECOMMENDATION:
Conduct nine foreclosure auctions at the scheduled foreclosure sale through the substitute trustee. Counsel has advised that separate sales will be required for each collateralized Property with separate bids for each sale. Midland will bid the current draft appraised value of each Property at the foreclosure sales. Counsel has advised to enter in the top bid for each Property, there is no benefit for a low bid price such as setting deficiencies or any transfer type taxes. Below is the bid schedule:

| Property | Property Address | Occup | Size (RSF) | As Is Value |
|---|---|---|---|---|
| Attorney General Bldg | 629 Woodland Sq Loop, Lacey, WA | 0.0% | 33,269 | $1,000,000 |
| Dept of Licensing | 645 Woodland Sq Loop, Lacey, WA | 100.0% | 5,746 | $970,000 |
| Dept of Corrections | 637 Woodland Sq Loop, Lacey, WA | 100.0% | 18,104 | $2,680,000 |
| Dept. of Insur. Comm. | 5000 Capitol Blvd, Tumwater, WA | 100.0% | 46,080 | $5,780,000 |
| Lacey Prudential | 4565 7th Ave, Lacey, WA | 87.6% | 66,596 | $6,330,000 |
| Lacey DSHS | 640 Woodland Sq Loop, Lacey, WA | 96.7% | 84,966 | $10,450,000 |
| Moses Lake-Dept DSHS | 1620 Pioneer Way, Moses Lake, WA | 0.0% | 25,307 | $650,000 |
| Wenatchee 2 | 805 S. Mission St., Wenatchee, WA | 100.0% | 28,383 | $3,600,000 |
| Seattle West | 8830 25th 5ve, SW, Seattle, WA | 100.0% | 9,604 | $1,500,000 |
| Total | Totals | 78.1% | 318,055 | $32,960,000 |

The Borrower and Guarantor have filed BK and the Guarantor has been discharged of its liability under its guaranty so no further collection action will be taken against the Borrower or Guarantor.

The loan documents will be assigned from the trust to MLMT 2005-MCP1 Washington Office Properties, LLC ("REO Entity") prior to the foreclosure sale. The trust is the sole member and Midland is the manager of the REO Entity.

Recommend to engage JSH Properties, Inc. to manage the Properties. JSH was established in 1986 and is based in Bellevue, WA. JSH provides property management, leasing services, and investments sales in the Puget Sound area of Washington. JSH manages over 15 million of sf of retail, office, and industrial space. JSH has been managing the Properties for the Receiver and is currently managing the noted capital projects. The management fee will be 3.25% with a minimum of $1,200 per property per month.

Recommend to engage JSH Properties, Inc. as leasing agent for the Properties. The leasing commission paid to JSH for new leases will be 5% for the first five years and 2.5% thereafter and 2.5% for renewals. The leasing agent has signed lease renewals with several State agencies and is currently negotiating a new lease with US Healthvest for 66,596 sf which is the best opportunity to increase the portfolio value.

The REO Business Plan is to continue leasing efforts over the next 6 months. The Properties had been severely neglected in the market over the past few years. Midland will attempt to increase the occupancy for a short period in an attempt to add value for the trust including pursuit of the US Healthvest lease. During the hold period, Midland will explore sales of the outlier properties such as 5000 Capitol, Moses Lake, Wenatchee II, and Seattle West. Once leasing efforts are concluded or no longer considered fruitful Midland will engage a broker to sell all of the remaining Properties in the most efficient manner to return value to the trust.

Midland prepared an analysis for an as-is sale of the Properties at the appraiser's $32,960,000 value. NCF is projected at the current level with a sharp decrease in period 5 due to the Gambling Commission vacating which is a loss of appx $707,000/yr. However, NCF is projected to gradually increase during the hold period due to operating expense reductions. The analysis includes $3.85MM for immediate needs and TI/LC costs which are in process by the Receiver. The NPV for this scenario is $25,013,500 using the note rate as the discount rate with a loss on the A Note estimated at $4,889,000. As noted in the valuation section, the appraisals are in draft form and will likely have slight downward adjustments. If Midland's concluded value of $26,375,000 is included as the sales price the NPV decreases to $19,044,500. If Midland is able

to sell several of the outlier Properties prior to the final portfolio disposition at or above the appraised value then the NPV will increase.

## RESOLUTION STRATEGIES:

| Strategy | Discount Rate | Net NPV | Go-Forward NPV | Net Loss Est. |
|---|---|---|---|---|
| Recommended Strategy – Foreclose sell 15 months | 5.45% | $25,013,498 | $26,523,134 | $4,889,382 |
| Alternative 1 – Foreclose Stabilize (42 months) | 5.45% | $26,064,106 | $27,573,734 | $3,022,992 |
| Alternative 1 – Foreclose Stabilize (42 months) Market discount rate | 12% | $21,405,479 | $22,915,116 | $3,022,992 |
| Alternative 2 – Note Sale | 5.45% | $19,793,223 | $21,302,860 | $10,206,999 |

*The Go-Forward NPVs include $4.06MM which includes $3.85MM the receiver has incurred or is in the process of incurring but not yet requested an advance from Midland to pay and $217K tax payment that is in the process of being advanced.

### Alternative 1 (Foreclose – Stabilized Sale)
Midland prepared an analysis of a stabilization scenario with a sale in 42 months at the appraiser's stabilized value of $39,520,000. Current operations are projected per scenario 1 with continued lease-up and operating expense reduction over another 27 months. TI/LC costs utilized in the appraiser's lease-up is included. The NPV for this scenario is $26,064,000 with a projected loss of $3MM. The note rate is considered a below market discount rate for the risk associated with lease-up of the portfolio. The appraiser concluded a 10.5% discount rate for the Lacey Prudential building and HFF concluded a 12% return for the Lacey portfolio. A 12% discount rate reduces the NPV to $21,405,000. A 6.75% discount rate results in a NPV equivalent to the NPV of the recommend strategy. The risk of stabilizing all of the properties is greater than a 6.75% discount rate so Midland is not recommending a long term stabilization strategy as the NPV would be lower than the recommended strategy.

### Alternative 2 (Note Sale)
Midland evaluated a note sale which can be completed in 3 months. This scenario captures current operations including the $3.85MM costs the Receiver has incurred and a note sale at $26,170,000 which is the average of the HFF and Mission Capital note sale pricing estimates. The NPV for the note sale alternative is $19,793,000 with a projected loss of $10.2MM. Based on the NPV analysis, Midland did not recommend this strategy.

## COMPLIANCE:
Flood determinations for all nine properties was obtained on 10/13/16, flood insurance is not required for any of the collateral properties. If any Property is sold at foreclosure auction, first obtain an OFAC for remitter of funds if required.

## FAIR VALUE DETERMINATION:
**A Note:** The Special Servicer established a fair value for the A-Note of $31,278,745 on 5/5/16. The fair value is hereby revised to $30,587,000 which is equal to the Go-Forward NPV scenario for the as-is appraised value sale of the Properties plus the $4.06MM of costs the receiver has or is in the process of incurring but has not yet been advanced by the Master Servicer and the tax advance that is currently in process by the Master Servicer; these costs are considered additional sunk costs.

**B Note:** The Special Servicer established a Purchase Price for the B-Note of $3,561,112 on 5/5/16. The Majority Subordinate Certificateholder has an assignable purchase option to

purchase the Defaulted Mortgage Loan from the Trust Fund equal to the Purchase Price of the Defaulted Mortgage Loan (as defined in the PSA), which includes outstanding principal balance, plus a) accrued & unpaid interest on the Loan and on P&I Advances made, b) unreimbursed servicing advances, plus interest on advances, c) reasonable costs and expenses of any enforcement action incurred by the servicer or the Trust Fund regarding any such purchase. The Purchase Price has not substantially changed from the 5/5/16 price so is not required to be updated.

**PSA (MLMT 2005-MCP1)**
3.09 Realization Upon Defaulted Mortgage Loans; Required Appraisals
3.16 Title to REO Property; REO Accounts
3.17 Management of REO Property
3.18 Sale of Defaulted Mortgage Loans and REO Properties
3.20 Modifications, Waivers, Amendments and Consents
6.11(a) The Controlling Class Representative: The Controlling Class Representative is entitled to advise the Special Servicer with respect to the Trust Mortgage Loans and any REO Properties. The Special Servicer shall not be permitted to take any foreclosure or conversion of ownership of properties securing Trust Specially Serviced Mortgage Loans that have come into default if the Controlling Class Representative has objected in writing within 10 Business Days of being notified in writing. If a written objection has not been received by the Special Servicer within such 10 Business Day period, then the Controlling Class Representative's approval will be deemed to have been given.

**PSA (MEZZ CAP 2004 C-2)**
3.09 Realization Upon Defaulted Mortgage Loans
3.16 Title to REO Property; REO Account
3.17 Manage of REO Property
3.18 Resolution of Defaulted Mortgage Loans and REO Properties
6.10 The Controlling Class Representative – The CCR is entitle to advise the Servicer with respect to any foreclosure. The CCR shall have 10 Business Days to object or its approval will be deemed to have been given.

**INTERCREDITOR AGREEMENT**
8(a) Purchase of the A Loan by the B Note Holder: Midland provided the required notice on 2/5/16 and the Trustee for the B Note did not provide notice to exercise the option within the required 30 day period.
16 Modifications; Exercise of Remedies; Servicing: The A Note Holder may in its discretion exercise any rights of the A Note Holder. A Note Holder shall have the sole and exclusive authority with respect to the administration of, and exercise of rights and remedies including instituting any foreclosure action and the B Note Holder shall have n voting, consent, or other rights with respect to the A Note Holder's exercise of its rights and remedies.

**LEGAL DISCUSSION:**
K&L Gates is engaged as legal counsel and has been engaged through the duration of the Borrower and Guarantor Bankruptcy cases. K&L Gates engaged Schweet Linde as Successor Trustee to file for non-judicial foreclosure. Successor Trustee has issued the Notice of Default and Notice of Sale. K&L Gates will oversee the foreclosure sale and advise the Special Servicer during the REO period.

**SUBSTANTIATION:**
- A workout with the Reorganized Debtor was not agreed as they did not have capital to invest in the Properties which deteriorated under their control.

Confidential

- A Receiver has been appointed who is correcting immediate needs and completed several lease renewals to retain existing tenants.
- The Guarantor has been discharged from BK.
- The REO Business Plan is to continue leasing efforts over the near term to determine if additional tenants can be secured to add value to the portfolio before selling the Properties which is supported by the NPV analysis.

## AUTHORIZATION:

**Action:**     Request for Approval on Action or Resolution of Asset
*(Delegation of Authority D-3a, D-4, D-9a)*

**Requested Authority:**

1.  Assignment of the loan documents from the trust to MLMT 2005-MCP1 Washington Office Properties, LLC, a newly formed SPE with the Trust as the sole member and Midland as the manager, prior to foreclosure.

2.  Conduct nine individual foreclosure sales with bid prices at the as-is appraised value pursuant to the current draft appraisals as detailed in the schedule below:

| Property | Property Address | Occup | Size (RSF) | As Is Value |
|---|---|---|---|---|
| Attorney General Bldg | 629 Woodland Sq Loop, Lacey, WA | 0.0% | 33,269 | $1,000,000 |
| Dept of Licensing | 645 Woodland Sq Loop, Lacey, WA | 100.0% | 5,746 | $970,000 |
| Dept of Corrections | 637 Woodland Sq Loop, Lacey, WA | 100.0% | 18,104 | $2,680,000 |
| Dept. of Insur. Comm. | 5000 Capitol Blvd, Tumwater, WA | 100.0% | 46,080 | $5,780,000 |
| Lacey Prudential | 456S 7th Ave, Lacey, WA | 87.6% | 66,596 | $6,330,000 |
| Lacey DSHS | 640 Woodland Sq Loop, Lacey, WA | 96.7% | 84,966 | $10,450,000 |
| Moses Lake-Dept DSHS | 1620 Pioneer Way, Moses Lake, WA | 0.0% | 25,307 | $650,000 |
| Wenatchee 2 | 805 S. Mission St., Wenatchee, WA | 100.0% | 28,383 | $3,600,000 |
| Seattle West | 8830 25th Sve, SW, Seattle, WA | 100.0% | 9,604 | $1,500,000 |
| Total | Totals | 78.1% | 318,055 | $32,960,000 |

3.  In the event the Trust is the successful bidder at the foreclosure sale, enter into Midland's standard Management Agreement with JSH Properties, Inc. with the following conditions:

    a.  Monthly management fee equal to the greater of 3.25% of gross receipts with a minimum of $1,200 per month per property;
    b.  6-month term with automatic renewal for same;
    c.  30-day written termination by either party;

4.  In the event the Trust is the successful bidder at the foreclosure sale, enter into a Midland approved leasing agreement with JSH Properties, Inc. with the following conditions:
    a.  6-month term with automatic renewal for same;
    b.  30-day written termination by either party;
    c.  Leasing Commission will be 5% for the first five years and 2.5% thereafter for new leases and 2.5% for renewals.

5.  Midland will create two separate bank accounts with PNC, one for property operations and one for security deposits. Authorized representatives of Midland and the property management company will be authorized signatories on the accounts.

6.  It is hereby requested that the Plurality Subordinate Certificateholder waive its Purchase Option of the Defaulted Mortgage Loan per Section 3.18 of the PSA.

