1                    David Bornheimer                268

2          A.   It would be helpful if I had the

3    screen print.

4          Q.   I'll go get them.  I just don't know

5    where to look.

6               When you say the screen print, tell

7    me which one to look for it?

8               MR. FELD:  These were the

9          supplemental production that you had

10         asked for.  It all came in one batch.

11              MR. MONAHAN:  Joe, they have

12         been marketed as Trial Exhibits 156

13         to 162.  They should be in those

14         binders that we dropped off for you.

15              MR. MANISCALCO:  156 to 162?

16              MR. MONAHAN:  Exactly.

17              MR. MANISCALCO:  Okay.

18         Q.   In there, sir, if you look up above,

19    you have what's called reserve credits in

20    April of 2016; do you see that?

21         A.   Yes.

22         Q.   Would that also be reflected in

23    these screen prints?

24         A.   Should be.  I believe so.

25         Q.   Do you know what all these different

1                    David Bornheimer                    269
2     reserve credits are?
3              This is just additional money that's
4     coming in.
5              Do you know where that money came
6     from?
7         A.   Again, I think, would it be helpful
8     if I had the screen prints for me to answer
9     that.
10        Q.   I understand where the $217,000 is.
11             The protective advance legal, that's
12    $400,767.62, do you know where that's
13    reflected in this loan history?
14        A.   It's going into be in the other
15    amounts column.  It's going to be under
16    transaction description disbursement slash
17    recoverable advance.
18        Q.   Have you found it?
19        A.   That's -- that amount is going to be
20    in several payments.  Several advances.
21    You're not going to see that line item
22    amount.
23        Q.   You don't identify it as legal?
24        A.   In this it doesn't.  In the screen
25    prints that we provided, I do provide the

1                    David Bornheimer                270

2      legal account, I guess, you could say.

3          Q.   Then, if you look at your next line

4      item, the protective advance operating

5      expenses of $420,000, is that reflected in

6      the December 15, 2016 recoverable advance?

7          A.   It's December 22, 2016 recoverable

8      advance.

9          Q.   The third-party expenses, sir, the

10     $51,750, do you know where that would be

11     reflected?

12         A.   It's going to be one of the

13     disbursement recoverable advances in the

14     other amounts column, but it's going to be

15     multiple payments, so, you're not going to

16     see that one amount on this report.

17         Q.   I understand where you've identified

18     maintenance fee.

19              The special servicer liquidation

20     fee, the$389,000.  I have read through the

21     pooling and servicing agreement.

22              What is the special servicer

23     liquidation fee?

24         A.   It's a fee due to the special

25     servicer for certain events to fine in the

1                    David Bornheimer                    271

2    servicing agreement.

3        Q.    Isn't it a fee to work out a loan?

4        A.    Essentially, yes.

5        Q.    If this loan is not worked out and

6    these properties are liquidated, how is that

7    special servicing liquidation fee earned?

8                MR. FELD:    Objection as to

9         form.

10       A.    Well, we calculate it as one percent

11   of the amount due.

12       Q.    But the pooling and servicing

13   agreement actually does use the words a work

14   out, right?

15       A.    Yes.

16       Q.    When you calculated it, you didn't

17   take into consideration a work out, you just

18   used the one percent?

19               MR. FELD:    Objection as to form

20        as to how you're defining work out.

21       A.    We calculated this off of one

22   percent of the amount due.

23       Q.    So, you calculated it out of, I

24   guess, you took the $40 million $252,000

25   minus that amount?

1                       David Bornheimer                272

2          A.   I think, that's right.

3          Q.   Then, multiply that by one percent?

4          A.   Yes.

5          Q.   My office brought in the screen

6     shots.  This will challenge your eyes.  It's

7     pretty small.  (Handing.)

8               I just showed you the screen shots

9     that you were looking for.

10              MR. FELD:  Are we going to mark

11         these as an exhibit?

12              MR. MANISCALCO:  Yes.  Exhibit

13         62.

14              (Whereupon, Bornheimer Exhibit 62,

15         screen shots were marked, for

16         identification, as of this date.)

17         Q.   If you look at this, sir, does this

18    refresh your recollection now as to what some

19    of these different line items represent?

20         A.   Yes.

21         Q.   Can you take me through the first

22    page.

23              This is the $420,000 dip payment?

24         A.   Correct.

25         Q.   I think, we totally agree on that

1                David Bornheimer              273

2    one?

3        A.   I think so.

4        Q.   The next page, this shows the

5    $400,000; this is the legal fees?

6        A.   Correct.

7        Q.   Then, you show me the different days

8    that the fees were paid?

9        A.   Yes.

10       Q.   If you look at this, this seems to

11   be a running total of fees that were on this

12   file since March 5th of 2013; is that

13   correct?

14       A.   Yes.

15       Q.   These are not fees that were

16   incurred post petition during the bankruptcy,

17   right?

18       A.   Well, they were incurred post

19   Washington bankruptcy.

20       Q.   Were they incurred post Olympia

21   bankruptcy?

22       A.   Somewhat.

23       Q.   This $400,000 that you're asking for

24   in this line item, this amount of money was

25   incurred dating back to 2013, correct?

1                     David Bornheimer                    274

2         A.   Yes.  It goes back to 2013, yes.

3         Q.   This is, a portion of this line

4    item, is a pre-petition Olympia amount, and a

5    portion of it is a post petition Olympia

6    amount?

7         A.   Correct.

8         Q.   I reviewed the CDC plan.

9              You had fees approved in the CDC

10   plan; do you recall that?

11        A.   Yes.

12        Q.   Those legal fees were paid back

13   then; why are they continually being accrued

14   here?

15        A.   This starts in 2013.  That CDC plan

16   was 2011.

17        Q.   So, you got paid for the prior

18   period from 2011 and these are fees that were

19   incurred from March 5th of 2013?

20        A.   Yes.  After the default.

21        Q.   You have another line item, which is

22   your property tax advance?

23        A.   Yes.

24        Q.   This is the amount that coincides

25   with the loan history that you just showed

1                    David Bornheimer                    275

2    me?

3        A.    Correct.

4        Q.    The next page you have $51,750 on

5    the next page, sir.

6              If I look at this, this was incurred

7    from June of 2016 to December 2016, correct?

8        A.    That says April.

9        Q.    I apologize.  I told you it was

10   going to challenge our eyes and I have

11   glasses on.

12             April 6th of 2016?

13       A.    Correct.

14       Q.    That's when it starts to December

15   6th of 2016?