**PREPARED AND RECOMMENDED BY:**

_____  10/13/16
David Bornheimer                Date
Vice President

**REVIEWED AND RECOMMENDED BY:**

_____  10/14/16
Kevin Semon                     Date
Vice President

_____  10/17/16
David Spotts                    Date
Senior Vice President


**APPROVED:  Under delegation of Authority (D-1, D-5b)**
**Midland Loan Services, a division of PNC Bank, National Association,**
**in its capacity as Special Servicer**

_____  18 OCT 16
Chairperson                     Date
Asset Review Working Group


**APPROVED BY:**
**Sutherland Asset I, LLC c/o Waterfall Asset Management**
**Controlling Class Representative**


_____
By:                   .         Date
It's:


**EXHIBITS:**
NPV Analysis
OSAR
Flood Determination
Officer Certificate of Fair Value
Asset Summary Report
Loan Modification Case-Debtor Plan
McRoberts Environmental Risk Assessment Memo
PSA sections
Rent Roll
Map



| Property | | Address | City, State |
|---|---|---|---|
| A | Lacey DSHS | 640 Woodland Square Loop SE | Lacey, WA |
| B | Lacey Revenue | 4565 7th Avenue SE | Lacey, WA |
| C | Capitol Building | 5000 Capital Blvd | Tumwater, WA |
| D | AG Building | 629 Woodland Square Loop SE | Lacey, WA |
| E | Wenatchee II | 805 S Mission Street | Wenatchee, WA |
| F | Moses Lake Bldg | 1620 Pioneer Way | Moses Lake, WA |
| G | Dept of Corrections | 637 Woodland Square Loop SE | Lacey, WA |
| H | Seattle West | 8830 25th Avenue SW | Seattle, WA |
| I | Dept of Licensing | 645 Woodland Square Loop SE | Lacey, WA |

# Exhibit 10

HONORABLE BRYAN LYNCH
**Chapter 11**
HEARING DATE: JANUARY 10, 2017
HEARING TIME: 9:00 AM
COURTROOM: TACOMA, ROOM I
RESPONSE DEADLINE: JANUARY 3, 2018

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In Re | No. 11-41010-BDL |
| CDC Properties I, LLC, | **EQUITY FUNDING'S MOTION FOR RULING THAT CERTAIN ACTIONS BY THE TRUSTEE AND LENDERS VIOLATED THIS COURT'S ORDER DATED NOVEMBER 22, 2011 AND DEBTOR'S PLAN OF REORGANIZATION** |
| Debtors. | |

COMES NOW creditor Equity Funding/Centrum Financial Services, Inc., hereinafter "Equity Funding" by and through its attorney of record, Rick J Wathen of COLE WATHEN LEID & HALL PC and hereby presents their Motion for Court's Ruling that Certain Actions of the Trustee and the Lenders have Violated this Court's Order Dated November 22, 2011 and Debtor's Plan of Reorganization.

## I.     <u>RELIEF REQUESTED</u>

**A.     Equity Funding requests this court rule that the Lenders have violated the plan by making certain payments to the Lenders continuing to the Plan.**

Specifically, Lenders violated the Plan by making payments on the B Note before they were due, thus creating a cash flow deficit which led to Lenders claims of default.  The Lenders also failed to make payments on the B Note when there was adequate money available to make

CENTRUM'S MOTION RE PLAN – 1
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

1   the required payments.  In other words, Lenders violated the Plan thereby creating the very

2   default is now seeks collect millions of dollars in default interest charges and penalties.

3   **B.      Equity Funding requests this court rule that the sale of the Debtor's Real**
            **Property violated this court's order dated November 22, 2011 and violated the**
4           **Debtor's Plan of Reorganization.**

5       The Trustee and the Lenders violated the Plan by selling property in Wenatchee.  The

6   Trustee violated the Plan by selling all the remaining properties of CDC.

7                              **II.      FACTS**

8   **A.      CDC Properties I, LLC is the Debtor which owned and managed**
        **commercial office space throughout Washington.**

9
        The Debtor's property consisted of ten office buildings throughout Washington

10  including, Lacey, Tumwater, Seattle, Moses Lake, and Wenatchee. The majority of the office

11  space is occupied by Washington State agencies including the Department of Social and Health

12  Services, the Gambling Commission, the Employment Security Department, and the

13  Department of Licensing. See, Dkt. 55, p.2.

14      On February 10, 2011, the Debtor filed a voluntary Petition under Chapter 11. The

15  Debtor filed its original plan on June 10, 2011. Dkt. 54. Members of the creditor classes

16  thereafter proposed and negotiated with the Debtor certain modifications to the original plan. A

17  modified plan was proposed and accepted by all voting creditors. Dkt. 119, p.2. The Debtor's

18  plan of reorganization was approved by this court pursuant to this court's order dated

19  November 22, 2011. Dkt. 119. Attached hereto as **Exhibit A** is a copy of this court's order and

20  Debtor's Plan of Reorganization.

21  **B.      The Lenders, not the Debtor, administered the Plan and in Particular the**
        **Waterfall Provisions**

22

23

---

CENTRUM'S MOTION RE PLAN – 2

K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON  98121
(206) 622-0494/Fax (206) 587-2476

The A Note was originally held by Wells Fargo.  The B Note was held by LaSalle Bank.  Midland Loan Services, Inc. acted as the special servicer for Wells Fargo and LaSalle. They are collectively referred to as "Lenders." *Id*. at p.11 and 12.

All of the tenant income from the properties was being deposited into a central bank account that was exclusively controlled by the Lenders. Attached hereto as **Exhibit B** is a true and correct copy of the Continued Deposition Transcript of David Bornheimer. Bornheimer Deposition, p. 290, l. 6-14.  The Lenders were then to utilize the money in the account and make payments according to the Plan.  *Id* at l. 15-19.  The Lenders agree that they controlled the central account and that the Lenders would follow the Plan and make payments according to the Plan.  *Id* at p. 301, l. 8-15.

### C.      The Lenders fail to follow the Plan.

The Lenders claim the B Note went into default in March of 2013 because of a failure to make a payment.  *Id* at p. 300, l. 2-5.   The payment obligation on the B Note was $27,792.18. See Plan Dkt. 119, page 17, para (b.).   Subsequent discovery confirms that there was ample money in the central account to make the payment.  The Lenders didn't make the payment as required under the Plan, and now claim that its own failure in making that payment has triggered millions of dollars in default interest and penalties.

The Lenders steadfastly refused to provide to Equity Funding an accounting of the Waterfall provisions required under the Plan.  Consequently, Equity Funding obtained an order requiring a 2004 Examination.  In response to that order, the Lenders produced what was claimed to be the accounting for the Waterfall provision in the Plan.  Attached hereto as **Exhibit C** is a true and correct copy of the Waterfall Allocation produced by the Lenders. Attached hereto as **Exhibit D** is a copy of the Central Account Activity produced by the Lenders.

CENTRUM'S MOTION RE PLAN – 3

K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON  98121
(206) 622-0494/FAX (206) 587-2476

From the onset, it is apparent that the Lenders were not properly administering the Waterfall. It failed to make payments on the B Note from Dec 2011 – May 2012, and then made a payment of $222,337.44 in June of 2012. That amount represents 8 payments even though it only covered a 7 month timeframe. See **Exhibit C**, allocation line d. All totaled, the Lenders paid between December 2011 and December 2012, fourteen (14) payments towards the B Note. Only thirteen should have been paid. In the first three months of 2013, Lenders paid six (6) payments towards the B Note. (regular monthly payment and the catch up payment provided for in the Plan.) Under any scenario, the March 2013 payment was made, and, based upon the number of payments made, the April 2013 payment should also have been allocated.

The Waterfall allocation prepared by the Lenders purports to show negative cash flow beginning six months post confirmation; June 2012. However, when comparing the Central Account activity report, it becomes apparent that there were ample funds available to pay the B Note. For example, in **Exhibit D**, p.8, March 2013 payment, the amount available in the account to pay the B Note payment was $300,633.52. The money was available, the Lenders failed to make the payment (to themselves) and based upon that failure, the Lenders declared a default.

David Bornheimer testified as follows:

> Q.   It's been your consistent position that the B note went interest default in April of 2013?

> A.   Yes. There was no payment made.

> Q.   But the problem is, if we look at Exhibit 66, which is the money of April 2013, the cash balance is not what your attorney reflected on the schedule of $300,000, but rather the actual money in the account was $560,000, correct?

> A.   I see that on the bank statement.

CENTRUM'S MOTION RE PLAN – 4
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

Case 17-04120-BDL    Doc 5-8    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 30 of 100

1      Q.      Do you know why your attorney took this position on the schedule when

2   there was actually money in the account?

3              Isn't the best thing to look at, sir, I know you're looking at your loan

4   history, here's the money in the account, the bank statement?

5      A.      No, I don't think so, because that's a moment in time, whereas, it could

6   be a timing issue as to how much money was available, when funds were posted.

7      Q.      I'll get you the next one.

8              If you want to look at the month after, we can clarify the moment in time

9   issue, right?

10             Here's May of 2013. And we can mark it.

11             (Whereupon, Bornheimer Exhibit 69, bank statement was marked, for

12  identification, as of this date.)

13     Q.      This is Bornheimer 69. Bornheimer 66 is the March/April period of time,

14  and Bornheimer 69 is, I give you the next month just in case we have an overlap

15  like you just said.

16             The way I read this, sir, the average balance is a half million dollars in

17  the account; do you read it the same way?

18     A.      The average balance, yes.

19     **Exhibit B**, David Bornheimer p. 330, l. 8- p. 331, l. 23.

20  So, Mr. Bornheimer testifies that the actual bank balances show an average daily

21  balance in excess of $500,000, but, the Waterfall analysis provided to Equity Funding shows a

22  negative balance.  See **Exhibit C,** March, April, May 2013.

23  These reports establish the Lenders had in its control more that enough cash to make the

B Note payment when it was due but failed to do so.

CENTRUM'S MOTION RE PLAN – 5
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON  98121
(206) 622-0494/Fax (206) 587-2476

Case 17-04120-BDL     Doc 5-8     Filed 12/12/17     Ent. 12/12/17 13:51:59     Pg. 31 of 100

The problem becomes even more obvious in later months. For example, beginning in 2014, there was $87,227.83 left over in the Waterfall allocation. And yet, the Lender didn't make the payment. The same failure continued for the next nine (9) months.

### D. Lenders Fail to Properly Allocate "Reletting Reserve"

Generally, the underlying notes and Plan allow for a percentage allocation to be held by the lender in a "reletting reserve" account on a monthly basis. These accumulated funds were to be used by CDC to pay for tenant improvements (TI) and other expenses associated with lease renewals. The contractor retained by CDC to perform these TI improvements was Green Johnny, LLC. Green Johnny had agreed to accept monthly payments. Thus, according to the notes and Plan, Green Johnny, LLC should have been paid from the reletting reserves account. Edmonds Declaration. Instead, the Lenders paid Green Johnny as an "other expense" and simultaneously withheld the funds in the reletting reserve account. Compare **Exhibit C** Line B and 2nd to the last line. Both are entered by the Lender as negative numbers. The effect of this action was to make $227,417.93 unavailable to pay the B Note. $227,417.93 is the aggregate total of the payments to Green Johnny as shown on the Waterfall analysis. (Curiously, in the month of Sept 2014, the Lenders paid Green Johnny the amount of the B Note payment of $27,792.18.)

### E. Equity Funding's Claim.

Equity Funding has two allowed claims against the Debtor in the aggregate amount of $6,000,000. These claims consist of two separate classes of claims under the approved plan. Dkt. 119, p. 6:26-16:6. As part of the plan, Equity Funding/Centrum was required to release deeds of trust and any other encumbrances on the real property. Dkt. 119, p. 14:14-16. The plan required an aggregate total of $6,000,000 to be deposited into an escrow account. The final deposit was to be made by November 22, 2016. Dkt. 119, p. 15. The aggregate payment of

CENTRUM'S MOTION RE PLAN – 6
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

Case 17-04120-BDL    Doc 5-8    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 32 of 100

1   $6,000,000 was to be made to Equity Funding by November 22, 2016. See, Dkt. 119, p. 14:3-

2   13.[1]

3   ## F. Trustee Appointment.

4       Through a series of corporate entities, the Debtor is owned and managed by Mr.

5   Thomas Price and Mr. Hyun Um. Dkt. 55, p.4:3-4. On August 17, 2010, Mr. Price and Mr. Um

6   were forced into involuntary bankruptcy in their individual capacities. Their bankruptcies were

7   assigned cause nos. 10-46731-PBS and 10-46732-PBS. Thereafter, Mr. Eric Orse was

8   appointed Chapter 11 Trustee on October 2, 2013, 10-46732-PBS Dkt. 620. Mr. Price and Mr.

9   Um owned and operated a company named Prium Companies, LLC which in turn, through a

10  series of corporate entities owned CDC Properties I, LLC, the Debtor in this matter. On August

11  15, 2014, Prium Companies filed a voluntary petition for relief under Chapter 11. Prium was

12  assigned no. 14-44512-PBS. Prium is being managed by Eric Orse who is the court appointed

13  Chapter 11 Trustee in the consolidated bankruptcy cases of Um and Price. Dkt. 81.

14  ## G. Eric Orse acknowledges his fiduciary obligations.

15      The order issued in the Prium matter appointed Mr. Orse as the "management

16  representative." Ultimately, Mr. Orse continued to operate utilizing the title of Trustee and

17  management representative interchangeably throughout the course of the individual

18  bankruptcies and the corporate bankruptcies. Mr. Orse testified as follows:

19          Q. And you mentioned this role as
            management representative. What's your
20          understanding of what a management
            representative is, and how does being a
21          management representative differ from being a
            trustee?

22

23  ───────────────

    [1] The lawsuit between Equity Funding received all rights to the CDC I proceeds as a result of
    the resolution of its dispute with Bingo in King County Superior Court Cause No. 11-2-09088-4 SEA.

CENTRUM'S MOTION RE PLAN – 7
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

A. I'm not sure it differs. The
management order that was approved for me as
Chapter 11 trustee of Price & Um I believe is
the same order that was approved in the Prium
bankruptcy for me as management
representative. So the same management
authority I had as the Chapter 11 trustee in
Price & Um was given to me as the management
representative in Prium Companies LLC.