16       A.    Yes.

17       Q.    Out of this $51,750, the post

18   petition period for the Olympia bankruptcy is

19   really only one item, which is the $27,000,

20   which is in December of 2016; is that

21   correct?

22       A.    That's correct.

23       Q.    And the balance is a pre-petition

24   amount, right?

25       A.    Yes.

1                David Bornheimer                276

2         Q.   It says here a miscellaneous fee

3    credit of $28,600, which was paid on June

4    10th of 2016; do you know what that's for?

5              MR. FELD:   Can you repeat the

6         amount you're looking at?

7              MR. MANISCALCO:   Joe.

8         Q.   The line item $28,600, Casey

9    Phillips, it's a credit; do you know where

10   that came from?

11        A.   Yes.   That came out of our suspense

12   account.   It was an amount to pay down that

13   protective advance.

14        Q.   Who's Casey Phillips?

15        A.   She's an employee at Midland.

16        Q.   You took money from the borrower's

17   suspense account and you swept it to a

18   disbursement account to pay for this

19   appraisal?

20        A.   Yes.   We paid Midland back for the

21   advance for the appraisal.

22        Q.   If you look, sir, at the legal fee

23   analysis, that also occurred on June 10th of

24   2016, $153,248.95 was swept from the

25   borrowers reserve account and credited to

```
 1                    David Bornheimer              277

 2    legal fees; is that correct?

 3         A.   Can you give me the number?

 4         Q.   June 10th of 2016.

 5         A.   Yes.  $153, 248.98?

 6         Q.   Yes.

 7              Did you direct that sweep to occur?

 8         A.   Yes, I would have directed that.

 9         Q.   What authority did you have to take

10    the money from the reserve account and sweep

11    it to the miscellaneous fee account and

12    credit it to legal fees?

13         A.   We swept it to the suspense account.

14    You can see the entry on 6-9 of '16, where we

15    collapsed the reserves.

16         Q.   It went into a suspense account and

17    then to a reserve account?

18         A.   No.  The reserves were collapsed,

19    and the money was transferred to the suspense

20    account, and then applied to the advances

21    that we've discussed.

22         Q.   So, by collapsing those reserve

23    accounts, the debtor then was now deficient

24    in its reserve account?

25         A.   Well, the borrower was deficient in
```

1                    David Bornheimer              278

2     the reserve account, absent that collapse.

3          Q.   How do you know that?

4          A.   Because they did not make the June

5     2016 payment.

6          Q.   You said they didn't make the June

7     payment because the receiver didn't make the

8     payment, they didn't have enough money to

9     make the payment.

10              It wasn't the borrower that didn't

11    make the payment in June, right; the receiver

12    is in control?

13         A.   The borrower is the obligor.

14         Q.   But the receiver was in control of

15    the money in June of 2016?

16         A.   Yes, that's right.

17         Q.   If you look down, sir, in May of

18    2015, there's another miscellaneous fee

19    credit which goes to legal fees of, I think,

20    it says $58,925?

21         A.   Which account are you in?

22         Q.   I'm in the same legal account, page

23    two.

24         A.   Yes.

25              MR. FELD:   What's the date and

1                     David Bornheimer                279

2        the amount?

3            MR. MANISCALCO:  May.  The line

4        item is May 6, 2015.

5        Q.  Is that the same situation, you

6    swept it from a reserve account to pay the

7    legal fees?

8        A.  I don't have that in my screen shots

9    where that money came from.

10       Q.  You don't know why you took that

11   from the debtor's account and applied it to

12   legal?

13           MR. FELD:  Objection.

14           Did you mean to say debtors?

15           MR. MANISCALCO:  Borrowers.

16       A.  Well, there was an outstanding legal

17   advance at the time.

18       Q.  Why did you take the borrower's

19   reserve money and sweep it to pay legal fees?

20       A.  I didn't say we took the reserve

21   money to sweep it to pay legal fees.  I

22   didn't say that on this entry.

23       Q.  Can you tell me what happened with

24   this entry, this miscellaneous fee credit

25   entry?

1                    David Bornheimer              280

2         A.   As I mentioned, the screen prints

3    that we've got here don't show this entry.

4    It's not from one of the accounts that are on

5    these screen prints.

6         Q.   I don't understand what that means.

7              The screen prints that you're

8    looking at don't show what entry?

9         A.   Don't show where the $58,925.27 came

10   from.

11        Q.   But the one we just looked at didn't

12   show where it came from either, but you said

13   it came from the reserve account, which went

14   into the suspense account; it's the same

15   exact language?

16        A.   Which one are we talking about?

17        Q.   In June you said, oh, that one was

18   we collapsed the reserve and we set up a

19   suspense account and applied it to legal

20   fees.

21              If you look at the May one, it's the

22   exact same language of entry, miscellaneous

23   fee credit; so, how do you know what you did

24   in the June one, but you don't know what you

25   did in the May one?

David Bornheimer                    281

1

2      A.   I know the June one because it's on

3   the suspense account.  If you flip back a

4   couple of pages you'll see the suspense

5   account.  That money went from the reserve

6   accounts to the suspense account.  It's

7   detailed here (indicating).

8      Q.   But you don't know where the $53,000

9   went?

10      A.   I said I don't know where it was

11   allocated from to pay down the legal advance.

12   It wasn't from these accounts we're looking

13   at from these screen prints.

14      Q.   Let's look at the suspense account

15   that you were just testifying to.

16          What is a suspense account?

17      A.   It's an account that is set up to

18   house money for a temporary period of time,

19   typically.  So, if money comes in, and

20   there's no instructions to where it goes, the

21   money gets deposited into a suspense or an

22   applied account.  The money is held there

23   usually for a short period of time.

24      Q.   In this suspense account analysis,

25   or screen print that I'm looking at, I have

1                     David Bornheimer              282

2    in June of 2016, $266,330.04 sitting in a

3    credit suspense account; do you see that?

4         A.   Yes.

5         Q.   Do you know where that money came

6    from?

7         A.   It came from those transaction

8    accounts that are noted 2000, 2010 2430,

9    2455, and 2490.

10        Q.   What does that tell me?

11        A.   They are just different accounts.

12        Q.   Those were different accounts and

13   the money was swept into this particular

14   suspense account?

15        A.   Yes.

16        Q.   But do you know what those accounts

17   are?

18        A.   Not without reviewing my servicing

19   system.

20        Q.   And reviewing the identification of

21   all those different accounts?

22        A.   Correct.

23        Q.   It came into the suspense account,

24   from there, you applied it to miscellaneous

25   fee credits for the balance of the month of

1                    David Bornheimer                    283

2    June and, I guess, some was sent to the

3    receiver of $83,590, correct?