Q. And would that authority also come
with the same fiduciary and other duties that
you would have had as the trustee in the
bankruptcy?

A. Yes.

**Exhibit E**, Orse Deposition, page 20:5-21.

Shortly thereafter, the Trustee began exercising his acknowledged fiduciary duties as Trustee over CDC, the debtor in this case.

**H.     The court's order and plan of reorganization only grants conditional authority to sell.**

The plan provides in part:

"6.     The Reorganized Debtor may sell or refinance the Real Property, or any component thereof, at any time *if the proceeds of the sale or refinance are sufficient to pay all Allowed Claims in Classes 1-5* and sums otherwise required to be paid under the terms of this Plan. Any sale of the Real Property shall be: (a) free and clear of all liens and monetary encumbrances pursuant to section 363 of the Bankruptcy Code, and (b) exempt from excise tax pursuant to section 1146 of the Bankruptcy Code and section 458-6IA-207 of the Washington Administrative Code."

**Exhibit A,** Dkt. 119, p.20 [Emphasis added.]

The court order and plan only authorize the Trustee to sell the assets of CDC *if* there is sufficient proceeds to pay Equity Funding which is the Class I and Class II Creditor.

**I.     The Trustee and the Lenders Jointly and Cooperatively Violate the Plan.**

One of the properties owned by CDC in the portfolio was located at 215 Bridge Street, Wenatchee, WA.  Dkt. 119, p.11.  By Special Warranty Deed dated January 8, 2016, the

CENTRUM'S MOTION RE PLAN – 8
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON  98121
(206) 622-0494/Fax (206) 587-2476

Case 17-04120-BDL    Doc 5-8    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 34 of 100

Trustee sold 215 Bridge Street, Wenatchee, WA for $1,250,000.00. Attached hereto as **Exhibit F** is a copy of the Special Warranty Deed and Assessors printout showing sales price. On that same date, the Lender received the net sales proceeds. **Exhibit G,** Redacted Loan history produced by Lenders, See Payment received on 01/08/2016. Thus, the Lenders were aware of the sale and presumably participated in the sale in order to release the security interest.

   **F. Orse sells the *entire* remaining real property of CDC without notice to the court or any affected creditor under the plan.**

   On July 25, 2016, Mr. Orse received an unsolicited offer to purchase CDC. The offer was for a total purchase price of $100,000.[2] **Exhibit E**, Orse Deposition, 40:1-10.

   With respect to the Trustee's due diligence, he testified as follows:

Q. And between the offer coming in on
July 25 and the acceptance on July 27, what
did you do to analyze and consider this offer?

A. I didn't do a lot. Again, we were
not spending a lot of time on the CDC, and we
were in the process of closing the Prium case.

Q. Well, when you say, you know, you
didn't do a lot, did you review any files or
any analyses you had done with respect to the
properties?

A. No.

Q. Did you --

A. Because, remember, at this time the
properties were in receivership.

Q. Did you speak to the receiver about
the offer?

A. No.

---

[2] Although the ultimate valuation of the portfolio is in dispute, the value of the portfolio is estimated to be worth between $40-50,000,000.

CENTRUM'S MOTION RE PLAN – 9

K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

1

2      Q. Did you speak to any of the
       creditors about the offer?

3      A. No.

4      Q. Did you --

5      A. Define creditors, please.

6      Q. Anyone who was owed money by CDC
       Properties I LLC.

7
       A. No.

8
       Q. Did you speak to anyone other than

9      counsel regarding this offer?

10     A. The only person I would have
       possibly talked to was Tom Petramalo, who was

11     my property manager.

12     Q. Did you speak to anyone affiliated
       with the Noteholder regarding this offer?

13
       A. No.

14
       Q. Did you solicit other offers?

15
       A. No.

16
       Q. Did you think about soliciting

17     other offers?

18     A. No.

19     **Exhibit E**, Orse Deposition, 40:8 – 41:21.

20     The Trustee agreed to sell the real property of CDC on July 27, 2016. A formal

21     purchase agreement was executed by the parties on September 9, 2016. Attached hereto as

22     **Exhibit H** is a copy of the purchase agreement. As part of that purchase and sale agreement,

23     the Trustee represented and warranted:

CENTRUM'S MOTION RE PLAN – 10
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

7.1.1 **Authority**. The Seller has the power and authority to execute and deliver this Agreement and to consummate the transactions contemplated by this Agreement. Eric D. Orse, as management representative, has the full and unfettered right, power and authority to execute and deliver this Agreement and to bind the Seller.

The Trustee made the above representation despite the plan's grant of conditional authority only if the sale pays all creditors and *in particular* pays Equity Funding $6,000,000.

### III.  ISSUES PRESENTED

A.      Have the Lenders violated the Plan by failing to comply with the Waterfall provisions of the Plan?

B.      Have the Trustee and the Lender violated the Plan by jointly participating in the sale of 215 Bridge Street, Wenatchee, WA knowing that funds were not sufficient to satisfy Equity Funding's claim and comply with the Plan? The answer is yes. The plan only grants conditional authority to sell the property if the sales price is sufficient to satisfy the creditors' claims.

C.      Was the Trustee's sale of the remaining real property of CDC a violation of the court's order and plan of reorganization?

### IV.  <u>EVIDENCE RELIED UPON</u>

A.      The pleadings and file contained herein;

B.      **Exhibit A –**  Order Confirming Plan;

C.      **Exhibit B** – Continued Deposition Transcript of David Bornheimer;

D.      **Exhibit C –**  Waterfall Allocation Produced by the Lenders;

E.      **Exhibit D** – Central Account Activity Produced by the Lenders;

F.      **Exhibit E** – Deposition Transcript of Eric Orse;

G.      **Exhibit F** – Special Warranty Deed;

H.      **Exhibit G** – Redacted Loan History;

CENTRUM'S MOTION RE PLAN – 11
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON  98121
(206) 622-0494/Fax (206) 587-2476

Case 17-04120-BDL    Doc 5-8    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 37 of 100

I.      **Exhibit H** – Purchase Agreement;

J.      Declaration of Derek Edmonds;

K.      Declaration of Rick J Wathen.

# V.      <u>ARGUMENT</u>

## A.      The sale of the CDC assets violates this court's order and plan of reorganization.

The plan of reorganization is clear.

6.      The Reorganized Debtor may sell or refinance the Real Property, or any component thereof, at any time *if the proceeds of the sale or refinance are sufficient to pay all Allowed Claims in Classes 1-5* and sums otherwise required to be paid under the terms of this Plan. Any sale of the Real Property shall be: (a) free and clear of all liens and monetary encumbrances pursuant to section 363 of the Bankruptcy Code, and (b) exempt from excise tax pursuant to section 1146 of the Bankruptcy Code and section 458-6IA-207 of the Washington Administrative Code. [Emphasis added.]

Simply stated, the Trustee could only sell the property if there was sufficient sales proceeds to satisfy all the creditors. Obviously this was not the case as Equity Funding was owed a $6,000,000 payment on November 22, 2016. The payment was not made. The Trustee sold the assets of CDC for $100,000. On its face, the sales price is not sufficient enough to satisfy the $6,000,000 obligation owed to Equity Funding. As a result, this court should enter an order finding that the sale of the CDC assets violates the court order and plan of reorganization.

## B.      The Lenders and the Trustee Cooperatively Violate the Plan.

In January of 2016, the Trustee sold 215 Bridge Street, Wenatchee, WA which was one of the properties owned by CDC.  The Trustee executed a Special Warranty Deed transferring the property on January 8, 2016.  For the same reason set forth above, the sale of this property is a violation of the Plan.  Furthermore, the Lenders were knowingly complicit and assisted the Trustee in violating the Plan by selling the property.  The bank statement shows that the

CENTRUM'S MOTION RE PLAN – 12

K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/FAX (206) 587-2476

Case 17-04120-BDL    Doc 5-8    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 38 of 100

Lenders received the net sales proceeds and that no funds were set aside to comply with the Plan, there was no court approval and $6,000,000 had not be reserved for the benefit of Equity Funding as required under the Plan.

### C. The Lender violated the Plan in several other ways.

The Lenders undertook implementation of the plan. The Lenders collected all rents into the central account. The Lenders controlled all funds. The Lenders undertook compliance with the Plan and was solely responsible to see that the Waterfall provisions were met. The Lenders, through its representative David Bornheimer acknowledges these facts and the role the Lenders undertook with respect to the Plan.

The Lenders failed to pay the B Note from the onset. The undisputed evidence establishes that there were sufficient funds the central account to make all required B Note payments as they became due. The Waterfall analysis prepared by the Lenders (not considering the actual money in the central account) establishes that funds were available, but the Lenders simply didn't make the payment on the B Note. See **Exhibit C,** January 2014-December 2014. The Lenders simply failed to pay the B Note thus creating the default if now claims has led to millions of dollars in default interest fees, expenses and penalties.

Additionally, Lenders failed to comply with the Plan by properly accounting for the "reletting reserve" account. Green Johnny was paid as a monthly expense rather than as a TI expense which should have been paid from the reletting reserve account. The effect of the Lenders violation of the Plan resulted in depriving CDC of in excess of $227.000 in available cash to support ongoing operations.

Equity Funding respectfully request this court find that the Lenders have violated the Plan.

CENTRUM'S MOTION RE PLAN – 13
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

# VI.  CONCLUSION

In exchange for a $6,000,000 payment under the plan, Equity Funding/Centrum agreed to release its deeds of trust on certain property owned by CDC. By giving up its deeds of trust, Equity Funding/Centrum relinquished its security interests in the property in exchange for a court order and plan of reorganization which limited the ability of the Trustee to sell the real property. The only way the Trustee was authorized to sell the property was *if* the proceeds were sufficient enough to satisfy Equity Funding's $6,000,000 claim. Clearly this did not happen. The Trustee's actions in selling all of CDC's assets is a clear violation of the plan. This court should order that the Trustee's sale of the CDC assets violated the court's order and plan of reorganization. The same conclusion applies to the sale 8 the Wenatchee building. However, the Lenders also participated in that sale in violation of the Plan. And finally, the Landers failed to pay the B Note, when payments were due, despite the fact that enough funds were available to make the payments.

Dated this 5th day of December, 2017.

**COLE | WATHEN | LEID | HALL, P.C.**
*s/Rick J Wathen*
Rick J Wathen, WSBA #25539
Attorneys for Centrum/Equity
303 Battery Street
Seattle, WA  98121
P: 206-622-0494 / F: 206-587-2476
rwathen@cwlhlaw.com

CENTRUM'S MOTION RE PLAN – 14
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON  98121
(206) 622-0494/Fax (206) 587-2476

Case 17-04120-BDL    Doc 5-8    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 40 of 100

# CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the State of Washington that on this date I caused to be served in the manner noted below a true and correct copy of the foregoing on the parties mentioned below via ECF Court Filing and electronic notification:

**CDC Properties I, LLC**
c/o Keven A. Bay
Brad A. Goergen
Mark D. Northrup
kbay@tousley.com
plewis@tousley.com
kstokes@tousley.com
efile@tousley.com
brad.goergen@millernash.com
mark.northrup@millernash.com
dona.purdy@millernash.com

John Rizzardi
CAIRNCROSS & HEMPELMANN, P.S.
524 Second Avenue, Suite 500
Seattle, WA 98104-2323

**Eric Orse**
c/o Diana K. Carey
Karr Tuttle Campbell
701 Fifth Ave Ste 3300
Seattle, WA 98104
dcarey@karrtuttle.com

**United State Trustee**
Hillary Bramwell Mohr
USTPRegion18.SE.ECF@usdoj.gov
Hilary.b.mohr@usdoj.gov
Tara.Maurer@usdoj.gov
young-mi.petteys@usdoj.gov
martha.a.vandraanen@usdoj.gov

**Mariners Portfolio LLC**
**Olympia Office LLC**
**Seahawk Portfolio LLC**
**WA Portfolio LLC**
c/o Donald A. Bailey
donald.bailey@shaferbailey.com

CENTRUM'S MOTION RE PLAN – 15
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

**MLMT 2005-MCP1 Washington Office Properties LLC**
c/o Theodore A Cohen
Alan M. Feld
tcohen@sheppardmullin.com
amontoya@sheppardmullin.com
afeld@sheppardmullin.com

**Washington State Dept of General Administration**
c/o Brian Faller
brianf@atg.wa.gov beckym@atg.wa.gov

**Bingo Investments LLC**
c/o R. Bruce Johnston
bruce@rbrucejohnston.com

**Midland Loan Services, Inc.**
c/o Brian L Lewis
brian.lewis@klgates.com
bankruptcyecf@klgates.com

**Wells Fargo Bank**
c/o Brian L Lewis
brian.lewis@klgates.com
bankruptcyecf@klgates.com

**Hyun J Um and Jin S. Um**
c/o J. Todd Tracy
todd@thetracylawgroup.com
ecf@thetracylawgroup.com

**Thomas W. and Patricia A. Price**
c/o J. Todd Tracy
todd@thetracylawgroup.com
ecf@thetracylawgroup.com

**Debtor CDC Properties I LLC**
c/o Brad A Goergen
brad.goergen@millernash.com

DATED at Seattle, Washington, this 5th day of December, 2017.

_s/Sonia Chakalo_____
Sonia Chakalo, Legal Assistant

CENTRUM'S MOTION RE PLAN – 16
K:\FILES\Centrum-CDC 16288\Motion for Court's Ruling that Actions have violated the plan.doc

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WASHINGTON 98121
(206) 622-0494/Fax (206) 587-2476

HONORABLE BRYAN LYNCH
**Chapter 11**
HEARING DATE: JANUARY 10, 2018
HEARING TIME: 9:00 AM
COURTROOM: TACOMA, ROOM I
RESPONSE DEADLINE: JANUARY 3, 2018

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

In Re

CDC Properties I, LLC,

                    Debtors.