4        A.   Correct.

5        Q.   So, the $153,000 paid legal fees,

6    the $28,600 paid an appraisal fee, and the

7    $83,000 went to the receiver?

8        A.   Yes.

9             MR. FELD:  Is this page four

10        you're working off of, Joe?

11             MR. MANISCALCO:  This is the

12        third to last page called suspense

13        account.

14             (Whereupon, a recess was taken at

15        this time.)

16        Q.   Mr. Bornheimer, I'm going to mark as

17    Bornheimer 63, this is a copy of the most

18    recent payoff now on the B note.

19             (Whereupon, Bornheimer Exhibit 63,

20        payoff on B Note was marked, for

21        identification, as of this date.)

22        Q.   Are you familiar with this document?

23        A.   Yes.

24        Q.   Can you tell me how you obtained a

25    copy of this payoff?

1                  David Bornheimer              284

2        A.   This was prepared by Wells Fargo who

3    is the master servicer for the B note loan.

4        Q.   Wells Fargo then sent this to you?

5        A.   Yes.

6        Q.   You requested this payoff in

7    connection with Midland's position as the

8    special servicer?

9        A.   Yes.

10       Q.   This indicates that the B note is

11   owed $2 and a half million dollars in

12   principle; do you see that?

13       A.   Yes.

14       Q.   And I see the interest component,

15   which is due from 2014 through April 30th of

16   2017; do you see that?

17       A.   Yes.

18       Q.   Then, there's a default interest

19   component, there's a late fee component, do

20   you know what the additional principle and

21   interest component is?

22       A.   Yes.

23       Q.   What is that?

24       A.   That's an amount due under the

25   bankruptcy plan.

1                   David Bornheimer           285

2        Q.   That is the prior CDC bankruptcy

3   plan?

4        A.   Yes.

5        Q.   There's a special servicer

6   liquidation fee; is that a fee to Midland?

7        A.   Yes.

8        Q.   Is that a similar server liquidation

9   fee that you had calculated in connection

10  with the A note payoff?

11       A.   Yes.

12       Q.   Is it the same one percent or is it

13  a different interest rate?

14       A.   The same one percent.

15       Q.   The special servicing fee, the

16  $41,000, that is actually a reimbursement due

17  back to the US Bank trust on this note?

18       A.   Yes, due back to the trust.

19       Q.   I'm going to mark as Exhibit 64,

20  this is a copy of that CDC plan that we were

21  just talking about.

22            (Whereupon, Bornheimer Exhibit 64,

23       CDC plan was marked, for identification,

24        as of this date.)

25       Q.   If you look at that document, sir,

David Bornheimer                    286

1

2    is that the CDC plan that you were just

3    talking about with respect to the A note and

4    the B note?

5        A.    This is the order confirming the

6    plan.

7        Q.    Do you recall what the terms of that

8    plan were?

9        A.    Well, the terms are detailed in the

10    plan, in the disclosure statement.

11        Q.    At the time Midland's attorneys were

12    K&L Gates; is that correct?

13        A.    Yes.

14        Q.    Did K&L Gates work with the debtors

15    in the CDC case in order to confirm a plan of

16    reorganization?

17        A.    That's my understanding, yes.

18        Q.    Is it your understanding that

19    Midland agreed on behalf of the A note and

20    the B note to accept the terms of the plan?

21        A.    Yes.

22        Q.    If you turn to page 16, the plan, it

23    talks about the Wells Fargo claim and how the

24    claim is going to be paid; do you see that?

25        A.    Yes.

1                     David Bornheimer              287

2          Q.   It talks about the LaSalle Bank

3      claim, which is class four.  It indicates how

4      that is going to be paid and the LaSalle

5      claim is the B note that we've been referring

6      to; is that correct?

7          A.   That's correct.

8               MR. FELD:  What page?

9               MR. MANISCALCO:  That was page

10         16.

11              MR. FELD:  Page 16 of the --

12              MR. MANISCALCO:  Of 28.  Bottom

13         right; do you see it?

14         Q.   If you look at page 17, sir, B, it

15     says outstanding accrued, but unpaid payments

16     totalling $361,298.34; do you see that?

17         A.   Yes.

18         Q.   That's the same number that's on

19     this B note payoff that we were just looking

20     at?

21              If you look at the B note payoff.

22         A.   Yes.

23         Q.   If you look at page 18, sir, it

24     talks about a waterfall provision; do you see

25     that?

1                    David Bornheimer                    288

2        A.   Yes.

3        Q.   What is your understanding of how

4   the waterfall was supposed to work with

5   respect to the reorganized CDC debtor?

6        A.   Well, as detailed in the plan.

7        Q.   Let's go through it then.

8             The waterfall indicates the debtor

9   will first pay, or reserve funds for paying

10  when due, the monthly property taxes,

11  insurance, and normal and customary operating

12  expenses arising from the property, as well

13  as administrative expenses currently arising

14  under the cash management agreement; do you

15  see that?

16       A.   Yes.

17       Q.   The debtor in the CDC case had a

18  cash management agreement with Midland?

19       A.   These were the cash management

20  agreements in place.

21       Q.   Do you understand what the cash

22  management agreement provided for?

23       A.   Yes, generally.

24       Q.   What did it provide for?

25       A.   It provided for the cash to be

```
1                    David Bornheimer              289
2      deposited into a central account.
3                MR. FELD:  Objection.
4                The document speaks for itself.
5                MR. MANISCALCO:  No, it
6           doesn't.
7                MR. FELD:  Do you have a
8           specific --
9                MR. MANISCALCO:  I asked him a
10          specific question, which he was
11          answering.
12     Q.   You can continue.
13               MR. FELD:  Is there a question
14          about that document?
15               MR. MANISCALCO:  No, there's a
16          question about the cash management
17          agreement, which you were just doing
18          a great job explaining, sir.
19     Q.   Why don't you finish that
20     explanation as to what the cash management
21     agreement is?
22     A.   It's part of the loan documents that
23     provides for the administration of the cash
24     trap period.
25     Q.   Does that mean a central bank
```

1                    David Bornheimer              290

2    account is established where all the money

3    from the tenants is going to go into?

4        A.   I believe, that's how this was set

5    up.

6        Q.   So, the process at the time of this

7    confirmed plan was that all of the tenant

8    income was going to go into a central bank

9    account; is that correct?

10       A.   That's my understanding.

11       Q.   That's central bank account is going

12   to be controlled by the lender; is that

13   correct?