No. 11-41010-BDL

**DECLARATION OF RICK WATHEN**

I, Rick J Wathen, make the following declaration certified to be true under penalty of perjury pursuant to RCW 9A.72.085:

1.     I am over the age of eighteen and am competent to testify herein.

2.     The information contained herein is based upon my personal knowledge.

3.     I am one of the attorneys for Debtors CDC Properties I, LLC.

4.     Attached hereto as **Exhibit A** is a true and correct copy of the Order Confirming Plan.

5.     Attached hereto as **Exhibit B** is a true and correct copy of the Continued Deposition Transcript of David Bornheimer.

6.     Attached hereto as **Exhibit C** is a true and correct copy of the Waterfall Allocation Produced by the Lenders.

Consolidated No. 17-2-03914-4

**DECLARATION OF RICK WATHEN** - 1

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WA 98121-1419
P: 206-622-0494 / F: 206-587-2476

7.     Attached hereto as **Exhibit D** is a true and correct copy of the Central Account Activity Produced by the Lenders.

8.     Attached hereto as **Exhibit E** is a true and correct copy of the Deposition Transcript of Eric Orse.

9.     Attached hereto as **Exhibit F** is a true and correct copy of the Special Warranty Deed.

10.     Attached hereto as **Exhibit G** is a true and correct copy of the Redacted Loan History.

11.     Attached hereto as **Exhibit H** is a true and correct copy of the Purchase Agreement.

**I DECLARE UNDER PENALTY OF PERJURY OF THE LAWS OF THE STATE OF WASHINGTON THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.**

DATED this 5th day of December, 2017, at Seattle, Washington.

COLE | WATHEN | LEID | HALL, P.C.

*/s/ Rick J Wathen*_____
Rick J Wathen, WSBA#25539

Consolidated No. 17-2-03914-4

**DECLARATION OF RICK WATHEN** - 2

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WA 98121-1419
P: 206-622-0494 / F: 206-587-2476

Case 17-04120-BDL    Doc 5-8    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 44 of 100

# CERTIFICATE OF SERVICE

The undersigned certifies under penalty of perjury under the laws of the State of Washington that on this date I caused to be served in the manner noted below a true and correct copy of the foregoing on the parties mentioned below via ECF Court Filing and electronic notification:

**CDC Properties I, LLC**
c/o Keven A. Bay
Brad A. Goergen
Mark D. Northrup
kbay@tousley.com
plewis@tousley.com
kstokes@tousley.com
efile@tousley.com
brad.goergen@millernash.com
mark.northrup@millernash.com
dona.purdy@millernash.com

John Rizzardi
CAIRNCROSS & HEMPELMANN, P.S.
524 Second Avenue, Suite 500
Seattle, WA 98104-2323

**Eric Orse**
c/o Diana K. Carey
Karr Tuttle Campbell
701 Fifth Ave Ste 3300
Seattle, WA 98104
dcarey@karrtuttle.com

**United State Trustee**
Hillary Bramwell Mohr
USTPRegion18.SE.ECF@usdoj.gov
Hilary.b.mohr@usdoj.gov
Tara.Maurer@usdoj.gov
young-mi.petteys@usdoj.gov
martha.a.vandraanen@usdoj.gov

Consolidated No. 17-2-03914-4
**DECLARATION OF RICK WATHEN** - 3

COLE | WATHEN | LEID | HALL, P.C.
303 BATTERY STREET
SEATTLE, WA 98121-1419
P: 206-622-0494 / F: 206-587-2476

Mariners Portfolio LLC
**Olympia Office LLC**
**Seahawk Portfolio LLC**
**WA Portfolio LLC**
c/o Donald A. Bailey
donald.bailey@shaferbailey.com

**MLMT 2005-MCP1 Washington Office Properties LLC**
c/o Theodore A Cohen
Alan M. Feld
tcohen@sheppardmullin.com
amontoya@sheppardmullin.com
afeld@sheppardmullin.com

**Washington State Dept of General Administration**
c/o Brian Faller
brianf@atg.wa.gov beckym@atg.wa.gov

**Bingo Investments LLC**
c/o R. Bruce Johnston
bruce@rbrucejohnston.com

**Midland Loan Services, Inc.**
c/o Brian L Lewis
brian.lewis@klgates.com
bankruptcyecf@klgates.com

**Wells Fargo Bank**
c/o Brian L Lewis
brian.lewis@klgates.com
bankruptcyecf@klgates.com

**Hyun J Um and Jin S. Um**
c/o J. Todd Tracy
todd@thetracylawgroup.com
ecf@thetracylawgroup.com

**Thomas W. and Patricia A. Price**
c/o J. Todd Tracy
todd@thetracylawgroup.com
ecf@thetracylawgroup.com

Consolidated No. 17-2-03914-4

**DECLARATION OF RICK WATHEN** - 4

**Debtor CDC Properties I LLC**
c/o Brad A Goergen
brad.goergen@millernash.com

DATED at Seattle, Washington, this 5<u>th</u> day of December, 2017.

_s/Sonia Chakalo_____

Sonia Chakalo, Legal Assistant

Consolidated No. 17-2-03914-4

**DECLARATION OF RICK WATHEN** - 5

Below is the Order of the Court.

*Paul B. Snyder*

Paul B. Snyder
U.S. Bankruptcy Judge
(Dated as of Entered on Docket date above)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

The Honorable Paul B. Snyder
Chapter 11
Hearing Date: November 21, 2011
Hearing Time: 9:00 a.m.
Response Date: November 14, 2011
(or as extended by consent
of the Debtor)

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| In Re: | ) No. 11-41010 |
| | ) |
| CDC Properties I, LLC | ) |
| | ) |
| TIN: 76-0766443 | ) ORDER CONFIRMING PLAN |
| | ) |
| Debtor. | ) |
| | ) |

THIS MATTER having come on for hearing on November 21, 2011 before the undersigned Judge on confirmation of the Debtor's Plan of Reorganization originally dated as of

ORDER CONFIRMING PLAN -- 1

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

No. 11-41010
m43291-1670189.doc

EXHIBIT
A

June 10, 2011 and as modified (the "Plan"); and the Court previously having entered an Order Approving Disclosure Statement and Setting Hearing on Confirmation (the "Order"); and a copy of said Order and the Disclosure Statement and Plan having been transmitted to the holders of claims and interests; and the Debtor having appeared by and through its counsel, Graham & Dunn PC; and the Debtor having submitted evidence in support of confirmation of the Plan via the Declaration of Thomas W. Price in Support of Plan Confirmation (Dkt. #117); and the Court having considered the files, records, and testimony presented in connection with the Plan, the Court makes the following findings:

### Findings

1. This bankruptcy was commenced on February 10, 2011.

2. The Debtor filed its Plan on June 10, 2011 (Dkt. #54; the "Original Plan") and the Original Plan was subsequently transmitted to all creditors and parties in interest as an attachment to the Court-approved Debtor's Disclosure Statement (Dkt. #55). Members of creditor Classes 1-5 thereafter proposed and negotiated with the Debtor certain modifications to the Original Plan. All creditors whose treatment under the Plan has been modified from the Original Plan provisions have fully participated in the modification process. The modified Plan, as accepted by all voting creditors, is dated November 21, 2011 and is attached hereto as Exhibit A (the "Plan").

3. Notice of this hearing on confirmation was given to creditors and parties in interest in accordance with Federal Rule of Bankruptcy Procedure 2002 and notice of this proceeding was otherwise adequate.

4. The Plan complies with the applicable provisions of Chapter 11 of the Code.

5. The proponent of the Plan complies with the applicable provisions of the Code.

ORDER CONFIRMING PLAN -- 2

No. 11-41010
m43291-1670189.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

6. The Plan has been proposed in good faith and not by any means forbidden by law.

7.    A.    Any payment made or promised by the Debtor for services or for costs and expenses in, or in connection with, the bankruptcy case, or in connection with the Plan and incident to the case, has been disclosed to the Court; and

      B.    Any such payment made before confirmation of the Plan is reasonable; or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Court as reasonable.

8.    A.    The proponent of the Plan has disclosed the identity and affiliations of any individuals proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a joint plan with the Debtor, or a successor to the Debtor under the Plan; and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity security holders and with public policy; and

      B.    The proponent of the Plan has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insiders.

9. There are no regulatory commissions with jurisdiction, after confirmation of the Plan, over the rates of the Debtor.

10. With respect to each impaired class of creditors or interests:

      A.    Each holder of an allowed claim or interest of such class has accepted the Plan; or will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that that holder would so receive or

ORDER CONFIRMING PLAN -- 3

No. 11-41010
m43291-1670189.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

retain if the Debtor were liquidated under Chapter 7; or

B. If §1111(b)(2) of the Code applies to the claims of such class, each holder of a claim of such class will receive or retain under the Plan on account of such claim property of a value, as of the effective date of the Plan, that is not less than the value of such creditor's interest in the estate's interest in the property that secures such claims.

11. Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that:

A. With respect to a claim of a kind specified in §§507(a)(1) or 507(a)(2) of the Code, on the effective date of the Plan, the holder of such claim will receive on account of such claim cash equal to the allowed amount of such claim, unless otherwise mutually agreed;

B. With respect to a class of claims of the kind specified in §§507(a)(3)-(7) of the Code, each holder of a claim of such class will receive, if such class has accepted the Plan, deferred cash payments of a value, as of the effective date of the Plan, equal to the allowed amount of such claim; or, if such class has not accepted the Plan, cash on the effective date of the Plan equal to the allowed amount of such claims; and

C. With respect to a claim of a kind specified in §507(a)(8) of the Code, the holder of such claim will receive on account of such claim deferred cash payments over a period not exceeding five years after the date of assessment of such claim, or a value, as of the effective date of the Plan, equal to the allowed amount of such claim.

12. At least one impaired class of claims has accepted the Plan, determined without including any acceptance of the Plan by an insider holding the claim of such class.

ORDER CONFIRMING PLAN -- 4

No. 11-41010
m43291-1670189.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

13.  Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the debtor or any successor of the debtor under the Plan unless its liquidation or reorganization is proposed in the Plan.

14.  All fees payable under §1930 of title 28, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the effective date of the Plan.

15.  The Plan satisfies the confirmation requirements of Bankruptcy Code §1129(a).

16.  All objections to Plan confirmation (if any) have either been withdrawn or overruled.

### Order

BASED ON THE FOREGOING FINDINGS, now therefore it is

ORDERED as follows:

1.    The Debtor's Plan of Reorganization, a copy of which is attached hereto as Exhibit A and incorporated herein by this reference, is hereby confirmed and the Debtor is authorized and directed to carry out the terms and intent of said Plan.

2.    The Reorganized Debtor may prepare and execute any documents necessary to accomplish the purposes and intent of the Plan and the Reorganized Debtor and all affected creditors are authorized and instructed to cooperate in the prompt execution of such documents.

3.    If inconsistent with the terms of the Plan, the provisions of this Order shall control.

//end of order//

Presented by:
GRAHAM & DUNN PC
By /s/Mark D. Northrup
Mark D. Northrup
WSBA# 16947
Email: mnorthrup@grahamdunn.com
Attorneys for the Debtor

ORDER CONFIRMING PLAN -- 5

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

No. 11-41010
m43291-1670189.doc

# EXHIBIT A

The Honorable Paul B. Snyder
Chapter 11
Hearing Date: November 21, 2011
Hearing Time: 9:00 a.m.
Response Date: November 14, 2011
(or as extended by consent
of the Debtor)

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

In Re:

CDC Properties I, LLC

TIN: 76-0766443

          Debtor.

No. 11-41010-PBS

DEBTOR'S PLAN OF REORGANIZATION

Debtor CDC Properties I, LLC ("Debtor") proposes the following Debtor's Plan of Reorganization (the "Plan of Reorganization") pursuant to Chapter 11 of the Bankruptcy Code.

## I. DISCLOSURE STATEMENT

The Debtor has filed the Debtor's Disclosure Statement with this Plan of Reorganization pursuant to section 1125 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3016(b). This Plan of Reorganization is being disseminated to creditors and equity security holders for vote after Bankruptcy Court approval of the information in the Debtor's Disclosure Statement. The Debtor's Disclosure Statement contains useful information to assist creditors and equity security holders in making an informed judgment about how to vote on this Plan of Reorganization. Please read the Debtor's Disclosure Statement with care in evaluating the impact of this Plan of Reorganization upon your claim or interest.

DEBTOR'S PLAN OF
REORGANIZATION -- 1

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

## II. DEFINITIONS

A term used in this Plan of Reorganization that is not defined below and is used in the Bankruptcy Code shall have the meaning ascribed in the Bankruptcy Code. The following terms when used in this Plan of Reorganization have the meanings specified below.

Administrative Expense: An expense of administration allowed under section 503(b) of the Bankruptcy Code and any fees and charges due under 28 U.S.C. § 1930.

Allowed Claim: Any claim either:

1.     in the amount and priority classification set forth in the proof of such claim that has been timely filed unless:

a.     such claim has been objected to or is objected to after the Confirmation Date, in which case such claim shall be allowed only in the amount and classification that is authorized by the Bankruptcy Court, or

b.     such claim has been paid, withdrawn, waived or otherwise deemed satisfied in full; or

2.     if a proof of such claim has not been timely filed, in the amount and priority classification listed by the Debtor in its bankruptcy schedules D, E and F as amended and filed with the Bankruptcy Court, unless:

a.     such claim is listed as disputed, contingent and/or unliquidated,

b.     such claim has been objected to or is objected to after the Confirmation Date (a "Disputed Claim"), in which case such claim shall be allowed only in the amount and classification that is authorized by the Bankruptcy Court, or

c.     such claim has been paid, withdrawn, waived or otherwise deemed satisfied in full.