14       A.   Yes.

15       Q.   The lender would then utilize the

16   money in the account and payout according to

17   these waterfall provisions under the plan; is

18   that correct?

19       A.   Right.

20       Q.   After payment of A, the next payment

21   was going to be made as necessary to meet

22   current obligations under certain reserve

23   accounts?

24       A.   Yes.

25       Q.   Then, C is going to pay the monthly

David Bornheimer                    291

1
2   debt service on Wells Fargo's claim?
3        A.   Yes.
4        Q.   And, then, LaSalle's claim, which is
5   the B note, right?
6        A.   Right.
7        Q.   Then, the waterfall follows through,
8   right?
9        A.   Right.
10       Q.   My understanding is the way this
11  plan was set up was, hands off for the
12  debtor, the money is going to come into an
13  account controlled by the lender, then, the
14  lender will disburse this money in a
15  waterfall analysis under the plan; is that
16  your understanding as well?
17       A.   Yeah.
18       Q.   Have you reviewed the loan histories
19  and the bank statements to determine whether
20  the waterfall provisions under this plan were
21  followed?
22       A.   I reviewed the loan history report.
23       Q.   What else did you review aside from
24  the loan history report to determine whether
25  Midland was complying with the waterfall

1                     David Bornheimer                    292

2    provisions?

3         A.   Well, I reviewed, there was a letter

4    that our counsel at the time drafted, that I

5    reviewed after an analysis was done on the

6    bank accounts.

7         Q.   That's K&L Gates?

8         A.   Yes.

9         Q.   What else did you review; I think, I

10   have that letter?

11        A.   Just the information in the file.

12        Q.   Can you tell me what else you

13   reviewed, aside from loan histories, the

14   letter from your counsel; did you review

15   anything else?

16        A.   I reviewed the file that was

17   produced.

18        Q.   Did you review the bank statements

19   and the cash that was actually in the bank?

20        A.   Not in detail.  I know we produced

21   those.  I have not had a chance to review

22   them in detail.

23        Q.   Here is a letter.  If you hold that

24   plan open, sir, a letter from K&L Gates dated

25   November 13, 2014.

```
 1                  David Bornheimer              293

 2              Is that one of the letters that you

 3   reviewed?

 4              (Whereupon, Bornheimer Exhibit 65,

 5          11-13-14 letter was marked, for

 6          identification, as of this date.)

 7     A.   Yes, I have seen this letter.

 8     Q.   This letter indicates that there was

 9   an error in the waterfall provisions, but

10   that they caught up some of the B note

11   payments under the waterfall, and then made

12   the payments, correct?

13              MR. FELD:  Take your time in

14          reading it.

15     A.   What was the question?

16              MR. MANISCALCO:  Read it back.

17              MR. FELD:  Do you have a copy

18          of this?

19              MR. MANISCALCO:  There's a

20          question first.  You have to answer

21          it.

22     A.   They are talking about the catch up

23   payments.

24              MR. FELD:  Before you ask the

25          next question, do you have a copy
```

1                    David Bornheimer                294

2          that has the Bates numbers on it so

3          we could track it?

4                MR. MANISCALCO:  I do not.  I

5          only have this.

6                MR. FELD:  Who was this

7          produced by?

8                MR. MANISCALCO:  You guys.  I

9          don't know why it's not on here

10         though.  This may have come from

11         Centrum.

12    Q.   Did you ever discuss with Paul

13 Martin the waterfall provisions and who was

14 responsible at Midland to make sure that

15 these payments were made?

16    A.   I have discussed those -- I did

17 discuss the waterfall provisions with Paul

18 before he retired.

19    Q.   Who was it at Midland that was

20 handling the payment of the waterfall amounts

21 to the different creditors?

22    A.   The asset manager provides the

23 posting instructions.

24    Q.   It would have been Paul Martin?

25    A.   Whoever the asset manager is at the

```
 1                    David Bornheimer              295

 2    time.  That's their responsibility.

 3         Q.  Let's identify who was the asset

 4    manager was at the time.

 5              In 2014, this letter is copied to

 6    Paul Martin, does that refresh your

 7    recollection that he was the asset manager?

 8         A.  Yes, he was at the time.

 9         Q.  Paul Martin was the asset manager in

10    2014 when the CDC plan was confirmed, which

11    is the exhibit you looked at before, that was

12    in November of 2011, right?

13         A.  Right.

14         Q.  Those plan payments were supposed to

15    start December of 2012 and was Paul Martin

16    the asset manager in December of 2012?

17         A.  No.

18         Q.  Who was it?

19         A.  I don't recall.

20         Q.  It was someone before him?

21         A.  Yes.

22         Q.  In here, he indicates that there is

23    insufficient money in the account to make the

24    March 1, 2013 regular payment; do you see

25    that?
```

1                    David Bornheimer                296

2          A.    Yes.

3          Q.    I'll mark as Bornheimer 66, a copy

4     of the March bank statement, which is PNC

5     National Bank, which basically shows the

6     money that's going in and out of the account

7     in accordance with the waterfall provision;

8     do you see that, sir?

9                    (Whereupon, Bornheimer Exhibit 66,

10             PNC bank statements was marked, for

11             identification, as of this date.)

12         Q.    In looking at that, sir, what is the

13    amount of money that's in the bank account?

14         A.    The ending balance is $675,686.06.

15         Q.    What is the monthly payment that is

16    supposed to be made to the B note?

17         A.    To the B note?

18         Q.    Yes.  In accordance with the

19    waterfall?

20         A.    The plan says the debtor will pay

21    the next monthly debt service payment in the

22    LaSalle Bank claim.

23         Q.    Right.

24                    If you look at page 17, it gives you

25    the amount though, right?

1                    David Bornheimer              297

2              Isn't the monthly payment to the B

3     note $27,792.18?

4         A.  We're talking -- are you asking

5     about B, where it says the $361,000 --

6         Q.  No.

7              It says here in the K&L Gates letter

8     the monthly payment is $27,792.18.

9         A.  The catch up payments.

10        Q.  The monthly payment that is due on

11    the B note is $27,792.18, right?

12        A.  I don't know.

13        Q.  I'll get it for you then.

14             You don't know who the monthly

15    payment is due on the B note?

16        A.  It doesn't say in the plan.  At

17    least what you've shown me.

18        Q.  If we look at the plan at page 17 it

19    says there's an outstanding balance of

20    $361,298.34, which will be due and payable in

21    monthly installments of $27,792.18,

22    commencing on January 1, 2013, and continuing

23    every month thereafter, right?