Anniversary Date: A date which is exactly one calendar year after the Confirmation Date (the first Anniversary Date), exactly two calendar years after the Confirmation Date (the second Anniversary Date), and so forth provided that if the Anniversary

DEBTOR'S PLAN OF
REORGANIZATION -- 2

No. 11-41010
m43291-1666789.doc

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

Date falls on a weekend or holiday, the Anniversary Date shall be deemed the first business date thereafter.

Assets: Every conceivable asset of the Debtor, all property of the Debtor's bankruptcy estates under section 541 of the Bankruptcy Code, and all claims that prior to the Effective Date could have been asserted and/or were asserted by the Debtor.

Bankruptcy Code: The Bankruptcy Code as amended and set forth in Title 11 of the United States Code.

Bankruptcy Court: The United States Bankruptcy Court for the Western District of Washington at Tacoma, before which the Case is pending, or any other court exercising jurisdiction over the Case in the future.

Bankruptcy Rules: The Federal Rules of Bankruptcy Procedure as supplemented by the Local Bankruptcy Rules for the Western District of Washington, and any other local rules applicable to the Bankruptcy Court.

Bingo Investments, LLC: A Washington limited liability company that has filed a claim in the Case (the "Bingo Claim"), including a claim to any and all distributions issued by the Reorganized Debtor in payment of the Equity Funding Claims.

Bingo Lawsuit: That certain pending lawsuit styled *Bingo Investments LLC v. Centrum Financial Services, Inc.*, Superior Court of King County, Washington, Case No. 11-2-09088-4 SEA.

Case: The Debtor's bankruptcy case that is presently pending in the Bankruptcy Court under Bankruptcy Case No. 10-41010.

Cash Management Agreement: Those agreements and provisions collectively included in Article V of the Wells Fargo/LaSalle Deed of Trust.

Class: A class of claims or interests as defined in Section III of the Plan.

Confirmation Date: The date that the Confirmation Order is entered on the docket in the Case.

DEBTOR'S PLAN OF
REORGANIZATION -- 3

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN pc
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

1  Confirmation Order: The order of the Bankruptcy Court confirming the Plan.

2  Debtor: CDC Properties I, LLC.

3  Effective Date: The first business day: (i) at least fourteen days after the entry of the
4  Confirmation Order; and (ii) after the satisfaction of any conditions precedent to the Plan, if any,
5  or the Debtor's waiver of such conditions precedent.

6  Equity Funding: Equity Funding, LLC, a limited liability company organized under the
7  laws of the state of Washington, and its manager and sole owner, Centrum Financial Services,
8  Inc ("Centrum").

9  Equity Funding Claim 1: All claims of Equity Funding against the Debtor and/or in the
10 Case relating to a Promissory Note dated March 28, 2008, in the original principal amount of
11 $1,200,000.00, including all subsequent amendments, modifications, and restatements thereof.

12 Equity Funding Claim 2: All claims of Equity Funding and/or Centrum, that are alleged
13 to be secured by the Real Property and that are alleged to have been acquired through: (i) that
14 certain Loan Transfer and Membership Purchase Agreement dated November 4, 2008, between
15 Prium Companies, L.L.C., Hyun J. Um, Thomas W. Price, Bingo Investments, LLC, and David
16 Bingham; and (ii) that certain Agreement dated November 5, 2008, between the Debtor, CDC
17 Properties II, LLC, Prium Development Company, L.L.C., Rock Pointe Holdings, LLC, Centrum
18 Financial Services, Inc., allegedly Centurion Properties III, LLC, and Bingo Investments, LLC.
19 The Equity Funding Claim 2 is a subject of the Bingo Lawsuit.

20 Equity Funding Claims: Equity Funding Claim 1 and Equity Funding Claim 2.

21 Equity Interests: The membership interests in the Debtor.

22 Escrow Account: A bank account established by the Reorganized Debtor at an institution
23 approved for deposits by the Bankruptcy Court, to hold the disputed proceeds payable in respect
24 of the Equity Funding Claims 1 and 2, until (i) an order of the Bankruptcy Court directing
25 distribution of all or part thereof, (ii) a final order in the Bingo Lawsuit designating the

26

DEBTOR'S PLAN OF
REORGANIZATION -- 4

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

ownership and calling for the distribution of the funds, or (iii) a final settlement agreement between Equity Funding and Bingo Investments, LLC providing for the distribution of the funds.

LaSalle Bank:  LaSalle Bank, N.A., as Trustee, Mezz Cap Commercial Mortgage 2004-C2, acting by and through Special Servicer Midland Loan Services.

LaSalle Bank Claim:  All claims of LaSalle Bank against the Debtor and/or in the Case, including the claims secured by a deed of trust and assignment of rents encumbering the Real Property.

Manager: CDC Acquisition Company I, LLC, the sole equity member of the Debtor.

Midland: Midland Loan Services, Inc., a division of PNC Bank, N.A., as special servicer with respect to debt instruments secured by the Real Property.

Miscellaneous Reserve Account:  That reserve account established by letter dated April 28, 2006, sent by Midland to Prium Companies.

Petition Date: February 10, 2011.

Plan: This Plan of Reorganization in its present form or as it may be amended or modified in accordance with the Bankruptcy Code or order of the Bankruptcy Court.

Real Property: All real property owned by the Debtors, which is located at:

1.    629 Woodland Square Loop, Lacey, Washington;
2.    637 Woodland Square Loop, Lacey, Washington;
3.    645 Woodland Square Loop, Lacey, Washington;
4.    4565 7th Avenue SE, Lacey, Washington;
5.    640 Woodland Square Loop, Lacey, Washington;
6.    5000 Capitol Boulevard, Tumwater, Washington;
7.    8830 25th Avenue SW, Seattle, Washington;
8.    1620 Pioneer Way, Moses Lake, Washington;
9.    215 Bridge Street, Wenatchee, Washington; and
10.   805 S. Mission Street, Wenatchee, Washington.

DEBTOR'S PLAN OF
REORGANIZATION -- 5

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax (206) 340-9599

Reletting Reserve Account:  The account established pursuant to Section 5.11 of the Wells Fargo/LaSalle Deed of Trust.

Rents: All rents and other reimbursements payable to the Debtor and arising from the Real Property.

Reorganized Debtor: The Debtor, or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

Replacement Reserve Account: The account established pursuant to Section 5.08 of the Wells Fargo/LaSalle Deed of Trust.

Reserve Accounts:  The Miscellaneous Reserve Account, the Reletting Reserve Account, and the Replacement Reserve Account, collectively.

Tenant Leases:  All leases with tenants occupying space at the Real Property on the Effective Date, including the leases identified on Exhibit A attached hereto.

Unsecured Claim: A claim against the Debtor that is not the Equity Funding Claim 1, Equity Funding Claim 2, Wells Fargo Claim, LaSalle Bank Claim or an Administrative Expense.

Wells Fargo: Wells Fargo Bank, N.A., in its capacity as trustee for registered holders of Merrill Lynch Mortgage Trust 2005-MCP1 Commercial Pass-Through Certificates, Series 2005-MCP1, acting by and through Special Servicer Midland Loan Services.

Wells Fargo Claim: All claims of Wells Fargo against the Debtor and/or in the Case, including the claims secured by a deed of trust and assignment of rents encumbering the Real Property.

Wells Fargo/LaSalle Deed of Trust:  Those deeds of trust collectively executed on or about September 29, 2004 by the Debtor in order to secure the Wells Fargo Claim and the LaSalle Bank Claim.

### III. CLASSIFICATION OF CLAIMS AND INTERESTS

The claims and interests are classified as follows:

Class 1:      Equity Funding Claim 1.

DEBTOR'S PLAN OF
REORGANIZATION -- 6

No. 11-41010
m43291-1666789.doc

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

Class 2:     Equity Funding Claim 2.

Class 3:     The Wells Fargo Claim.

Class 4:     The LaSalle Bank Claim.

Class 5:     The Allowed Unsecured Claims incurred by the Debtor prior to the Petition Date that are not included in any other Class.

Class 6:     The Equity Interests.

## IV. IMPAIRED CLASSES

Classes 1, 2, 3, 4, and 5 are impaired under the Plan and are entitled to vote on the Plan.

## V. TREATMENT OF CLAIMS

Administrative Expenses:  All Administrative Expenses approved by the Bankruptcy Court shall be paid first from any advance fee deposits held by the claimant and then in full from the Rents on the earlier of the Effective Date or 15 days after approval, unless the claimant agrees to accept deferred payments.

Classes 1 and 2:  The Equity Funding Claims (Claims of Classes 1 and 2) will be comprehensively treated, as follows:

a.)  Subject to the payment provisions of subparagraph c.), below, the Debtor stipulates that Equity Funding Claims 1 and 2 will be Allowed Claims against the Debtor and the Debtor's bankruptcy estate in the amount of Six Million Dollars ($6,000,000.00), unless otherwise determined in a lesser amount by the court in the Bingo Lawsuit, and neither Equity Funding nor Bingo shall individually or collectively ever be entitled to seek more than the amount of $6,000,000.00 from the Debtor in respect of the Equity Funding Claims 1 and 2 and the Bingo Claim, or any other pre-Confirmation Order claims they may at any time assert against the Debtor.  This restriction shall not bar either Equity Funding or Bingo from pursuit of claims against other persons or entities, including affiliates of the Debtor.

b.)  The Reorganized Debtor's obligation to pay this amount will be: i) interest free (0%); ii) unsecured; iii) will have no maturity date; and iv) subject to the Waterfall Provisions and

DEBTOR'S PLAN OF
REORGANIZATION -- 7

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

Subordinated Payment Schedule below, satisfied from the excess cash flow generated by the Real Property.

c.) Payments on the Equity Funding Claims shall occur in accordance with the "Waterfall Provisions" set forth below, in the section denominated Provisions Applicable to all Plan Payments. All payments shall be made to the Escrow Account, the distribution of which shall not occur until: (i) entry of an order of the Bankruptcy Court directing distribution of all or part thereof; (ii) entry of a final order in the Bingo Lawsuit designating the ownership and calling for the distribution of the funds; or (iii) a final settlement agreement between Equity Funding and Bingo Investments, LLC providing for the distribution of the funds. Nothing in this Plan shall alter, limit or affect the right of either Bingo Investments, LLC or Equity Funding to pursue claims against, or to obtain recoveries from, the other, based on a final ruling of the court issued in the Bingo Lawsuit, or otherwise in proceedings outside of this Case and any adversary proceeding filed in connection with this Case.

d.) On or before the Effective Date, all of the existing Equity Funding/Centrum deeds of trust and any other encumbrances on the Real Property shall be released at the expense of the Debtor.

e.) The following minimum, cumulative payments shall be made in respect of the Equity Funding Claims, and in compliance with the "waterfall" provisions set forth below (the "Subordinated Payment Schedule"):

(1). At least $75,000 delivered in good funds to the Escrow Account or as directed by final order or final settlement of the Bingo Lawsuit by the first Anniversary Date;

(2). At least $500,000 delivered in good funds to the Escrow Account or as directed by final order or final settlement of the Bingo Lawsuit by the second Anniversary Date;

(3). At least $1,150,000 delivered in good funds to the Escrow Account or as directed by final order or final settlement of the Bingo Lawsuit by the third Anniversary Date;

DEBTOR'S PLAN OF
REORGANIZATION -- 8

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

(4). At least $1,650,000 delivered in good funds to the Escrow Account or as directed by final order or final settlement of the Bingo Lawsuit by the fourth Anniversary Date

(5). At least $2,250,000.00 delivered in good funds to the Escrow Account or as directed by final order or final settlement of the Bingo Lawsuit by the fifth Anniversary Date.

Nothing in the foregoing Subordinated Payment Schedule shall obligate Midland to disburse to the Reorganized Debtor (or any other person) funds from the accounts described in the Cash Management Agreement until such time as the items described in the Waterfall Provisions (a) through (g) below have been paid in full.

In the event the Reorganized Debtor's fails to satisfy the minimum cumulative payments provided above, or if such minimum cumulative payments have been made contrary to the "waterfall" provisions set forth below, Equity Funding and/or Bingo Investments (as their interests may appear at the time of the alleged default or as designated by final order, or final settlement of the Bingo Lawsuit) shall provide written notice of default to the Reorganized Debtor c/o Graham & Dunn, ATTN: Mark Northrup, and to such address for the Reorganized Debtor as the Reorganized Debtor may specify in writing to Equity Funding and Bingo, or if no such address is so specified, to the last known address of the Reorganized Debtor. The Reorganized Debtor shall in turn provide copies of any such notice to Wells Fargo and LaSalle Bank, via Midland, c/o K&L Gates, LLP ATTN: Brian L. Lewis and at such address Wells Fargo, LaSalle Bank and/or Midland may specify in writing to the Reorganized Debtor, or if no such address is so specified, to the last known address for Midland. The Reorganized Debtor shall have 30 days in which to cure such default. Upon the failure of the Reorganized Debtor timely to effect such cure, time being of the essence, Equity Funding and/or Bingo Investments (as their interests may appear at the time of the alleged default or as designated by final order or final settlement of the Bingo Lawsuit) shall be entitled to pursue all remedies available under state, federal or other applicable law, subject to the liens securing the Class 3 and Class 4 Claims, the terms of which shall remain as set forth in the Plan. Jurisdiction to hear any dispute over the

DEBTOR'S PLAN OF
REORGANIZATION -- 9

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN pc
Pier 70, 2801 Alaskan Way – Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax (206) 340-9599

existence of a default or cure under this section shall be exclusively reserved to the Bankruptcy Court following and notwithstanding confirmation of the Plan and, if necessary, the Case shall be reopened upon ex parte motion of either the Reorganized Debtor or Equity Funding or Bingo Investments (as their interests may appear at the time of the alleged default or as designated by final order or final settlement of the Bingo Lawsuit), in order to consider any such motion or dispute.