24        A.  I see that.

25        Q.  That was going to be paid to the B

1                David Bornheimer                298

2    note to catch up on these arrears, they

3    essentially didn't ask for the cash up front.

4    They said you owe us $361,000, but you could

5    pay it over time, right?

6         A.    Right.  The catch up payments.

7         Q.    The catch up payments were due on a

8    monthly basis of $27,792.18, right?

9         A.    Right.

10        Q.    Your attorney is saying there's

11   insufficient money in March of 2013 to make a

12   $27,792.18 payment, right?

13        A.    Right.

14        Q.    The bank statement I showed you,

15   what's the average balance that's in the bank

16   account of that month?

17        A.    The average balance is $555,863.30.

18        Q.    Why did Midland not make the March

19   2013 payment on the B note?

20             MR. FELD:  Objection.

21             There's a problem with that

22             question.  I think, you're

23             misconstruing what the letter says.

24             The letter talks about the regular

25             monthly payment and the catch up

1                    David Bornheimer              299

2         payment.  You have to read the letter

3         in context.

4              MR. MANISCALCO:  Okay.

5         Q.  Do you know why Midland, if there's

6    $555,000 in the bank account, did not make

7    the B note's monthly payment for March of

8    2013?

9         A.  Yes.  Because the letter says that

10   the cash flow was insufficient.

11        Q.  As you look at the bank statement,

12   can you tell me how the cash flow is

13   insufficient when there's $555,000 in the

14   bank?

15        A.  The bank statement doesn't tell me

16   what's available in -- to fund the plan

17   payments.

18        Q.  So, cash in the bank doesn't tell

19   you what is available to be utilized to make

20   the payments?

21        A.  It doesn't tell me when the loans --

22   what months that's supposed to be applied to.

23   I don't have enough information to make a

24   comment on that.

25        Q.  Well, you remember testifying that

David Bornheimer                        300

1    you said this B note went into default March
2    of 2013 because of a failure to make a
3    payment, right?
4        A.   Right.
5        Q.   What I'm trying to understand is, I
6    went and looked at the bank statements
7    because wouldn't that show me, if there's no
8    money in the bank, then, I get it, there's no
9    money in the bank, you can't make the
10   payment, right; do you understand?
11       A.   I understand.
12       Q.   I'm showing you the bank statement
13   that shows there is over a half a million
14   dollars in the bank.
15            If there's a half a million dollars
16   in the bank, why is Midland not paying the B
17   note?
18       A.   That's -- you're giving me a date
19   and time.  You got to correspond that to how
20   far the loan was past due.  What the
21   obligations were at the time to run in the
22   waterfall.
23       Q.   I gave you the plan, the plan says
24   we're going to make payments on a monthly
25

1                   David Bornheimer                301

2   basis, right?

3       A.   Right.

4       Q.   Here's how we're going to make the

5   payments on a monthly basis, right?

6       A.   Here's how who's going to make the

7   payments?

8       Q.   Midland controls the bank account.

9           We already established that the

10  lender controls the bank account.  The lender

11  controlling the bank account is going to

12  follow this plan and it's going to make

13  payments to the creditors in accordance with

14  that plan?

15      A.   Right.

16      Q.   Because the debtor, the CDC debtor,

17  the reorganized debtor, was absolutely not in

18  control of the money, right?

19           MR. FELD:  Objection to using

20       the word debtors.

21      Q.   The reorganized debtor as defined in

22  the plan was not in control of the money?

23      A.   The money was supposed to be

24  deposited into the lock box account.

25      Q.   Do you have any information where

David Bornheimer                        302

1

2    that reorganized debtor actually grabbed the

3    money or did it go into the lock box account?

4        A.   I think, it went into the accounts.

5        Q.   If the money went into the bank

6    accounts, and I'm showing the bank statements

7    where the cash is in the bank account, what I

8    don't particularly understand is, why Midland

9    didn't pay the B note?

10       A.   We ran the waterfall pursuant to the

11   plan.

12       Q.   Exactly.

13            If you ran the waterfall pursuant to

14   the plan, and there was cash in the bank, why

15   didn't Midland make the payment?

16       A.   Because it states in the letter

17   there, the cash was insufficient.

18       Q.   This is a letter from your attorney

19   saying the cash is insufficient.

20            I'm telling you, I'm showing you,

21   sir, do you come to the same conclusion,

22   looking at the bank statement, that there was

23   $500,000 in the bank?

24       A.   In the balance, yes.

25       Q.   You come to the same conclusion,

1                          David Bornheimer                    303

2    looking at the bank statement that is in

3    front of you, with the conclusion that your

4    attorney drew back in November of 2014, that

5    there's no money in the bank and, therefore,

6    the B note is default?

7              MR. FELD:  Objection as to

8         form.

9         A.   No.  He didn't say there was no

10   money in the bank.  He said the cash flow is

11   insufficient.

12        Q.   Right.

13             I'm asking you, there's $500,000 in

14   the account.  There's cash in the account.

15   Can you tell me how the money in the account

16   is not sufficient to pay the B note?

17        A.   Because when we ran the waterfall

18   pursuant to the plan it wasn't sufficient

19   money.

20        Q.   We're going to mark as Bornheimer

21   67, we'll go through the waterfall, sir.

22             (Whereupon, Bornheimer Exhibit 67,

23         waterfall schedule was marked, for

24         identification, as of this date.)

25        Q.   Bornheimer 67, sir, is a schedule,

1                     David Bornheimer                304

2    which was created based on the bank

3    statements that were turned over in this

4    case.

5            If you look at the first month, sir,

6    see the first month; November 1, 2011?

7        A.   Yes.

8        Q.   In the account it shows there were

9    deposits in the bank account of $1 million

10   $51,082; do you see that?

11       A.   Yes.

12       Q.   Money was taken out for operating

13   expenses, replenishment reserve accounts,

14   releasing reserve accounts; do you see that?

15           MR. FELD:   Just for

16           clarification, what is the origin of

17           this document; what's the nature of

18           it?

19           MR. MANISCALCO:   This was a

20           document that was created by our

21           accountant utilizing the bank

22           statements.   Basically, taking the

23           bank statements and putting it into a

24           spreadsheet.

25           MR. FELD:   This was created by

1                    David Bornheimer            305

2          your accountants?

3                    MR. MANISCALCO:  Yes.

4          Q.   If you look, sir, at the first

5     month, November of 2011, there's $1 million

6     $51,000 in deposits, correct?

7          A.   I see that number.

8          Q.   Now, it goes through a waterfall.

9               C, column, D says BOA $66,299?

10         A.   Column D?

11         Q.   D as in David; on the left-hand side

12    vertically up and down?