Class 3: The Wells Fargo Claim will be treated as follows:

a.) The Wells Fargo Claim will continue to be controlled by the existing loan documents applicable to the Wells Fargo Claim, except as otherwise provided in this Plan. The Wells Fargo Claim shall be fixed at $36,311,190.93 and will continue to be serviced according to the existing loan documents.

b.) On the Effective Date, current outstanding advances and expenses of $160,647.87, plus the loan extension fee (below), plus any costs of Plan confirmation assessed against the Debtor's estate and paid from income from the Real Property, will be paid from the Miscellaneous Reserve Account.

c.) The current loan maturity date of October 1, 2014 will be (and hereby is) extended for thirty-six (36) months, to a new maturity date of October 17, 2017.

d.) A fee of one percent (1%) of the outstanding loan balance will be paid from the Miscellaneous Reserve Account Balance on the Effective Date.

e.) The Wells Fargo Claim will continue to be secured by a first-position mortgage lien on the Debtor's Real Property.

f.) The Reorganized Debtor shall have the right to prepay the Wells Fargo Claim at par, in full or in part, during the extension period (i.e., after October 30, 2014); provided, however, that if prepaid, the LaSalle Bank Claim must also be prepaid.

Class 4: The LaSalle Bank Claim will be treated as follows:

DEBTOR'S PLAN OF
REORGANIZATION -- 10

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax (206) 340-9599

a.) The LaSalle Bank Claim will continue to be controlled by the existing loan documents applicable to the LaSalle Bank Claim, except as otherwise provided in this Plan. The LaSalle Bank Claim will be fixed at $2,533,530.41, and will be serviced according to the terms of the existing loan documents.

b.) Outstanding accrued but unpaid payments totaling $361,298.34 will be due and payable in monthly installments of $27,792.18 (or any multiple thereof), commencing on January 1, 2013 (unless operating cash flow permits earlier payment) and continuing on the first day of the month thereafter.

c.) The current loan maturity date of October 1, 2014 will be (and hereby is) extended for thirty-six (36) months, to a new maturity date of October 17, 2017.

d.) A fee of one percent (1%) of the outstanding loan balance will be paid from the Miscellaneous Reserve Account Balance on the Effective Date.

e.) The LaSalle Bank Claim will be secured by a first position mortgage lien on the Debtor's Real Property.

f.) The Reorganized Debtor shall have the right to prepay the LaSalle Bank Claim at par, in full or in part, during the extension period (i.e., after October 1, 2014); provided, however, that if prepaid, the Wells Fargo Claim must also be prepaid.

Class 5: All Allowed Claims in Class 5 will earn interest at the fixed rate of 2% per annum from the Effective Date. The Reorganized Debtor will make semi-annual payments to Class 5 creditors from the income of the Real Property each January and July commencing in January 2012 until the Class 5 claims are paid in full. The total amount of each semi-annual payment to Class 5 will be $50,000, except for the final payment to be made, which will be in such lesser amount as is necessary to fully satisfy Allowed Claims in Class 5. With respect to each semi-annual payment to be made to holders of Allowed Claims in Class 5, each holder of an Allowed Claim will receive a pro rata share of the semi-annual payment.

Class 6: Class 6 will retain its Equity Interests.

DEBTOR'S PLAN OF
REORGANIZATION -- 11

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN pc
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

<u>Provisions Applicable to all Plan Payments.</u>

<u>Waterfall Provisions</u>: The Reorganized Debtor will continue to comply with the Cash Management Agreement currently in place and will make payments (including creditor payments required by this Plan) from available operating income from the Real Property in accordance with the following "Waterfall Provisions":

a.) The Reorganized Debtor will first pay (or reserve funds for paying when due) the monthly property taxes, insurance, and normal and customary operating expenses currently arising from the Real Property, as well as the administrative expenses currently arising under the Cash Management Agreement.

b.) The Reorganized Debtor will next pay such amounts as are necessary to meet current obligations arising under the Replacement Reserve Account, the Reletting Reserve Account.

c.) The Reorganized Debtor will next pay the monthly debt service owing on the Wells Fargo Claim.

d.) The Reorganized Debtor will next pay the monthly debt service on the LaSalle Bank Claim.

e.) The Reorganized Debtor will next pay the semi-annual $50,000 payments to holders of Allowed Class 5 Claims (in January and July of 2012 and January of 2013); provided, if the total Allowed Class 5 Claims are less than $150,000, the January 2013 payment shall be limited to an amount sufficient to satisfy the unpaid balance of the Allowed Class 5 Claims.

f.) The Reorganized Debtor will next pay into the Miscellaneous Reserve Account an amount equal to the expenses and loan extension fees described above with respect to the treatment of the Wells Fargo Claim and LaSalle Bank Claim, until the amount of such expenses and fees has been restored to the Miscellaneous Reserve Account.

g.) From available operating cash flow after payment of the foregoing items, the Reorganized Debtor will next pay (commencing in January 2013 unless operating cash flow

DEBTOR'S PLAN OF
REORGANIZATION -- 12

No. 11-41010
m43291-1666789.doc

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

permits earlier payment) the accrued but unpaid $361,298.34 in interest owing on the LaSalle Bank Claim, in monthly installments of $27,792.18 (or any multiple thereof) until paid in full.

h.) From available operating cash flow after payment of the foregoing items, the Reorganized Debtor will next pay to the Escrow Account or the party designated by order of the above entitled Court or by final order or final settlement agreement in the Bingo Lawsuit, the payments required in respect of the Equity Funding Claims as provided above in the Subordinated Payment Schedule.

i) All remaining funds shall remain with the Reorganized Debtor for its business purposes.

## VI. SOURCE OF PLAN PAYMENTS

The funds necessary to make the payments required by the Plan will come from the Reorganized Debtor's cash on hand on the Effective Date, the Reserve Accounts, and the Rents received after the Effective Date. Nothing in this Plan shall be interpreted as requiring the Debtor to make Plan payments from any other source.

## VII. MEANS FOR EXECUTION OF THE PLAN

On the Effective Date:

1. The Reorganized Debtor shall be responsible for implementing the Plan.

2. All of the Assets shall vest in the Reorganized Debtor free and clear of all liens, security interests and claims except as otherwise expressly provided for in the Plan.

3. The Debtor shall be discharged of all debts that arose prior to the Confirmation Date.

Except as otherwise provided in the Plan, on and after the Effective Date:

1. The Reorganized Debtor shall manage the Real Property consistent with the provisions of the Plan. The Reorganized Debtor shall utilize the Rents to pay the operating expenses of the Real Property.

DEBTOR'S PLAN OF
REORGANIZATION -- 13

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN pc
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

2.      The Reorganized Debtor shall maintain the Reserve Accounts, and all agreements with Midland, Wells Fargo and/or LaSalle Bank regarding the Reserve Accounts shall continue to be enforceable against the parties thereto until such time as the Wells Fargo Claim and the LaSalle Bank Claim are fully satisfied, except as otherwise provided in this Plan.

3.      The Reorganized Debtor shall make the payments required by the Plan.

4.      The Reorganized Debtor shall use diligent efforts to lease any vacant space at the Real Property to creditworthy tenants on commercially reasonable terms.

5.      The Reorganized Debtor may employ such persons as it deems appropriate to manage and operate the Real Property, and otherwise assist it in performing the Plan.

6.      The Reorganized Debtor may sell or refinance the Real Property, or any component thereof, at any time if the proceeds of the sale or refinance are sufficient to pay all Allowed Claims in Classes 1-5 and sums otherwise required to be paid under the terms of this Plan. Any sale of the Real Property shall be: (a) free and clear of all liens and monetary encumbrances pursuant to section 363 of the Bankruptcy Code, and (b) exempt from excise tax pursuant to section 1146 of the Bankruptcy Code and section 458-61A-207 of the Washington Administrative Code.

7.      The Reorganized Debtor may, in its discretion, pursue claims against third parties and settle those claims.

8.      Payments to professionals employed by the Debtor for services through the Effective Date shall remain subject to approval by the Bankruptcy Court after appropriate notice. Professional fees and expenses incurred by the Reorganized Debtor after the Effective Date shall not require Bankruptcy Court approval and shall be paid by the Reorganized Debtor from the Rents or by any third party guarantor. Notwithstanding the prior sentence, the Bankruptcy Court shall be the exclusive forum for determining any dispute over professional fees and expenses incurred by the Reorganized Debtor through the date the Case is closed.

DEBTOR'S PLAN OF
REORGANIZATION -- 14

No. 11-41010
m43291-1666789.doc

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

## VIII. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

1. <u>Assumed Leases</u>: On the Effective Date, the Tenant Leases shall be deemed assumed under section 365 of the Bankruptcy Code. The Debtor and the Reorganized Debtor shall not be required to pay any cure in connection with assumption.

2. <u>Rejected Contracts and Leases</u>: On the Effective Date, the Debtor rejects all executory contracts and unexpired leases except the Tenant Leases.

3. Entry of the Confirmation Order shall constitute approval of: (1) the assumptions and rejections provided for under the Plan, and (2) the cure amount of zero.

4. All Allowed Claims arising from the rejection of executory contracts or unexpired leases shall be included in Class 5. All claims arising from the rejection of executory contracts or unexpired leases shall be filed with the Bankruptcy Court on or before the first business day that is twenty-one (21) days after the date of the mailing of the notice of the entry of the Confirmation Order. Any such claim that is not timely filed is forever barred.

## IX. CLAIMS OBJECTIONS

The Reorganized Debtor and any other party in interest shall have until 180 days after the Effective Date to file an objection to any claim with the Bankruptcy Court. All claim objections shall be determined by the Bankruptcy Court after notice to the person whose claim is being objected to and an opportunity for a hearing. Both the Bingo Claims and the Equity Funding Claims shall be deemed Disputed Claims, to which the other party (Equity Funding and Bingo) shall be deemed to have objected, as of the Effective Date. The Bankruptcy Court will resolve the claims objections as to Equity Funding and Bingo Investments, LLC upon issuance of a final order or final settlement agreement resolving the Bingo Lawsuit (unless good cause shall be shown for an earlier resolution of those claim objections); provided, that Equity Funding and Bingo Investments LLC may agree that the final determination of their respective claims by the court in the Bingo Lawsuit may be accepted by the Reorganized Debtor as a final determination of such claims requiring no further claims adjudication by the Bankruptcy Court and such state

DEBTOR'S PLAN OF
REORGANIZATION -- 15

No. 11-41010
m43291-1666789.doc

**GRAHAM & DUNN** pc
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

court determination may be relied upon by the Reorganized Debtor for the purpose of releasing and tendering payments required by this Plan.

## X. UNCLAIMED FUNDS

The Reorganized Debtor may stop payment on any check intended as a payment on a Class 5 claim under the Plan any time at least 60 days after the check was mailed. If the Reorganized Debtor stops payment on any check pursuant to the prior sentence, the claims of the payee shall be deemed automatically disallowed for all purposes and the Reorganized Debtor may use those funds for other purposes. The Reorganized Debtor may rely on the address set forth in each proof of claim (or if there is no proof of claim, the address set forth in the bankruptcy schedules) unless the creditor provides the Reorganized Debtor with a written notice of a change in the creditor's address.

## XI. REPORTS AND STATUTORY FEES

Until the Case is closed, the Reorganized Debtor shall: (1) file post-confirmation reports consistent with Local Bankruptcy Rule 2015-1(c), and (2) pay all quarterly fees due and payable to the Office of the United States Trustee.

## XII. CLOSING CASE

The Reorganized Debtor, in its discretion, may move the Bankruptcy Court to enter a final decree closing the Case provided, however, the Reorganized Debtor shall not move for a final decree until: (1) all claim objections have been resolved by the Bankruptcy Court, and (2) payments have commenced to at least one Class of claims. After the Case is closed, the Reorganized Debtor, in its discretion, may reopen the Case to resolve any issue relating to the Plan or claims by creditors, and the Reorganized Debtor or the party designated by final order, or final settlement agreement in the Bingo Litigation may reopen this Case according to the provisions in Articles V and/or IX above.

DEBTOR'S PLAN OF
REORGANIZATION -- 16

No. 11-41010
m43291-1666789.doc

GRAHAM & DUNN PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

## XIII. MODIFICATION OF THE PLAN

The Debtor may propose amendments or modifications to the Plan at any time prior to the Confirmation Date. After the Confirmation Date, the Debtor or the Reorganized Debtor may, with approval of the Bankruptcy Court, and so long as it does not materially or adversely affect the interests of creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effect of the Plan.

## XIV. RETENTION OF JURISDICTION

Following the Confirmation Date, the Bankruptcy Court shall retain jurisdiction over the Reorganized Debtor and the Assets until the Plan is fully consummated and an order closing the Case is entered by the Bankruptcy Court. The Bankruptcy Court's retained jurisdiction shall give it authority to hear matters for purposes of administering the Plan, including without limitation:

1. To determine all adversary proceedings, applications, motions, and contested matters instituted prior to the closing of the Case;

2. To ensure that distributions are accomplished as provided in the Plan;

3. To determine all objections to Administrative Expenses and claims filed both before and after the Confirmation Date;

4. To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

5. To issue orders in aid of execution of the Plan and to issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any entity;

6. To consider all modifications of the Plan, to cure any defect or omission in the Plan, or to reconcile any inconsistency in the Plan or any order of the Bankruptcy Court, including without limitation, the Confirmation Order;

DEBTOR'S PLAN OF
REORGANIZATION -- 17

No. 11-41010
m43291-1666789.doc

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

Case 11-41010-PBS    Doc 119    Filed 11/22/11    Ent. 11/22/11 07:51:16    Pg. 23 of 28

1    7.    To determine all applications for compensation and reimbursement of expenses of

2    professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

3    8.    To determine any disputes arising in connection with the interpretation,

4    implementation, execution or enforcement of the Plan, the Confirmation Order, or any other

5    order of the Bankruptcy Court;

6    9.    To recover all of the Assets, wherever located;

7    10.   To determine all matters concerning state, local, and federal taxes in accordance

8    with sections 346, 505, and 1146 of the Bankruptcy Code;

9    11.   To determine any other matter not inconsistent with the Bankruptcy Code; and

10   12.   To enter a final decree closing the Case.