13         A.   I see nothing in that D column.

14         Q.   (Indicating).

15         A.   The row.

16         Q.   Yes.  Row D?

17         A.   Yes.

18         Q.   $66,299 went to the operating

19    expenses, right?

20         A.   I see that number.

21         Q.   Which follows the waterfall, the

22    next tranche of money goes to Wells Fargo,

23    $229,814.95; do you see that?

24         A.   Okay.

25         Q.   That appears to be a regular monthly

1                    David Bornheimer                    306

2    payment to the A note, correct?

3         A.   I don't know.

4         Q.   Okay.  Let's make it clear.

5              Why don't we look at the loan

6    history, cross reference this.  You have the

7    loan history in front of you, it's Exhibit 4.

8              Tell me whether that's a regular

9    monthly payment?

10        A.   Does not appear so.

11        Q.   Next, if you look at that waterfall,

12   the next payment should be the B note, right?

13             If you look at the CDC plan

14   waterfall.  Let's go back to the waterfall.

15   If you look at page 18, the reorganized

16   debtor will pay the monthly debt service owed

17   to Wells Fargo, right?

18             That seems to be the 229 payment?

19        A.   I don't know.

20        Q.   But what's the next payment that's

21   due; the monthly debt service on the LaSalle

22   Bank claim, right?

23        A.   Under D, under the waterfall

24   provisions?

25             Yes, I see that.

1                David Bornheimer                307

2        Q.   A says you pay operating expenses, B

3    says you pay two different reserve accounts;

4    are you following me so far?

5        A.   Not completely.

6        Q.   Really?

7             Look at page 18.  Let's read this,

8    "the reorganized debtor will continue to

9    comply with the cash management agreement

10   currently in place and will make payments,

11   including creditor payments required by this

12   plan, from available operating income from

13   the real property in accordance with the

14   following waterfall provisions;" do you

15   understand what that means?

16       A.   Yes.

17       Q.   Explain what it means?

18       A.   It means what you read.

19       Q.   What is your understanding?

20       A.   To make payments in accordance with

21   the waterfall.

22       Q.   What is your understanding of what

23   that means?

24       A.   That payments will be made in

25   accordance with the waterfall provisions.

1                     David Bornheimer              308

2        Q.   Where do they get payments from?

3        A.   Where does who get payments?

4        Q.   You said payments will be made.

5             What payments will be made?

6        A.   The payments received by the Midland

7    as the master server.

8        Q.   Midland will receive payments from

9    the rental income and then will pay it in

10   accordance with this document, right?

11       A.   Right.

12            MR. FELD:   Objection.

13            Which document?

14            MR. MANISCALCO:   The document

15        we're looking at, which is the CDC

16        plan.

17       Q.   What is the first payment that's

18   supposed to be made under this document and

19   how you read it?

20       A.   Monthly property taxes.

21       Q.   What else?

22       A.   Insurance.

23       Q.   What else?

24       A.   Normal and customary operating

25   expenses.

1                    David Bornheimer           309

2          Q.   Arising from the real property,

3     right?

4          A.   Yes.

5          Q.   The first thing we do, we take the

6     money that's in the account, from the rental

7     income, and we pay taxes, insurance, and

8     operating expenses, correct?

9          A.   Correct.

10         Q.   If there's money left after that we

11    pay the next thing, that's what a waterfall

12    is, right?

13              MR. FELD:  I'm going to object

14          to the questions based on this

15          document.

16              We don't have any idea of the

17          basis of this document whether it's

18          accurate or not.

19              MR. MANISCALCO:  This is the

20          plan.  I'm not even there.

21              MR. FELD:  I'm talking about

22          Exhibit 67.

23              MR. MANISCALCO:  He's answering

24          questions on the plan.  You could

25          object to that one, but we're talking

1                      David Bornheimer              310

2          about the plan.  We'll get there.

3      Q.   Let's go back, sir.

4           Do you understand what a waterfall

5   provision is?

6      A.   Yes.

7      Q.   The first amount of money of the

8   money in the bank will pay what's covered

9   under A, right?

10     A.   Right.

11     Q.   Then, if there's more money, the

12   next amount of money will pay B, right?

13     A.   Right.

14     Q.   That will pay two different reserve

15   accounts correct?

16     A.   Correct.

17     Q.   Then, the next amount of money will

18   pay the debt service to Wells Fargo claim,

19   right?

20     A.   Correct.

21     Q.   That is the A note?

22     A.   Yes.

23     Q.   Whatever the monthly debt service

24   payment is on the A note will be the third

25   thing that gets paid, right?

```
1                   David Bornheimer              311

2       A.   Yes.

3       Q.   What is the fourth thing that gets

4  paid?

5       A.   The debt service on the B note.

6       Q.   The debt service on the B note.

7            If there's still more money, then,

8  what happens?

9       A.   Then, you keep going down the

10 waterfall.

11      Q.   So, the waterfall is based upon

12 money that's in the bank, we waterfall the

13 payments in accordance with the money that's

14 coming in the bank, right?

15      A.   Right.

16      Q.   Now, let's look at 67.  If you look

17 at 67, it shows you a balance of $1 million

18 $51,000 that was in the bank; do you see the

19 deposits?

20            MR. FELD:  This is the document

21       I object to.  We don't the basis of

22       this.

23            MR. MANISCALCO:  You can object

24       to it.

25            MR. FELD:  We don't think the
```

1                        David Bornheimer                    312
2              witness should be answering questions
3              about a document that he doesn't know
4              the accuracy of or how it was
5              generated.
6                    You could answer it only if
7              you're comfortable with it, but if
8              you're not comfortable with the basis
9              or the origin of it, methodology
10             used, and no idea about the accuracy
11             of it, you shouldn't be speculating.
12                   You could answer any questions
13             about documents that you're familiar
14             with.
15                   THE WITNESS:  Okay.
16        Q.   So, presuming this document
17   accurately reflects what's in the bank
18   statements, this indicates there's $1 million
19   $51,000 in the bank in November of 2011.
20   This document shows a waterfall analysis of
21   what you and I just went through.
22             So, my question is, can you tell me
23   in this document where the B note is paid?
24        A.   I'm not familiar with this document.
25   So I'm not comfortable.  I can read along

David Bornheimer               313

1

2    with you fine, but I'm not comfortable

3    answering questions about a document that I'm

4    not familiar with.