11   DATED this 21st day of November, 2011.

12                              CDC PROPERTIES I, LLC

13

14                              By   /s/ Thomas W. Price
                                    Thomas W. Price, Member/Manager of Prium
15                                  Companies, L.L.C., the sole member of CDC
                                    Acquisition Company I, LLC, the sole member of
16                                  Debtor CDC Properties I, LLC

17

18                              GRAHAM & DUNN PC

19                              By   /s/ Mark D. Northrup
                                    Mark D. Northrup, WSBA #16947
20                                  Email: mnorthrup@grahamdunn.com
                                    Brad A. Goergen, WSBA #41611
21                                  Email: bgoergen@grahamdunn.com
                                    Attorneys for Debtor CDC Properties I, LLC
22

23

24

25

26

DEBTOR'S PLAN OF
REORGANIZATION -- 18

No. 11-41010
m43291-1666789.doc

**GRAHAM & DUNN** PC
Pier 70, 2801 Alaskan Way ~ Suite 300
Seattle, Washington 98121-1128
(206) 624-8300/Fax: (206) 340-9599

# EXHIBIT A

In re    CDC Properties I, LLC                                          Case No.    11-41010
                                                          Debtor

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Describe all executory contracts of any nature and all unexpired leases of real or personal property. Include any timeshare interests. State nature
of debtor's interest in contract, i.e., "Purchaser", "Agent", etc. State whether debtor is the lessor or lessee of a lease. Provide the names and
complete mailing addresses of all other parties to each lease or contract described. If a minor child is a party to one of the leases or contracts,
state the child's initials and the name and address of the child's parent or guardian, such as "A.B., a minor child, by John Doe, guardian." Do not
disclose the child's name. See, 11 U.S.C. §112 and Fed. R. Bankr. P. 1007(m).

☐ Check this box if debtor has no executory contracts or unexpired leases.

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| Department of Revenue<br>PO Box 47462<br>Olympia, WA 98504-7462 | Lease for nonresidential real property. Debtor is lessor. |
| Dept of Corrections<br>Accounts Payable Section<br>PO Box 41107<br>Olympia, WA 98504-1107 | Lease for nonresidential real property. Debtor is lessor. |
| Dept of Licensing<br>Quynh Dao<br>PO Box 9035<br>Olympia, WA 98507-9035 | Lease for nonresidential real property. Debtor is lessor. |
| Dept of Licensing - Seattle<br>Department of Licensing<br>Attn: Disbursements<br>PO Box 9036<br>Olympia, WA 98507 | Lease for nonresidential real property. Debtor is lessor. |
| Dept of Licensing - Seattle<br>Dept of Licensing<br>Attn: Accounts Payable<br>PO Box 9035<br>Olympia, WA 98507 | Lease for nonresidential real property. Debtor is lessor. |
| Dept of Services for the Blind<br>Attn: Peter Campbell<br>PO Box 40933<br>Olympia, WA 98504 | Lease for nonresidential real property. Debtor is lessor. |
| DSHS - ADSA<br>Dept of Social & Health Svcs<br>ADSA - Accounting<br>Po Box 45600<br>Olympia, WA 98504-5600 | Lease for nonresidential real property. Debtor is lessor. |
| DSHS - DVR<br>Attn: Karin Knapp<br>PO Box 45340<br>Olympia, WA 98504-5340 | Lease for nonresidential real property. Debtor is lessor. |
| DSHS - Moses Lake<br>DSHS - CSD Region 1<br>8517 E Trent #103<br>Spokane Valley, WA 99212 | Lease for nonresidential real property. Debtor is lessor. |

2

_____ continuation sheets attached to Schedule of Executory Contracts and Unexpired Leases
Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com

                                                                            Best Case Bankruptcy

## SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
(Continuation Sheet)

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| DSHS - Wenatchee<br>DSHS/CSD Region 1 Admin B32-6<br>Lease #SRL 8-0168<br>8517 E Trent Ave #103<br>Spokane, WA 99212-2334 | Lease for nonresidential real property. Debtor is lessor. |
| ESD - Lacey 0074<br>Employment Security Department<br>Attn: Facilities Unit<br>PO Box 9046<br>Olympia, WA 98507-9046 | Lease for nonresidential real property. Debtor is lessor. |
| ESD - Lacey 0075<br>Employment Security Department<br>Attn: Facilities Unit<br>PO Box 9046<br>Olympia, WA 98507-9046 | Lease for nonresidential real property. Debtor is lessor. |
| ESD - Lacey 0076<br>Employment Security Department<br>Attn: Facilities Unit<br>PO Box 9046<br>Olympia, WA 98507-9046 | Lease for nonresidential real property. Debtor is lessor. |
| ESD - Wenatchee<br>Employment Security Department<br>Attn: Vendor Pay<br>PO Box 9046<br>Olympia, WA 98507-9046 | Lease for nonresidential real property. Debtor is lessor. |
| Gambling Commission<br>PO Box 42400<br>Olympia, WA 98504-2400 | Lease for nonresidential real property. Debtor is lessor. |
| Kokopelli Cafe<br>PO Box 146<br>East Olympia, WA 98540 | Lease for nonresidential real property. Debtor is lessor. |
| Mike Neuschwander<br>Prudential<br>629 Woodland Sq Loop #102A<br>Lacey, WA 98503 | Lease for nonresidential real property. Debtor is lessor. |
| Office of the Insurance Comm<br>PO Box 40255<br>Olympia, WA 98504 | Lease for nonresidential real property. Debtor is lessor. |
| Sentencing Guidelines Comm<br>4565 7th Ave SE, 2nd Fl<br>PO Box 40927<br>Olympia, WA 98504-0927 | Lease for nonresidential real property. Debtor is lessor. |

Sheet __1__ of __2__ continuation sheets attached to the Schedule of Executory Contracts and Unexpired Leases

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com      Best Case Bankruptcy

In re    CDC Properties I, LLC                                  Case No.    11-41010
                                          Debtor

# SCHEDULE G - EXECUTORY CONTRACTS AND UNEXPIRED LEASES
### (Continuation Sheet)

| Name and Mailing Address, Including Zip Code, of Other Parties to Lease or Contract | Description of Contract or Lease and Nature of Debtor's Interest. State whether lease is for nonresidential real property. State contract number of any government contract. |
|---|---|
| Steele Financial Group<br>629 Woodland Sq Loop #100<br>Lacey, WA 98503 | Lease for nonresidential real property.  Debtor is lessor. |

Sheet  2  of  2   continuation sheets attached to the Schedule of Executory Contracts and Unexpired Leases

Software Copyright (c) 1996-2011 - CCH INCORPORATED - www.bestcase.com                                    Best Case Bankruptcy

1

2   UNITED STATES BANKRUPTCY COURT

3   EASTERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - X

5   IN RE:

6   OLYMPIA OFFICE, LLC, ET AL.

7            Debtor

8            Chapter 11

9            Case Nos: 16-74892(AST)

10           16-75515(AST)

11           16-75516(AST)

12           16-75517(AST)

13   - - - - - - - - - - - - - - - - X

14               3305 Jerusalem Avenue
                 Wantagh, New York
15
                 May 23, 2017
16               2:15 p.m.

17

18        **CONTINUED DEPOSITION** of **DAVID**

19   **BORNHEIMER**, a Witness, by **the Debtors**, in the

20   above-entitled action, held at the above time

21   and place, pursuant to the Federal Bankruptcy

22   Rules, and Notice, taken before Tracie Shand,

23   a shorthand reporter and Notary Public within

24   and for the State of New York.

25



```
 1                    David Bornheimer                 244

 2    A P P E A R A N C E S :

 3

      LAMONICA, HERBST & MANISCALCO, LLP
 4          Attorneys for Debtors
            3305 Jerusalem Avenue
 5          Wantagh, New York 11793
      BY:  JOSEPH MANISCALCO, ESQ.
 6

 7

 8    SHEPPARD, MULLIN, RICHTER & HAMPTON, LLP
            Attorneys for Bornheimer
 9          Midland Loan Servicing
            333 South Hope Street, 43rd Floor
10          Los Angeles, California 90071
      BY:  ALAN M. FELD, ESQ.
11              -AND-
            THOMAS M. MONAHAN, ESQ.,
12          TELEPHONICALLY

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    David Bornheimer                245

 2                 S T I P U L A T I O N S

 3

 4          IT IS HEREBY STIPULATED AND AGREED

 5     by and between the attorneys for the

 6     respective parties herein, that filing,

 7     sealing and certification be and the same are

 8     hereby waived.

 9          IT IS FURTHER STIPULATED AND AGREED

10     that all objections, except as to the form of

11     the question shall be reserved to the time of

12     the trial.

13          IT IS FURTHER STIPULATED AND AGREED

14     that the within deposition may be signed and

15     sworn to before any officer authorized to

16     administer an oath, with the same force and

17     effect as if signed and sworn to before The

18     Court.

19

20

21

22

23

24

25
```

1                    David Bornheimer                    246

2    D A V I D   B O R N H E I M E R, the witness

3    herein, having been first duly sworn by a

4    Notary Public of the State of New York, was

5    examined and testified as follows:

6    EXAMINATION BY

7    MR. MANISCALCO:

8        Q.   State your name for the record,

9    please.

10       A.   David Bornheimer.

11       Q.   State your address for the record,

12   please.

13       A.   10851 Mastin Boulevard, Overland

14   Park, Kansas 66210.

15       Q.   Good afternoon, Mr. Bornheimer.  You

16   remember me.  I was conducting your

17   examination in Kansas City back on April

18   12th; do you remember that?

19       A.   Yes.

20       Q.   I'm going to continue today with

21   that examination so we can get your full

22   deposition completed in connection with this

23   litigation; okay?

24       A.   Okay.

25       Q.   I'll go briefly through some of the

1                     David Bornheimer                247

2      ground rules, I think, you have been through

3      this before.

4              Let me finish my question, then,

5      answer the question.  There may be times when

6      your counsel will object, not with standing

7      the objection, answer the question, unless,

8      your counsel directs you not to answer the

9      question; okay?

10        A.   Yes.

11        Q.   Answer the questions audibly as the

12     court reporter is not able to take down your

13     body movements.  She can only take down an

14     audible response; okay?

15        A.   Okay.

16             MR. FELD:  Tom, I want to make

17          sure you can hear?

18             MR. MONAHAN:  Yes.  I'm doing

19          great.  Thank you.

20        Q.   I went through the deposition and

21     I'll try to pick up exactly where we left off

22     on so I don't redo and ask you questions that

23     I already asked you about last time.

24        A.   Okay.

25        Q.   The last time we had concluded, when

1                     David Bornheimer                 248

2     we stopped the deposition, we were talking

3     about the payoff.  I was trying to breakdown

4     the payoff.  I'm going to mark as Bornheimer

5     61, this is a copy of a most recent payoff

6     statement, which is in connection with the A

7     note, but I'll show it to you.  It has an

8     issue date of April 28, 2017 with an

9     expiration date of May 8, 2017.

10             Take a look at that, sir.

11             Are you familiar with this document,

12    sir?

13        A.   Yes.

14             (Whereupon, Bornheimer Exhibit 61,

15             payoff statement for A Note was marked,

16             for identification, as of this date.)

17        Q.   This document is what appears to be

18    a payoff statement.  I know that the numbers

19    may fluctuate because today we're at May 24th

20    and we're not necessarily at the day that

21    this was issued, but can you tell me how you

22    obtained this payoff statement from the A

23    note holder?

24        A.   Well, this is obtained from --

25    Midland is the master server for the A note.

<pre>
 1                    David Bornheimer          249
 2    I send instructions to my payoff department
 3    who calculates this.
 4         Q.   I would like to go through some of
 5    these different numbers.
 6              The first thing this payoff
 7    indicates that there's a principle balance on
 8    the A note of $30 million $556,353.60; is
 9    that correct?
10         A.   Yes.
11         Q.   Do you know where that principle
12    balance came from?
13         A.   Yes.
14         Q.   Where did it come from?
15         A.   Our servicing system.
16         Q.   Your servicing system tracks the
17    principle balance that's on the loan with
18    respect to the A note?
19         A.   Yes.
20         Q.   The next column says interest of $1
21    million $522,387.45; do you see that?
22         A.   Yes.
23         Q.   Can you tell me what that interest
24    is for?
25         A.   That is the interest that's due --
</pre>

1                    David Bornheimer              250

2    that's past due on the A note.

3         Q.   When you say "past due," is this and

4    that is due to Midland or is this interest

5    that is due to the trust of the A note?

6         A.   This is interest that is due under

7    the loan.

8         Q.   Who is owed this interest, is it

9    Midland as the servicer or is it the actual

10   note holder?

11        A.   It's the note holder.

12        Q.   The note holder is owed this money

13   based on this not being paid by the debtor?

14        A.   Correct.

15        Q.   In what period of time did the

16   debtor not make this interest payment under

17   this payoff statement?

18        A.   Well, it says, "this quote is based

19   on interest paid to 6-1 of '16 and it

20   includes interest to 5-1 of '17."

21        Q.   Is June 1, 2016 about the time that

22   the receiver took over with respect to this

23   portfolio of properties?

24        A.   I believe, the receiver was

25   appointed in May of 2016.

1                    David Bornheimer                251

2        Q.   As of June of 2016, the receiver was

3    now collecting the rents from the tenants; is

4    that correct?

5        A.   Yes.

6        Q.   In June of 2016, do you know whether

7    the receiver made the principle and interest

8    payment for that month to Midland on behalf

9    of the trust?

10       A.   I don't believe so.

11            MR. FELD:  Objection.

12            You used the word debtor.

13        Maybe, you can clarify that.

14            MR. MANISCALCO:  Could you read

15        back the question?