5        Q.    What I can do, I can introduce every

6    bank statement, if that makes you more

7    comfortable, and that's fine with me, from

8    November of 2011 to the present.  I will show

9    you that every month there is more than

10   enough cash flow in the bank account to

11   follow this waterfall.  If that makes you

12   more comfortable, I'll go do that.  I'll

13   print them up.  It's not that long.  I'm

14   saying to you, for the sake of sitting here

15   for four more hours going through every bank

16   statement, the accountant prepared the

17   schedule based on the bank statements.

18           You could say, presuming you're

19   correct, Joe, that's what this appears, and

20   reserve your right to object if the bank

21   statements don't say that; is that fair?

22           MR. FELD:  Let us take a short

23       break.

24           MR. MANISCALCO:  I could go

25       through everyone or you could say I

1                    David Bornheimer                    314

2          reserve my right to object later to

3          the bank statement, you and

4          accountants are wrong, you don't know

5          how to read numbers.

6                MR. FELD:  It might be easier

7          to take one or two as an example.

8                MR. MANISCALCO:  I tried to do

9          that.  I took the one from 2013.  I

10         printed five or six of them.  That's

11         a fair approach, Alan.

12               MR. FELD:  I don't know if we

13         have to go through all of them.

14               Give us a minute to talk in the

15         conference room.

16               (Whereupon, a recess was taken

17         at this time.)

18     Q.  I'm going to mark a document that

19     actually came from your attorney.  We'll mark

20     as Bornheimer 68, this is a letter from K&L

21     Gates dated January 2, 2015 to Rick Wathen,

22     he attaches, Midland's prior counsel,

23     prepared a waterfall spreadsheet analysis.

24               So, the document I was showing you

25     before, our accountant utilized the same

1                     David Bornheimer              315
2      concept of what Midland's prior counsel had
3      prepared and then took it to the next level.
4      So, take a look at that, sir.
5                     (Whereupon, Bornheimer Exhibit 68,
6            spreadsheet was marked, for
7            identification, as of this date.)
8           Q.   Have you ever seen that letter
9      before?
10          A.   Yes.
11          Q.   If you look at that letter,
12     Midland's prior counsel, in going through
13     with Rick Wathen, his inquiries as to what
14     occurred with respect to the waterfall and
15     the money, and provided this spreadsheet to
16     show the waterfall and how the waterfall of
17     money is supposed to go in accordance with
18     the plan.
19                    If you look at his schedule, it's a
20     pretty good schedule.  He gives you who gets
21     paid first, second, third, and he goes
22     through the waterfall.
23                    Now, if you look at the first page
24     of that schedule, does that help you now
25     understand, we talked about it before, how

1                     David Bornheimer                    316

2     the waterfall of money flows?

3         A.   Yes.

4         Q.   What we did was, we cross-referenced

5     what he provided to Mr. Wathen.  And we

6     actually got the bank statements to coincide

7     with what he was providing to see whether the

8     numbers were accurate.  That's what you were

9     looking at before, which is Bornheimer 67,

10    basically, took the same spreadsheet

11    analysis, the cash in the bank, we followed

12    the waterfall that Midland's counsel

13    provided, and then the last column shows

14    there's a difference.  I don't know where

15    he's getting his numbers from showing that

16    there was short falls.

17              Is that waterfall schedule that

18    you're looking at now, which is Bornheimer

19    68, was that contained within Midland's

20    files?

21              Had you ever seen this before?

22        A.   I think, I have seen this.

23        Q.   Did you see it in connection with

24    this case or you had seen it previously?

25        A.   I think, I saw this previously.

David Bornheimer                    317

1

2      Q.    If you look at that analysis, if we

3  go to month one, sir, whether you could

4  testify or not you'll let me know, if you

5  look at the first month it appears that

6  there's money in the bank to make the payment

7  to the B note and it's not made.

8         Do you know why Midland did not pay

9  the B note?

10     A.    I don't know why in month one.

11     Q.    In month two again it didn't pay the

12 B note, right?

13     A.    Right.

14     Q.    It seems like there's money in the

15 account, according to your attorney's

16 schedule, right?

17     A.    I'm getting an idea why, but it

18 doesn't tell me on the spreadsheet.

19     Q.    If you look, there was that letter

20 that your attorney wrote in November of 2014,

21 kind of indicates in the first paragraph,

22 that there was an error as the waterfall

23 provision contained in the CDC property's

24 confirmed bankruptcy plan, and on February of

25 2013 the sum of $55,000 was applied to

1                    David Bornheimer                    318

2    accrued, but unpaid interest on the B note;

3    do you see that?

4         A.   Yes.

5         Q.   It appears that they may have tried

6    to correct it by doubling up on payments that

7    were made in the later months; is that how

8    you read that?

9         A.   That the master server reversed and

10   reapplied.

11        Q.   It seems to be a two month, because

12   if we took the $55,584, and divide it by two,

13   it comes up to that $27,000 something catch

14   up payments that are supposed to be made?

15            If you look in the CDC plan, page

16   18, which is the number on page 18 and 19 in

17   the CDC plan, if I divide up the $55,000

18   number --

19        A.   It's also the number in the monthly

20   B note P&I payments.

21        Q.   I wasn't sure.  I thought the

22   monthly P&I payments are in the $23,000

23   range.  I think, the $27,000 was the catch

24   up.

25            If you look at this spreadsheet

1                    David Bornheimer              319
2    right here, it shows $23,869.42 every month.
3    It's being paid after the A note.  I'm
4    presuming that's the B note.
5                MR. FELD:  Which analysis is
6         this?
7                MR. MANISCALCO:  67.
8                MR. FELD:  I'm just going to
9         object again because I think there
10        are concerns about the preparation of
11        that document, the source of it.
12                Feel free to answer if you're
13        comfortable, Dave.
14        A.   I'm looking at the B note loan
15   history.  I see the $27,792.18.  If I pulled
16   it open to June of 2012, you can see multiple
17   entries of that same dollar amount, which was
18   prior to the catch up payments.
19        Q.   So, in June of 2012, there's
20   $27,792.18 made, right?
21        A.   Right.
22        Q.   Based on this loan history of the B
23   note, is that part of the catch up payments
24   or do you believe that's part of the monthly
25   principle and interest payment?

1                    David Bornheimer            320

2        A.   It looks to me like it's part of the

3    monthly principle and interest payment.

4        Q.   I'm trying to figure out where it

5    says that.

6        A.   Because the catch up payments don't

7    commence under the plan.  I'm on page 18,

8    January of 2013.

9        Q.   In 2012, the monthly principle and

10   interest payments are made, it appears,

11   right?