16            (Whereupon, the record was read

17        back by the reporter.)

18       Q.   I just want to understand, the

19    interest line item is interest that is due

20    from June 1st of 2016 through May 1st of 2017

21    in accordance with the loan documents between

22    the borrower and the lender?

23       A.   Yes.

24       Q.   We had previously spoken about these

25    bondholder reports.  We were looking at these

1                      David Bornheimer                252

2     bondholder reports at your last deposition

3     and we'll look at a couple them again.

4              During this same period of time,

5     June of 2016 to May of 2017, has Midland been

6     paying the trust, the monthly principle and

7     interest for the benefit of the bondholders?

8         A.    I don't know.  I would have to look

9     at the bondholder report.

10        Q.    Let's look at the bondholder report.

11    We'll pull out Exhibit 39.

12             Here you go, sir (handing.)

13             Look at Exhibit 39 together, this is

14    a bondholder report for December of 2016.

15             Looking at the same thing I'm

16    looking at?

17        A.    Yes.

18        Q.    We had previously gone through this

19    report and you had identified the loan in

20    this particular report by the loan number; do

21    you remember that testimony?

22        A.    Yes.

23        Q.    If you look at this report, turn to

24    page five, up at the top it indicates

25    available distribution amount $394,772.50.

1                          David Bornheimer                253

2            Do you know what that number

3    represents?

4            A.   No.

5            Q.   Can you tell me from looking at this

6    report, whether Midland made the December

7    payment to the trust for the benefit of the

8    bondholders?

9            A.   Not from what you've shown me.  I

10   don't see that.

11           Q.   Can you turn to page 17.  Page 17, I

12   believe, the loan number is identified as

13   30243254; is that your recollection; it's the

14   first one?

15           A.   Yes.

16           Q.   This indicates mortgage loan detail.

17   It identifies the interest payment and the

18   principal payment that was made for December?

19           A.   Yes.

20           Q.   Does this refresh your recollection

21   as to whether the Midland actually made the

22   principle and interest payment to the

23   bondholders in December of 2016?

24           A.   I see the detail on here, but I'm

25   not sure that's telling me that the payment

1                  David Bornheimer              254

2      was -- the money was advanced.

3          Q.   As you sit here today, do you know

4      whether the bondholders were paid during the

5      period June of 2016 to May of 2017?

6          A.   No.

7          Q.   In anticipation of your deposition,

8      did you look through your servicing system to

9      determine whether the bondholders were being

10     paid every month?

11         A.   That's not something that is housed

12     in our servicing system.

13         Q.   Where would that information be?

14         A.   That's a trustee level.  That is

15     trustee level information.  It's not

16     something that an asset manager reviews.  We

17     look at the loan documents and enforcement of

18     the loan documents.

19         Q.   Whether the bondholders were paid or

20     not, you wouldn't know that information?

21         A.   Right.  Not on my day-to-day

22     activities.

23         Q.   Would someone in your group know

24     that information?

25         A.   No.

1                    David Bornheimer                255

2         Q.   If you look here, sir, it says the

3    scheduled ending balance of the loan as of

4    December of 2016 is $29 million $928,896.23;

5    do you see that?

6         A.   Yes.

7         Q.   If that ending balance of the loan

8    is $29.9 million, why does your payoff say

9    the principle balance is $30.5 million?

10        A.   Because that's what the schedule

11   balance should be if the borrower was making

12   their payments on time each month, but that's

13   not the balance.

14        Q.   What is the balance?

15        A.   It's the amount in the actual

16   balance column $30 million $556.353.60, which

17   is the same number that's on the payoff quote

18   we just looked at.

19        Q.   Can tell me what page you're on?

20        A.   Page 21.

21        Q.   I was on 17.

22             Do you mean page 20?

23        A.   I was on 21, but they both report

24   the same actual balance.

25        Q.   So, if I look at the column which

David Bornheimer

256

1
2    says actual balance, that is the amount of

3    money that is contained on your payoff

4    statement, which is the same amount; is that

5    correct?

6         A.   Correct.

7         Q.   If we go back to page 17 though, the

8    beginning balance is $30 million $17,000 and

9    the ending schedule balance is $29.9 million.

10        Isn't the ending schedule balance

11   the amount of money that is owed after the

12   principle and interest payment on that line

13   item is made?

14        A.   No.

15        Q.   How do they come up with an ending

16   schedule balance?

17        A.   Well, that's scheduled balance, not

18   actual balance.

19        Q.   What is the difference?

20        A.   The schedule is what the balance

21   should be if the borrower was making their

22   payments as prescribed in the loan documents.

23   Actual balance is the actual balance that the

24   borrower owes and the difference is because

25   the borrower has not been making their

1                    David Bornheimer              257

2    payments.

3         Q.    That's the amount of money if the

4    borrower was making its payments, right?

5         A.    Yes.

6         Q.    The number here, $1 million $522,000

7    of interest, that is calculated utilizing the

8    interest payment column and multiplying it

9    by, I guess, 11 months?

10        A.    No.

11        Q.    How is the interest calculated?

12        A.    That's calculated off of our

13   servicing system.

14        Q.    So, you just press a button and some

15   computer does that calculation?

16        A.    We've got the schedules are

17   programed into our servicing system based on

18   the loan document requirements, the days of

19   interest per period.

20        Q.    So, that interest would be, I think,

21   the note rate here is five point four five,

22   if you took the five point four five,

23   calculated it against the outstanding

24   principal of $30 million $556,000, and do

25   some compound analysis, is that basically how

1                         David Bornheimer                    258

2    they come up with the interest?

3        A.   Yeah.

4        Q.   Your next column is default

5    interest.  We'll get to that next.

6             Next is the special servicing fee of

7    $290,616.56.

8             Do you know what that special

9    servicing fee is?

10       A.   Yes.

11       Q.   Can you tell me what that is?

12       A.   It's the fee that's due to the

13   special servicer for the time period that the

14   loan is in special servicing.

15       Q.   Is that the fee that the trust

16   already paid the special servicer and now the

17   trust is seeking reimbursement or is it the

18   fee that the special server should be

19   entitled to be paid?

20       A.   That's the fee if the special

21   servicer is paid each month out of the

22   remittance of the money to the trust.

23       Q.   Essentially, if this $290,000

24   payment is made, it goes back to the trust,

25   right?

<table>
<tr><td>1</td><td>David Bornheimer</td><td>259</td></tr>
</table>

1                     David Bornheimer                259

2        A.   Reimburses the trust for the special

3   servicing fee.

4        Q.   This is a reimbursable to the trust

5   that the trust already paid out, if you look

6   at these bondholder reports, the special

7   servicer gets a fee every month, correct?

8        A.   Yes.

9        Q.   We'll get to the late charges.

10            You have a property advance tax fee.

11   Was this the real estate taxes that were

12   paid?

13       A.   Yes.

14       Q.   Were these actually paid by Midland

15   or did it come from the proceeds that were in

16   the lock box account from the rents?

17       A.   These were paid by Midland.  Money

18   advanced by Midland.

19       Q.   I believe, that the real estate

20   taxes were due some time at the end of

21   September 2016; do you remember that?

22       A.   Yes.

23       Q.   During that timeframe, did you make

24   a request for the receiver to make those

25   payments?

1                          David Bornheimer                    260

2          A.   I don't know if there was a formal

3     request to the receiver, but there were

4     discussions with the receiver and the

5     receiver didn't have the money.

6          Q.   In September, his position was he

7     didn't have the money to pay the taxes and

8     Midland advanced it?

9          A.   That's my recollection.

10         Q.   If that advance was made by Midland

11    that would be reflected on the loan history?

12         A.   Yes.

13         Q.   Exhibit 4.

14              MR. FELD:   What's the date of

15          that?

16              MR. MANISCALCO:   The loan

17          history?

18              MR. FELD:   Yes.

19              MR. MANISCALCO:   This was the

20          loan history that you guys had turned

21          over.

22              When does it end, Alan?

23              MR. FELD:   Yes.

24              March 8th of this year.

25         Q.   Let's go to September of 2016.

David Bornheimer                    261

1

2          Can you tell me, based on your loan

3    history analysis and disbursement schedule,

4    where that money was paid out?

5          A.   Yes.  It was actually October of

6    2016.

7          Q.   Where is it?

8          A.   That starts on October 14, 2016 with

9    a transaction description that says

10   disbursement tax.  If you scroll over to the

11   tax column, you'll negative $20,589.70.

12          If you scroll down on that tax

13   column, you'll see the additional negative

14   numbers, which were all advances for the tax

15   parcels.

16          Q.   This loan history that we're looking

17   at, is this an internal reconciliation from

18   Midland as to money that's going in and out

19   or is this cross referencing against the bank

20   statement?

21          A.   What bank statement?

22          Q.   A bank statement with actual cash

23   that's coming into the bank.

24          I'm trying to understand the loan

25   history that's in front of me.  I'm trying to

1                     David Bornheimer               262

2    understand, I see the tax disbursement that

3    is in here, but is this an actual

4    disbursement that Midland made?

5         A.   Yes.  It's an actual disbursement

6    Midland made.

7         Q.   It's reflected on a loan history

8    schedule?

9         A.   It's in this loan history

10   (indicating).

11        Q.   This loan history schedule, which is

12   Exhibit 4, is reflecting money that comes in

13   and money that comes out, right?

14        A.   Right.

15        Q.   But the loan history is not

16   necessarily cross-referenced, they are

17   reconciled against the bank statement, right?

18        A.   What bank statement?

19        Q.   Again a bank statement.

20             You don't understand?

21        A.   No.

22        Q.   We have a loan history that we're

23   looking at, it's 130 pages, and it's showing

24   me ins and outs, but money going in and money

25   going out is based on cash, so, it has to be

David Bornheimer                    263

1
2    reconciled against the bank statement showing
3    cash in and out; you following me so far?
4         A.   No.
5         Q.   Do you know how this loan history
6    schedule is reconciled by Midland?
7         A.   It's money that's received on the
8    loan.  If there's advances, money that's paid
9    out of the loan.  That's advanced on the
10   loan, that's a better way to put it.
11        Q.   So, what I'm saying is, this advance
12   that goes out on the tax on October 14th of
13   2016, it doesn't tell me here whether there's
14   any money in the account to make this
15   payment?
16        A.   In what account?
17        Q.   In this loan history account.
18             Still don't understand?
19        A.   No.
20        Q.   Do you know what a general ledger
21   is?
22        A.   Yes.
23        Q.   Is this loan history a general
24   ledger of an analysis of the ins and outs of
25   this loan?

                              David Bornheimer                    264

2      A.    I call it a loan history report.

3  That's how we refer to it.  We don't refer to

4  it as a general ledger.

5      Q.    Go back two pages earlier.

6            There's is a regular payment of

7  $280,208.58; do you see that?

8      A.    Yes.

9      Q.    That was a regular monthly payment

10  on the note, right?

11      A.    I don't know if I would call it a

12  regular payment, but it's a payment.

13      Q.    I'm saying regular payment because

14  the loan history says it's a regular payment.

15      A.    Yes.  I see that.

16      Q.    The loan history calls this, this is

17  a regular payment that was made in May of

18  $280.208.58, right?

19      A.    Correct.

20      Q.    So, when I look at this, the way I

21  look at this loan history, that money

22  actually came in for the benefit of the note

23  holder, and Midland; is that how you see

24  this?

25      A.    Well, for the borrower.

1                          David Bornheimer                    265

2        Q.    The borrower made a payment?

3        A.    For the benefit of their alone.

4        Q.    For the benefit of their alone?

5        A.    Right.

6        Q.    That $280,000 would be reflected in

7    a bank statement, right; the money would have

8    had to go into a bank account?

9              There are tenants that are paying

10   money and the money goes into a bank account,

11   right?

12       A.    Yes.   In this case, because we were

13   in the cash sweep period prior to the

14   receivership.

15       Q.    So, the money comes in and, then, I

16   guess, what Midland did, correct me if I'm

17   wrong, you took that regular payment and

18   applied it against the loan?

19       A.    Yes.   We took the $280,000 and

20   change and applied it against the loan.

21       Q.    You reflected that application on

22   this loan history detail?

23       A.    Yes.

24       Q.    Which in my, the way I look at it,

25   essentially, a general ledger analysis of the

1                    David Bornheimer              266

2    money that's going in and out?

3          Do you understand how I see it that

4    way?

5       A.   Yes.   It's a loan history of the

6    money in and out, activity on this loan.

7       Q.   If you look down, two lines down,

8    disbursement of $84,078.82, this money is

9    going out.

10          Do you recall what that money is

11    for?

12       A.   Probably not off the top of my head.

13    Although, we did produce additional screen

14    prints off of my system is where I would go

15    to look that stuff up.

16          If you have copies of those screen

17    prints, I could probably find that entry.

18       Q.   The screen print would be the

19    disbursement account screen print?

20       A.   This is what's called other reserves

21    on this report.   My system has a breakdown of

22    the different reserve account it would have

23    gone out of.

24       Q.   Where does it say other reserves?

25       A.   The column heading.

```
 1                    David Bornheimer              267
 2         Q.   It's a screen print of the other
 3    reserves account?
 4         A.    It's not called other reserves on
 5    our system.
 6         Q.   What is it called so I could get my
 7    staff to get it?
 8         A.    I would have to see that account
 9    which it refers to.   This report lumps it
10    together.   We called it other reserves.   On
11    my system and the screen prints that we
12    produced, they are separate accounts, and
13    they are named differently.
14         Q.   As of today, you don't know what
15    that one is?
16         A.   Not off the top of my head.
17         Q.   Then, you have some credits that
18    come in from May 3rd to May 10th; do you see
19    that?
20         A.   Yes.
21         Q.   That's additional money that's
22    coming in; do you know what those are for?
23              MR. FELD:   If you need to see
24         the screen shots to look at those,
25         just let him know.
```