12       A.   Right.

13       Q.   Then, in 2013, if you look at

14   February 8, 2013, which is on the same

15   schedule I'm looking at, they are still

16   making those payments, and sometimes they

17   double up; you'll see a $55,000 payment some

18   months?

19            MR. FELD:  This is in the loan

20        history?

21            MR. MANISCALCO:  Yes.

22       A.   Yes, I see it, yes.

23       Q.   Then, in their loan history on March

24   21st of 2013, the $27,792 appears to be the

25   last entry on the B note's loan history,

1                    David Bornheimer              321

2    right?

3              Then, a late charge is assessed the

4    following month in April.

5         A.   If you continue on then, you see the

6    payment reversals which are in the November

7    letter.

8         Q.   In 2014?

9         A.   Yes, starting in October of 2014.

10        Q.   Payment reversal, what does that

11   mean?

12        A.   I believe, that's what's referenced

13   in this 2014 letter.

14        Q.   Got it.

15             So, it appears, from looking at this

16   loan history, payments are made on the B note

17   up until March of 2013.

18             The next payment for April of 2013

19   is not reflected in the loan history,

20   correct?

21        A.   I don't see a payment for April of

22   2013.

23        Q.   The next time you see a payment is

24   October of 2014?

25        A.   Correct, a payment reversal.

1                    David Bornheimer              322

2        Q.    What does that mean?

3        A.    That the money was reversed.

4        Q.    But there's a payment reversal,

5    then, a suspense credit.  Then, there's a

6    payment reversal, then, a suspense credit.

7    So, did they reject the money?

8        A.    Again, I think, that's back to the

9    explanation on the November 13, 2014 letter.

10       Q.    Can you explain to me what that

11   explanation says?

12       A.    It says there was an error in the

13   application of a payment in 2013, on February

14   7, 2013, the sum of $55,584.36 was applied to

15   accrued, but unpaid interest on note B, due

16   October 1, 2010 and November 1, 2010.

17            This was an error as the waterfall

18   provisions contained in the confirmed

19   bankruptcy plan requires current principle

20   and interest on B note before the catch up

21   payments.

22       Q.    They made that reversal, but then,

23   if you look in 2015, February of 2015,

24   payments are being made, but they are placed

25   in what's called a suspense payment account.

1                    David Bornheimer              323

2           It's all through 2015, up until

3    October of 2015; do you agree with me?

4              MR. FELD:   Could you repeat the

5         question again?

6              (Whereupon, the record was read

7         back by the reporter.)

8       A.   They are placed in the suspense

9    account, but if you look down beginning in

10   March of '15, they are starting to be

11   applied.

12      Q.   So, they start applying the monthly

13   payments that were made on the B note for the

14   period March of 2015 to October of 2015,

15   right?

16      A.   In the months that they are being

17   applied?

18      Q.   They applied the March through

19   October 15th payments as regular monthly

20   payments to the B note, right?

21      A.   But, if you look at the line item,

22   starting the date March 24, 2015, that's for

23   the December 2013 payment.

24      Q.   I see what you mean.

25           So, they are taking the payment in,

David Bornheimer                    324

1

2    but they are applying it to a December 2013

3    payment?

4        A.    Right.

5             It looks like they reversed some

6    payments and then re-posted it.

7        Q.    What I'm trying to get at, it seems

8    very confusing to me, who has knowledge of

9    the B note's application of payments under

10   this loan history?

11       A.    Midland directs as the special

12   servicer.

13       Q.    Who gives Midland the direction to

14   put the payments in this loan history that

15   you just testified about?

16       A.    The asset manager is the person

17   responsible at Midland for making sure the

18   payments are posted accurately.  It looks

19   like there were some discussions with outside

20   counsel, as you can see the letter

21   corresponding.

22       Q.    It appears during this time period

23   2012, 2013, '14 Centrum is asking, presumably

24   because it's a creditor in CDC, why is the

25   waterfall not being followed by Midland.

1                    David Bornheimer                325

2            Based on everything that you have in

3      front of you, do you know why Midland didn't

4      follow the waterfall?

5      A.    It looks like the waterfall is being

6      followed.  As detailed in the letter,

7      November 2014 letter, there was a

8      misapplication, so, those payments had to be

9      reversed and applied in the correct way.  But

10     the waterfall is being administered pursuant

11     to the plan.

12     Q.    But how is the waterfall being

13     administered under the plan, if you look at

14     this Exhibit 68 from December 1st of 2011 to

15     May 1st of 2012, there's no payment made to

16     the B note?

17     A.    Right, but there's also a large

18     amount of property protective advances

19     outstanding that were satisfied in February

20     of 2012.

21     Q.    I understand that.

22            But notwithstanding those property

23     protective advances, according to column row

24     D, the payment is $27,792, and every month at

25     the bottom, you'll see, according to your

```
 1                    David Bornheimer              326
 2     attorney, the cash balance in the account is
 3     in excess of the payment that should be made
 4     to the B note; do you agree with me?
 5          A.   Then, you can see a large payment
 6     was made was posted to the B note in June of
 7     2012.
 8          Q.   But my question was, you said
 9     Midland followed the waterfall from day one,
10     right?
11          A.   Right.
12          Q.   But Midland did not follow the
13     waterfall from day one, because December 1,
14     2011 up until May 1st of 2012, Midland had
15     money in the account and was not paying the B
16     note payment; incident that true?
17          A.   Then, you see the payments in June
18     of 2012 that came in and they are applied,
19     and the reorganized debtor or borrower
20     receives the credit for when the funds are
21     received.  They are applied as of the date
22     the funds are received, and you can see that
23     in the loan history report.
24          Q.   Let's make this a little more
25     simple.
```

1               David Bornheimer                327

2          In December of 2011, if you look at

3     the schedule, sir, there's $431,000 in the

4     bank, right, more or less; according to your

5     attorney's schedule?

6          A.   Right.

7          Q.   He follows the waterfall and he pays

8     Wells Fargo $229,000, right?

9          A.   Right.

10          Q.   After he pays the $229,000, he's

11     still sitting with cash of $76,000, right?

12          A.   Right.

13          Q.   But the B note is not paid; right?

14          A.   That month.

15          Q.   So, the first month Midland did not

16     follow the CDC plan in the waterfall

17     provisions; isn't that correct?

18          A.   No.   I wouldn't characterize it as

19     not following the plan.   To put yourself in

20     the timeframe that we're talking about, the

21     plan had just been confirmed and it takes

22     some time to get the proper receivables set

23     up on everybody's system.   We had to work

24     with Midland's system and Wells Fargo's

25     system to set this up.