1   UNITED STATES BANKRUPTCY COURT

2   EASTERN DISTRICT OF NEW YORK

3

4

In re:                          Chapter 11

5

OLYMPIA OFFICE LLC, et al.,     Case Nos.:

6

   Debtors.                     16-74892 (AST)

7                                16-75515 (AST)

                                 16-75516 (AST)

8                                16-75517 (AST)

_____      (Joint Administration)

9

10

11

12          DEPOSITION OF ERIC ORSE

13            SEATTLE, WASHINGTON

14          THURSDAY, MARCH 9, 2017

15

16

17

18

19

20

21

22

23   Reported by:

24   GWEN S. BRASS, CCR 1908, CSR 5784

25   JOB NO. 119750

**EXHIBIT**
E
tabbies

1  9TH OF MARCH, 2017
2  1:31 P.M.
3
4
5  DEPOSITION OF ERIC ORSE, HELD AT
6  THE OFFICES OF LANE POWELL, 1420 FIFTH
7  AVENUE, SUITE 4200, SEATTLE, WASHINGTON
8  98101, BEFORE GWEN BRASS, A CERTIFIED
9  COURT REPORTER IN THE STATE OF
10  WASHINGTON AND CERTIFIED SHORTHAND
11  REPORTER IN THE STATE OF CALIFORNIA.
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  A P P E A R A N C E S
2
3
4  SHEPPARD, MULLIN, RICHTER & HAMPTON
5  Attorneys for MLMT 2015-MCP1 Washington
6  Office Properties LLC
7    30 Rockefeller Plaza
8    New York, New York 10112
9  BY: THOMAS MONAHAN, ESQ.
10
11
12
13  SHEPPARD, MULLIN, RICHTER & HAMPTON
14  Attorneys for MLMT 2015-MCP1 Washington
15  Office Properties LLC
16    30 Rockefeller Plaza
17    New York, New York 10112
18  BY: ALAN FELD, ESQ.
19
20
21
22
23
24
25

1  KARR TUTTLE CAMPBELL
2  Attorneys for Eric Orse
3    701 Fifth Avenue
4    Seattle, Washington 98104
5  BY: DIANA CAREY, ESQ.
6
7
8
9  LAMONICA, HERBST & MANISCALCO
10  Attorneys for Chapter 11 Debtors
11    3305 Jerusalem Avenue
12    Wantagh, New York 11793
13  BY: JORDAN PILEVSKY, ESQ.
14    (APPEARING TELEPHONICALLY)
15
16
17
18  ALSO APPEARING:
19    ALBERT MAIMON, Videographer
20
21
22
23
24
25

1  ERIC ORSE,
2  called as a witness, having been
3  duly sworn by the court reporter, was examined
4  and testified as follows:
5
6  THE VIDEOGRAPHER: Good afternoon.
7  This is the start of tape labeled number
8  1 of the videotaped deposition of Eric
9  Orse in the matter of In Re Olympia
10  Offices LLC, et al., filed in the United
11  States Bankruptcy Court, Eastern
12  District of New York, Number 16-74892
13  (AST), 16-75515 (AST), 16-75516 (AST),
14  16-75517 (AST).
15  This deposition is being held at
16  Lane Powell, 1420 Fourth Avenue,
17  Suite 4200, Seattle, Washington 98101,
18  on March 9 at 2017 at approximately
19  1:32 p.m.
20  My name is Albert Maimon. I'm the
21  legal video specialist from TSG
22  Reporting Inc., headquartered at
23  747 Third Avenue, New York, New York.
24  Your court reporter is Gwen Brass,
25  also in association with TSG Reporting.

ERIC ORSE

1  ERIC ORSE
2  Will counsel please introduce
3  yourselves, after which the court
4  reporter will swear in the witness and
5  we will precede.
6  MR. MONAHAN: Yes. It's Tom
7  Monahan and Alan Feld of Sheppard Mullin
8  on behalf of MLMT 2005-MCP1 Washington
9  Office Properties LLC.
10  MS. CAREY: Diana Carey of Karr
11  Tuttle Campbell, representing Eric Orse
12  as the management representative of
13  CDC Properties I LLC.
14  MR. MONAHAN: Before -- and we have
15  on the phone --
16  Jordan, do you want to give your
17  experience?
18  MR. PILEVSKY: Yes. Sorry. I had
19  it on mute.
20  Jordan Pilevsky, LaMonica Herbst &
21  Maniscalco, on behalf of the Chapter 11
22  debtors.
23  (Witness sworn by the reporter.)
24  EXAMINATION
25  ///

1  ERIC ORSE
2  BY MR. MONAHAN:
3  Q. Good afternoon, Mr. Orse.
4  A. Good afternoon.
5  Q. As I mentioned just a moment ago,
6  my name's Tom Monahan. I represent
7  MLMT 2005-MCP1 Washington Office Properties
8  LLC, and for the mercy of all of us and the
9  court reporter here, I'm going to refer to
10  that entity as the Noteholder going forward,
11  and if you could understand that -- that I'm
12  referencing that entity.
13  Does that -- does that work for
14  you?
15  A. Understood. Yes.
16  Q. And so I represent the Noteholder
17  in connection with Chapter 11 bankruptcy
18  proceedings commenced by Olympia Office LLC,
19  WA Portfolio LLC, Mariners Portfolio LLC, and
20  Seahawk Portfolio LLC, pending in the Eastern
21  District Bankruptcy Court of New York.
22  And again for the mercy of everyone
23  here and especially our court reporter, I'm
24  going to refer to those four entities
25  collectively as the debtors here.

1  ERIC ORSE
2  Does that work for you here today?
3  A. Yes, it does.
4  Q. So, now, obviously you've been
5  deposed before. I know you had your
6  deposition taken in connection with the
7  Washington State court litigation in this
8  matter.
9  Again, I'll try and limit my
10  inquiry here today to issues that weren't
11  covered in that deposition. But just having
12  had your deposition before -- taken before,
13  are you familiar with how the proceeding
14  works?
15  A. Yes.
16  Q. And in addition to the Washington
17  State deposition, have you had your deposition
18  taken before in an instance other than that
19  time?
20  A. Yes.
21  Q. About how many times have you had
22  your deposition taken?
23  A. Probably five.
24  Q. Okay. So this isn't your first
25  rodeo, so to speak.

1  ERIC ORSE
2  A. Yes.
3  Q. So essentially I'm going to ask you
4  a series of questions. It's really a
5  conversation. I'm looking for information
6  related to our case. I'm going to ask you
7  questions and then I'm going to ask -- and put
8  a question mark on it and ask you for an
9  answer.
10  If you don't understand my
11  questions, if you could just ask me to
12  rephrase or restate the question, I'll do my
13  best to make it make more sense for you and we
14  can hopefully move these proceedings along as
15  quickly as possible.
16  If you do answer my question, it'll
17  be assumed that -- I'll assume and it will be
18  assumed that you understood the question.
19  Does that make sense?
20  A. Yes.
21  Q. And while this is generally a
22  question -- you know, a question and answer
23  session, a conversation, it's not really a
24  natural conversation.
25  You know, we can't speak over one

ERIC ORSE

another, and we have to give verbal responses
as opposed to nods or inaudible responses.

Seems to me you're familiar with
that process already in letting me drone on
with these instructions to you before
answering. But does that work for you, that
we don't talk over each other and you'll let
me put a question mark on my questions before
you answer them?

A. Yes.

Q. Thank you very much.

And, you know, even though it's a
more casual setting, you understand that
you're under oath? This testimony is sworn to
be true under penalties of perjury, the same
as if you were giving testimony in open court?

A. Yes.

Q. Okay. Great.

And with that, you know, I'll begin
the examination.

And just want to touch base
briefly. Are you currently employed?

A. I have my own firm.

Q. And what is that firm?

ERIC ORSE

A. Orse & Company Inc.

Q. And how did Orse & Company Inc.
come to -- come into being? What -- when did
it start?

A. Incorporated in 1997.

And I do financial services work,
primarily in the restructuring world, through
that company.

Q. And about how much of the business
is devoted to restructuring?

A. Hundred percent right now.

Q. And when you say the restructuring
world, you know, what types of engagements
does Orse & Company typically do?

A. Receivership, state receivership.
I do bankruptcy trustee work, and just chief
restructuring officer type work, CRO.

Q. And is there a breakdown between
receivership trustee work and work that Orse &
Co. typically does?

A. No. I mean, over what period? I
typically try to take one or two engagements
on at the same time, which takes up a hundred
percent of my time. And it could be a

ERIC ORSE

Chapter 11 trustee engagement or a
receivership engagement. And usually they
take up most of my time while I'm engaged in
the --

Q. So just whatever -- whatever comes
in the door, whatever types of engagement,
that's the type of engagement --

A. Yes.

Q. -- that would be --

(Parties speaking simultaneously;
reporter requesting parties to speak in turn.)

Q. Whatever comes in the door, that
would be the engagement that you would be
focused on?

A. Yes.

Q. And you said that 100 percent of
the firm's business is focused on
restructuring at the moment --

A. Since 2009.

Q. And prior to 2009, what other type
of work did Orse & Co. do?

A. Merger and acquisition work, pre
IPO, initial public offerings, as a, you know,
CFO or a CFO junior helping companies prepare

ERIC ORSE

to go public or be acquired.

Q. And during that time was -- what
percentage of the firm's work was devoted to
that type of pre IPO or start-up work and what
percentage was devoted to the restructuring?

A. Probably 75 percent M& -- merger
and acquisition type work, IPO work,
25 percent restructure.

Q. And when Orse & Co. was founded --
I'm sorry. What year was that?

A. 1997.

Q. When Orse & Co. was founded, were
you doing restructuring work then or --

A. No. I basically go with what the
cycle is --

Q. Yeah.

A. -- so in the late '90s I was doing
a lot of merger and acquisition work and early
stage CFO work for technology companies.
That's how I created my company.

And then when the dot com crash
hit, I started doing bankruptcy work for that
period of time.

And then when that ended, I went

ERIC ORSE

back over to do IPO and M&A work, mergers and acquisition.

And then when 2009 hit, I've been doing restructuring work since then.

Q. And then -- so you said the dot com crash, that would be sort of the early aughts, like 2003, 2002 ish?

A. 2001 to 2004.

Q. And was it in about that time that you took your first restructuring work?

A. Well, no. I worked at Pricewaterhouse in the mid '90s and did -- I worked in -- I actually was an auditor, and then I went back and received a graduate degree and returned in the -- what they call the dispute analysis and corporate recovery group and did bankruptcy work there.

Q. And do you have any -- what was your -- what was your higher degree in?

A. It's an MBA in finance.

Q. Do you have any other higher education degrees besides an undergraduate degree?

A. I have an undergraduate degree in

ERIC ORSE

accounting and then an MBA in finance.

Q. And no other degrees?

How is Orse & Co. managed? Is it just you? Do you have employees? Do you have other partners? Other owners --

A. Just me.

(Parties speaking simultaneously; reporter requesting parties to speak in turn.)

Q. Do you have any other co-owners or partners?

A. No.

Q. Do you have any employees?

A. No.

Q. So it's a one-man show?

A. Yes.

Q. And you typically have two engagements at one time?

A. Can, yeah.

Q. And when you're undertaking those engagements, are you more focused on one and then on the other or do you sort of juggle both at the same time?

A. Depends on the -- on the cycle of which that engagement is. As you know, in

ERIC ORSE

bankruptcy you're busy at the beginning and then it can drag on and you take on another one. And so it's that kind of a model.

Q. Do you focus on any particular industries in your -- in your work out restructuring engagement or are you a jack of all trades?

A. Jack of all trades.

Q. Any particular background in real estate?

A. No.

Q. Have you taken on real estate bankruptcy in restructuring engagements?

A. Not specific to real estate, no. I've had engagements where we've had to deal with real estate transactions but not specific portfolios of real estate.

Q. Other than -- so what -- can you give me just some past examples in the last five years of the types of engagements that you've worked on?

A. Sure.

I've worked on two receiverships, one of them as the receiver. It was a real

ERIC ORSE

estate escrow company called Hartman Escrow. As the receiver.

I was the chief financial advisor for the trustee on Darren Berg's bankruptcy.

And -- oh, the other receivership was an entity called Worldwide Water that I was assisting the receiver on.

And also in there I was the chief financial officer for a manufacturing company called Worldwide Press.

Q. And as far as trustee engagements, have you had any trustee engagements in about the past five years?

A. The trustee engagement would have been this case, Prium Companies and -- well, it was Price & Um. I was appointed the Chapter 11 trustee of Tom Price and Hyun Um.

Q. Any connection with your trustee engagement? Are you familiar with the types of duties that you are bestowed with as a trustee?

A. Yes.

Q. And what types of duties do you understand those to be?

ERIC ORSE

A. I have a fiduciary responsibility to the various stakeholders and creditors, unsecured creditors, lenders, and to the court itself.

Q. And would that fiduciary duty extend to secured creditors as well?

A. Yes.

Q. Now, sort of turning to the Prium Companies, the Prium bankruptcy --

A. "Prium."

Q. Prium? Thank you.
-- the Prium bankruptcy, how did you become appointed as the trustee for the Prium bankruptcy?

A. So it -- it's Price & Um. The individuals filed bankruptcy. I was contacted by the US trustee in the fall of 2013 as a potential candidate to be the trustee over the individuals Tom Price and Hyun Um, and I accepted that position.
So that's -- that's who I am -- was the Chapter 11 trustee over, Tom Price and Hyun Um.

Q. And in the course of that trustee

ERIC ORSE

engagement, did you become engaged in another capacity with respect to what's known as the Prium Companies?

A. Yes.

Q. And how did that come about?

A. Prium Companies LLC, which was owned by Tom Price, Hyun Um, and one other shareholder, was taken into Chapter 11 in August of 2014; and rather than appoint another trustee, Judge Snyder appointed me as the management representative of the Prium Companies LLC.

Q. And how did he appoint you the management representative of Prium Companies LLC?

A. With an order.

Q. And did that order include certain other entities that Prium -- the Prium Companies held or their subsidiaries held?

A. Yes, it did.

Q. And was one of those companies CDC Properties I LLC?

A. Yes.

Q. And you mentioned that you -- and

ERIC ORSE

were you ultimately made the management representative of CDC Properties I LLC?

A. Yes.

Q. And you mentioned this role as management representative. What's your understanding of what a management representative is, and how does being a management representative differ from being a trustee?

A. I'm not sure it differs. The management order that was approved for me as Chapter 11 trustee of Price & Um I believe is the same order that was approved in the Prium bankruptcy for me as management representative. So the same management authority I had as the Chapter 11 trustee in Price & Um was given to me as the management representative in Prium Companies LLC.

Q. And would that authority also come with the same fiduciary and other duties that you would have had as the trustee in the bankruptcy?

A. Yes.

Q. And in connection with your

ERIC ORSE

engagement on the Price and Um bankruptcies and your engagement as the management representative of the Prium -- Prium Companies, was that a separate engagement? Was there a different compensation structure, a different --

A. Same --

Q. -- agreement?

A. Same compensation structure.
The compensation structure was an hourly rate that was approved where I had to file fee applications every two months and the judge approved the fees in Prium as management representative just as he did with Price & Um as trustee.

Q. And when you -- and was the engagement with respect to CDC Properties I LLC under the same umbrella? Would you be putting in fee applications in the Prium bankruptcy estate for CDC Properties I LLC work, or was there a separate engagement there, or was it all sort of the same boat?

A. All of the same boat.

Q. Okay. And just so we're not

ERIC ORSE

1
2 completely talking in a vacuum here --
3 MR. MONAHAN: Could you just mark
4 this as 1, please.
5 (Exhibit 1 was marked for
6 identification.)
7 Q. If you could just take a moment to
8 review what's been marked as Noteholder
9 Exhibit 1, and let me know if you've seen the
10 document before, if you're familiar with it.
11 A. (Reviewing.)
12 Yes, I have.
13 Q. And is this the order appointing
14 you as management representative of the Prium
15 Companies including CDC Properties I LLC? The
16 order we were just discussing.
17 A. (Reviewing.)
18 Yes.
19 Q. And, now, sort of pivoting from the
20 broader Prium engagement to the CDC
21 Properties I LLC engagement, what can you tell
22 me generally about CDC Properties I LLC? What
23 was its business? What did it do?
24 A. When I took over, it had ten
25 buildings, commercial buildings, around the

ERIC ORSE

1
2 state of Washington where we had tenants,
3 classic commercial real estate business.
4 Primary tenants were the state of
5 Washington -- yeah, the state of Washington,
6 different agencies of the state of Washington.
7 So my role was to -- along with
8 other portfolios and other buildings under
9 Prium -- was to restructure that and basically
10 figure out the best modes for returning --
11 returning -- getting a return for the
12 creditors of Prium Companies.
13 Q. And in connection with that, did
14 you have opportunity to interact with the
15 creditors of CDC Properties I LLC
16 specifically?
17 A. The -- well, I interacted with the
18 lender. So when you say creditors, I'm not
19 sure exactly what you're asking. But I
20 interacted with the lender and -- and Derek
21 Edmonds, which was -- I'm not sure he's a
22 creditor, but he's in line for the bankruptcy
23 plan, the CDC bankruptcy plan, as a -- someone
24 who would get paid out.
25 I did not have any interaction with

ERIC ORSE

1
2 unsecured creditors.
3 Q. Did you have any interaction with
4 the secured creditors, with the lenders who
5 lent the property to acquire the ten
6 properties that CDC Properties I LLC held?
7 A. Sorry. Reask the question.
8 Q. Of course.
9 (Brief interruption.)
10 THE VIDEOGRAPHER: The time is
11 1:52 p.m. We're off the record.
12 (Recess taken from 1:52 p.m. to
13 1:53 p.m.)
14 THE VIDEOGRAPHER: The time is
15 1:54 p.m. We're on the record.
16 MS. CAREY: You -- an objection
17 here. You have defined Noteholder
18 previously in this matter, and now
19 you're using the term lender. I'm not
20 sure that you have clarified who the
21 lender is or the same as the Noteholder.
22 So perhaps you could rephrase that
23 question.
24 MR. MONAHAN: Yeah. Understood.
25 Q. And you had mentioned that you

ERIC ORSE

1
2 communicated with the lender. Who -- who --
3 who did you communicate with? Who were they
4 representing?
5 A. That would be the Noteholder --
6 Q. Okay.
7 A. -- in your definition. Sorry. I
8 changed the term.
9 We had various interactions
10 throughout the years with -- I guess it would
11 be the special servicer. Trying to remember
12 his name. Paul. Who was our main interaction
13 with regards to our operating payments every
14 month and, you know, the ten payments to
15 the -- to a lock box.
16 Q. And you mentioned the special
17 servicer that Paul would be working for. That
18 would be Midland, correct?
19 A. Correct. Yes.
20 Sorry. I don't recall his last
21 name.
22 Q. No problem at all.
23 A. Paul Martin.
24 Q. And how frequently and sort of on
25 what basis would you interact with Mr. Martin?

ERIC ORSE

A. Initially when I came into the case, I interacted with him maybe once a month, just to give him an update on the status of the portfolio. Then it slowed down because things were, you know, running fairly normally. Then we had interactions on trying to determine the debt balance of the loan, the loans and the accounting surrounding that. We did that for, you know, over an 18-month period, back and forth.

And then as the case -- the Prium case was -- was nearing its -- nearing the fourth quarter, we -- we wanted to deal with all the assets we had, including CDC, so we approached Paul about selling various buildings.

And, in fact, in December of 2015, we sold the Wenatchee building to a buyer approved by Paul and a lender, all the proceeds of which went to pay -- pay down the note.

And then we, in the spring of 2016, had multiple calls and emails with him regarding trying to restructure the portfolio

ERIC ORSE

and, in fact, had purchase and sale agreements in place from Derek Edmonds or Centrum who were interested in buying the buildings. And Paul was reviewing those with the lender.

And then, as you probably saw in my prior deposition, it went into bankruptcy -- went into receivership as that process was ongoing.

Q. So just a few sort of quick questions following up on that.

A. Yes.

Q. When you said as the Prium case was entering the fourth quarter, you mean like the fourth quarter of a football game? It was nearing the end, correct?

A. Yes.

Q. And so once you sold the Wenatchee property, you were down to nine properties, correct?

A. Correct.

Q. And at the time the receivership started, CDC Properties I LLC still held those nine properties, correct?

A. Yes.

ERIC ORSE

Q. And just going forward, I'm going to refer colloquially to those nine properties as "the properties." They're the real properties at issue in this case.

Does that work for you as well?

A. Yes.

Q. And I'll try and be better about my definitions as well so we'll avoid objections from Ms. Carey on those issues.

And you mentioned that the -- that a receivership occurred with respect to CDC Member -- I'm sorry, CDC Properties I LLC.

A. Yes.

Q. How did that come about?

A. Not quite sure how to answer that question. Your client would probably know the answer to that.

But we were notified probably 30 days in advance that a receivership action, custodial receivership of the state of Washington action, had been started and we continued to talk to Paul Martin about the purchase and sale agreements that were signed by the buyer, needed to be approved by the

ERIC ORSE

lender. We couldn't get that approved through Paul Martin, and so the receivership order, we did not object to it when it was approved. Nobody objected to it. And we transitioned the properties off to the receiver.

Q. And so at this time, the receiver is managing the day-to-day operations of the property, correct?

A. Yes.

Q. And you are still the management representative of CDC Properties I LLC, correct?

A. Yes.

Q. And you mentioned that you and -- you and Paul were having discussions about settling on the loan balance and that the sale of the one lower case property, the tenth property that was sold, the Wenatchee property, was used to pay down that loan balance.

During those conversations, did you both arrive at an agreed-upon loan balance that you understood to be what was outstanding and owed to the Noteholder?

ERIC ORSE

A.  No.

Q.  And what was the end result of -- strike that.

Why not?

A.  The loan balance -- the reason I hesitated, we didn't agree on the amount owed. The loan balance itself I believe we agreed on.  The default interest calculations and the reason for the default interest and the timing of the default interest is what I could never reconcile because I never was able to receive accounting that tied our records.  Throughout the whole CDC case.

Q.  And did you -- was there sort of a gap of the Noteholder claims one amount and you felt it was another amount?

A.  Yes.  And the accounting that the Noteholder or special servicer provided from plan confirmation through whatever date I was looking at it, we could not tie the cash flow. We couldn't -- we couldn't get the assumptions for what the lender and/or the special servicer had, those assumptions they made, to what our books said.

ERIC ORSE

Q.  And do you recall sort of what the spread was between the Noteholder's number and your number, what your books said?

A.  Round number, about 4 million.

Q.  And during those conversations and during your calculations, did you have any understanding as to whether there was equity in the CDC Properties I LLC portfolio, equity in the properties?

A.  It came down to that $4 million.

And by the way, I'm using the term note.  There were two notes, of which both had default interest put on them.  And that was one of our challenges, is if the default hadn't happened, based on a different way to look at cash flow, the note balance, there would have been equity.  Which is what I was under the impression when I came in the case. And then when I started getting payoff information and tried to reconcile that with the lender, it became clear that the equity would not -- it probably was very little equity if the Noteholder's balance was accurate.

ERIC ORSE

And so the answer could be yes depending on what balance you thought was right versus what the lender thought.

Q.  So after the spring 2016 receivership happens, what was your day-to-day or week-to-week or even month-to-month job as the management representative of CDC I Properties LLC?  What transpired?

A.  After the receivership?

Q.  Yeah.

A.  Once the receivership occurred, my role was basically to finish up the reporting that was rolling up through Prium Companies at the bankruptcy, and then I was in the process of -- that was -- that was the last -- state this correctly.

That was the second to last building portfolio in the -- under the Prium Companies' umbrella.  So I was in the process of wrapping up the Prium Companies' case at that point.

So to answer your question, very little with regards to the CDC portfolio.

Q.  And did there come a time that you

ERIC ORSE

or your representatives received an inquiry to purchase the CDC portfolio?

A.  Yes.

Q.  And how did that come about?

A.  The US trustee here in western Washington received an email and forwarded that email to Diana Carey, my attorney, with that inquiry in July, I believe, of 2016.

MR. MONAHAN:  Can we mark this as 2.

(Exhibit 2 was marked for identification.)

Q.  If you can just take a moment to review this, and let me know when you're ready.

A.  (Reviewing.)

Yes.

Whoops.  Hold on.  What's on the back?

(Reviewing.)

MS. CAREY:  Notice of trustee sale.

Q.  Yeah, so that was the attachment --

MS. CAREY:  Yeah.

Q.  -- to the -- to the email.

ERIC ORSE

A. Okay. Yes.

Q. And is this the email that you were -- that you were referencing --

A. It is.

Q. -- a moment ago?

And so that email in -- was to the US trustee but -- but copied Ms. Carey here, is that right?

A. Yes.

Q. And did you ultimately receive a copy of this email? Have you seen this email before?

A. Yes.

Q. Did you see the email at or about the time that it was received by Ms. Carey and the US trustee?

A. Yes.

Q. And the email's from a gentleman named Kazu Yamaguchi. Prior to receiving this email, had you ever heard of Mr. Yamaguchi?

A. No.

Q. Did you know who he was?

A. No.

Q. What was your reaction when you

ERIC ORSE

received the email?

A. Surprised. And, again, the mindset we were in at that point was we were closing Prium down. We had been -- as Mr. Feld can attest to, Judge Snyder had been asking us to get the case wrapped up, and so we were pushing to wrap up the case. And when I saw this offer, I thought, "Well, it was a benefit to the creditors of Prium," so we looked into it.

Q. You mentioned you were surprised. Why were you surprised?

A. Because I thought CDC, at that point, we were done working on CDC.

Q. And --

A. Because it was in receiver -- you know, we passed all the assets off to the receiver.

Q. And you mentioned that you thought that it would be a benefit to the creditors. Why?

A. Well, that's my job as a fiduciary is to return as much as I can to the unsecured creditors. And so bringing the money into the

ERIC ORSE

Prium estate would pay more money off to the creditors.

Q. And you just mentioned to the unsecured creditors.

A. Correct.

Q. Did you give any consideration as to the benefit to the secured creditors of such a transaction?

A. Well, the secured creditors, the concept would be that we would sell with the liens attached to the properties. So the secured creditors were covered by those liens.

Q. So upon receiving this inquiry, what did you do next?

A. I think -- I don't have all the emails in front of me, but I think we responded -- I didn't, Diana, I think, maybe did, my attorney -- responded to the buyer -- the buyer's inquiry, maybe asking for an offer. I don't -- I don't recall the exact steps along the way, but it was -- it happened fairly quickly.

Q. Understood.

MR. MONAHAN: And we'll mark this

ERIC ORSE

as 3, I believe.

(Exhibit 3 was marked for identification.)

Q. If you can just take a moment to review this set of -- an email with attachments.

A. (Reviewing.)

Okay. I've reviewed it.

Q. Great.

And now if I can just direct your attention, we added Bates numbers here to the bottom of the page.

A. Yes.

Q. So ORSE 603 --

A. Yes.

Q. -- which is the initial email from Mr. Yamaguchi, correct? The one we just were looking at in Exhibit 2?

A. Yes.

Q. And, as you will see, your memory does serve you. ORSE 600, Ms. Carey directs him to submit an offer and contact person for response.

A. Yes.

Case 17-04120-BDL     Doc 5-12     Filed 12/12/17     Ent. 12/12/17 13:51:59     Pg. 10 of 50

ERIC ORSE

Q. At the time this offer was made, had you directed Ms. Carey to request an offer?

A. Yes.

Q. And as you'll see from the beginning of this email, ORSE 596, it's an email from Mr. Yamaguchi indicating that he's attached a Letter of Intent, and that Letter of Intent is attached here as ORSE 605. It's the first attachment to the email.

A. A Letter of Intent to Purchase?

Q. Yes. Exactly.

A. Okay.

Q. And did you ultimately receive this Letter of Intent to Purchase?

A. Yes.

Q. And did you receive it at or about the time that it came in?

A. Yes.

Q. And you see the price term there was $100,000?

A. Yes.

Q. For the 100 percent controlling LLC interest of CDC Properties I LLC?

ERIC ORSE

A. Yes.

Q. What was your reaction to this offer?

A. I was happy to get an offer and thought we should take it. Again, trying to get the case closed.

Q. At the time you received the offer, did you believe you had the authority to complete this transaction --

A. Yes.

Q. -- to close the offer?

MR. MONAHAN: And, now, could we mark this as 4, please.

(Exhibit 4 was marked for identification.)

Q. And, now, if you could just turn your attention to that email on the first page. It's the email sent on July 27 at 11:30 a.m., indicating "your offer is acceptable" in the second sentence. "There will be no representations or warranties."

Did you authorize Ms. Carey to convey your acceptance?

A. Yes.

ERIC ORSE

Q. And that acceptance on January -- on July 27, 2016, came two days after the offer came in, correct? If you'll see on ORSE 589, the email from Mr. Yamaguchi with the Letter of Intent came in on July 25.

A. Yes.

Q. And between the offer coming in on July 25 and the acceptance on July 27, what did you do to analyze and consider this offer?

A. I didn't do a lot. Again, we were not spending a lot of time on the CDC, and we were in the process of closing the Prium case.

Q. Well, when you say, you know, you didn't do a lot, did you review any files or any analyses you had done with respect to the properties?

A. No.

Q. Did you --

A. Because, remember, at this time the properties were in receivership.

Q. Did you speak to the receiver about the offer?

A. No.

Q. Did you speak to any of the

ERIC ORSE

creditors about the offer?

A. No.

Q. Did you --

A. Define creditors, please.

Q. Anyone who was owed money by CDC Properties I LLC.

A. No.

Q. Did you speak to anyone other than counsel regarding this offer?

A. The only person I would have possibly talked to was Tom Petramalo, who was my property manager.

Q. Did you speak to anyone affiliated with the Noteholder regarding this offer?

A. No.

Q. Did you solicit other offers?

A. No.

Q. Did you think about soliciting other offers?

A. No.

Q. Why not?

A. Again, we were in the process of closing up the case. We had passed the properties off to the receiver, and we were

Case 17-04120-BDL    Doc 5-12    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 11 of 50

ERIC ORSE

under strict orders from Judge Snyder to get
this moving. So we were going to take what we
could get and move on rather than have a, you
know, extended, you know, offer period or
something like that.

Q. Did you consider touching base with
the Noteholder to see if they'd match the
offer --

A. No.

Q. -- or beat it?

A. No.

MR. MONAHAN: Up to 5? I get lost
on these numbers.

(Exhibit 5 was marked for
identification.)

Q. Mr. Orse, if you could just take a
moment to review ORSE Exhibit 5.

A. (Reviewing.)
Okay.

Q. And I guess before we get into the
document, after you accepted the offer in
Noteholder Exhibit 4 --

A. Yes.

Q. -- what happened next?

ERIC ORSE

A. Well, we started to prepare the --
the purchase agreement.

Q. And you say "we." Was it -- it was
you or a law firm on your behalf --

A. Law firm on my behalf.

Q. And who was that firm?

A. Karr Tuttle Campbell.

Q. And was Mr. Feinberg, Michael
Feinberg, taking the lead on that at that
point?

A. Yes.

Q. And do you know who was
representing the purchaser in those
communications?

A. It was Robyn Tuerk.

Q. And how did you or your attorneys
come in contact with Ms. Tuerk?

A. Well, I believe there's an email in
one of the prior exhibits where Diana Carey,
my attorney, asks Kazu for their attorney
contact. And so they must have connected via
email along the way.

Q. And -- and through that process
they came up with this document, which is Orse

ERIC ORSE

Exhibit 5, is that right?

A. Correct.

Q. Now, is this the initial agreement
arising out of Mr. Yamaguchi's offer?

A. Yes.

Q. And if you'll look at the last page
of the agreement itself, which is ORSE 430 --

A. Okay. Yes.

Q. -- it has -- the signatory for the
purchaser is CDC Member LLC.

A. Yes.

Q. What did you understand CDC Member
LLC to be?

A. The buyer.

Q. And you see the name Linda
Greenfield, and her signature actually appears
on the following page on ORSE 431.

A. Yes.

Q. Do you know who Ms. Greenfield is?

A. No.

Q. Did you ever speak with her?

A. No.

Q. To your knowledge, did your counsel
ever speak with her?

ERIC ORSE

A. No.

Q. Were there any emails or other
communications with Ms. Greenfield, to your
knowledge?

A. Not that I'm aware of.

Q. Do you understand what
Ms. Greenfield's role was at CDC Member LLC?

A. I do not.

Q. Did you understand what the
business of CDC Member LLC was?

A. No.

Q. Did you or anyone or your behalf
conduct any due diligence with respect to
CDC Member LLC?

MS. CAREY: Answer to the extent of
your knowledge.

A. If we did, it was very limited.
Google search. Which I don't recall it turned
up anything that -- that I remember. So very
little.

Q. Do you know whose idea it was to
structure this deal as an acquisition of the
membership interest of CDC I LLC?

A. I -- I don't recall. I believe

Case 17-04120-BDL    Doc 5-12    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 12 of 50

ERIC ORSE

it's in one of these prior emails, though,
isn't it?

Q.  I think as the -- the Letter of
Intent indicated that the Letter of Intent was
to purchase the controlling interest of the
LLC for CDC Properties I.  That's Exhibit 3.

A.  So Kazu, in the original email, the
one that was sent to the US trustee, states:
Would you be able to sell the LLC interest of
CDC Properties I LLC?

Q.  And -- and so this was always——at
least from Mr. Yamaguchi's proposal until this
document was created——a transfer of the
membership interest in CDC I Properties LLC,
correct?

A.  Originally, yes.

Q.  And did you ultimately change?

A.  It did.

Q.  And why did that ultimately change?

A.  We came to the realization that we
would incur REET, real estate excise tax,
State of Washington, on the sale of the the
interest would have made the the sale a
negative return on investment for us.

ERIC ORSE

Q.  And the obligation to pay that that
amount, the REET amount, would have been
CDC Properties I LLC's responsibility?

A.  Yes.

Q.  It's the seller's responsibility?

A.  Yes.

Q.  And as a result, was this
transaction ultimately restructured or
changed?

A.  Yes.

Q.  And how was it restructured or
changed?

A.  We changed the purchase agreement
to the purchase of the properties versus the
purchase of the LLC interest.

Q.  And that avoided the REET tax?

A.  Yes.

Q.  Why is that?

A.  Well, I'm not a tax expert, but
counsel has told me that it's not -- it's
either not subject or you -- I don't recall,
but we were given an opinion that it wasn't
subject to it.

Q.  Was it your -- is it your

ERIC ORSE

understanding that the transfer of the
properties was not subject to the tax because
the plan for CDC Properties I LLC, the
bankruptcy plan, indicated as much?

A.  That -- that could be correct, yes.
So what I think what you're saying
is, if it's sold subject to the plan?

Q.  I think I can clear this up.

A.  Okay.

MR. MONAHAN:  6.
(Exhibit 6 was marked for
identification.)

Q.  And if you could just take a look
at the email on top.  I don't think I have any
questions about the lengthy attachment.

A.  Okay.
(Reviewing.)

Q.  And I'll just direct you to the
third full sentence is -- full sentence of the
first page, ORSE 382, says:  Thus Orse is a
manager of CDC I Properties still -- I, still
retains the ability to transfer the real
property, which sale, pursuant to CDC's
confirmed plan of organization at paragraph 6,

ERIC ORSE

is free of excise tax.

A.  Yes.

Q.  Does that refresh your recollection
as to the purpose of structuring this as a
sale of the property?

A.  Yes.

Q.  And was the idea to restructure
this deal ultimately the decision -- was that
ultimately your decision?

A.  Yes.

Q.  And as you indicated before, it's
something you did so that this transaction was
in the green for CDC Properties I LLC,
correct?

A.  Yes.

Q.  How do you -- strike that.
After Ms. Carey makes this proposal
to restructure the deal in -- as a -- as a
transfer of the properties, what happened
next?  Was that ultimately implemented?

A.  Yes.

Q.  And do you recall how that was
ultimately implemented?

A.  You mean for purposes of an

Case 17-04120-BDL   Doc 5-12   Filed 12/12/17   Ent. 12/12/17 13:51:59   Pg. 13 of 50

ERIC ORSE

agreement?

Q. Yeah.

A. Yeah. Well, we -- we restructured the agreement to -- to -- to sell the properties directly.

Q. And was that an agreement to sell the properties -- did you enter into a new agreement separate and apart from the signed agreement that was the membership purchase agreement that we looked at as Exhibit 5?

A. Yes.

Q. And did that agreement call for the conveyance of the properties by a quitclaim deed?

A. Yes.

MR. MONAHAN: Can we mark this as 7.

(Exhibit 7 was marked for identification.)

Q. Why don't you take an opportunity to review Noteholder Exhibit 7 and just let me know: Is this the agreement that was ultimately renegotiated and signed?

A. Yes. Yes, it is.

ERIC ORSE

Q. If you'll look with me at paragraph 7.1.1 of the agreement --

A. Yes.

Q. -- under "Authority," it says: The seller has the power and authority to execute and deliver this agreement and to consummate the transactions contemplated by this agreement. Eric D. Orse as management representative has the full and unfettered right, power, and authority to execute and deliver this agreement and to bind the seller.

Did you believe that to be the case at the time that you signed this agreement?

A. Yes.

Q. Do you now understand that that wasn't the case?

A. No.

Q. Isn't it a fact that both the bankruptcy plan and the deeds of trust, the bankruptcy plan entered in the CDC I Properties bankruptcy and the deeds of trust executed by CDC Properties I LLC, prohibit, expressly prohibit, the transfer of the properties?

ERIC ORSE

A. Well, we sold the properties subject to the lien -- the liens, which we felt from a business perspective was appropriate.

Q. But you'll agree with me that it was prohibited by the plan, correct?

MS. CAREY: Asked and answered.

MR. MONAHAN: I don't believe that it has.

Q. That -- the transfer of the properties was prohibited by the plan, correct?

A. That's not our understanding, no.

Q. And the transfer of the properties was prohibited by the deeds of trust that CDC Properties I LLC had signed, correct?

A. Not that I'm aware of.

Q. Before you entered into this agreement --

A. Yes.

Q. -- had you reviewed the bankruptcy plan for CDC Properties I LLC?

A. Yes.

Q. Had you reviewed the deeds of trust

ERIC ORSE

on the properties held by CDC Properties I LLC?

A. Yes.

Q. And are you familiar with them generally?

A. Generally.

MR. MONAHAN: 8? Is that right?

(Exhibit 8 was marked for identification.)

Q. The court reporter has placed before you what is Noteholder Exhibit 8, which I will do us all the mercy of not requiring us all to read in full.

But if I can -- is this one of the deeds of trust for one of the properties held by CDC Properties I LLC?

A. I take your word for it, yes. Appears to be. I mean, I...

Q. And if you'll just go to the end of the document, which is signed on page 104 of 113.

A. 104 of 113?

Q. Yeah.

A. Yes.

ERIC ORSE

Q. Is that -- do you recognize that to
be the signature of Hyun Um?
A. "Hyun Um."
Q. Hyun Um?
A. It appears to be, yes.
Q. And this appears to be a deed of
trust that was recorded in Thurston County,
Washington, correct?
A. Yes.
Q. And if you'll turn your attention
to page 72 of 113, section 9.02 titled "No
Transfer," if you'll look at the second full
sentence, it says: Borrower shall not
transfer nor permit any transfer without the
prior written consent of lender, which consent
lender may withhold in its sole and absolute
discretion.
A. Okay.
Q. Do you understand that to prohibit
CDC Properties I LLC from transferring the
property subject to this deed of trust?
A. Well, that's what it says.
Q. And you are familiar with this deed
of trust, correct?

ERIC ORSE

A. Yes.
Q. And you were familiar with this
deed of trust when you received the offer to
sell this property?
A. Yes.
Q. And you were familiar with this
deed of trust when you signed the offer to
sell this property?
A. Yes.
Q. And I'm just going to ask again:
How does this deed of trust not prohibit you,
as the management representative of CDC
Properties I LLC, from transferring the
property without the consent of the lender or
the Noteholder?
A. I'm not an attorney. I was under
the impression that we sold it subject to the
confirmed bankruptcy plan which allowed us to
do that.
Q. Why don't we turn to that.
MR. MONAHAN: 9?
(Exhibit 9 was marked for
identification.)
Q. And now, Mr. Orse, the court

ERIC ORSE

reporter has placed before you Noteholder
Exhibit 9, which was previously marked at your
deposition in the state court action as Eric
Orse Exhibit 2.
Is this the confirmed bankruptcy
plan that you were referring to a moment ago?
A. Yes.
Q. Now, if you'll turn with me to --
if you look at the page numbers on the
bottom --
A. Yes.
Q. -- 1 of 28, it's page 20 of 28.
A. Yes.
Q. And it's that numbered paragraph 6.
A. Yes.
Q. And it says at the beginning of
paragraph 6: The reorganized debtor may sell
or refinance the real property, or any
component thereof, at any time if the proceeds
of the sale or refinance are sufficient to pay
all allowed claims in classes 1 through 5 and
sums otherwise required to be paid under the
terms of this plan. Any sale of real property
shall be (a) free and clear of all liens and

ERIC ORSE

monetary encumbrances pursuant to section 363
of the Bankruptcy Code, and (b) exempt from
excise tax pursuant to section 1146 of the
Bankruptcy Code and section 458-AIA-207 of the
Washington Administrative Code.
Do you understand that this
provision expressly restricts CDC Properties I
LLC's ability to transfer the property without
paying all of the claims, which obviously
includes the secured lenders' claims, the
Noteholder?
A. I understand what you're saying,
yes.
We -- we sold with the liens
attached to the properties. So we feel that
we are okay with what's -- what it says in
number 6.
Q. Well, so how do you reconcile that
position with the sentence that says: Any
sale of the real property shall be free and
clear of all liens and monetary encumbrances?
A. I -- I can't answer that. I just
know that we -- we sold them when we felt it
was appropriate. As long as the lien stayed

Case 17-04120-BDL    Doc 5-12    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 15 of 50

ERIC ORSE

with the property, the lender, secured lender, was in the same position.

Q. But the property was sold not free and clear of the security interest held by the Noteholder. It was sold subject to the --

A. Correct.

Q. -- the interest held by the Noteholder.

So the sale of the real property of the properties was not free and clear of those liens, correct?

A. That's correct. We sold it -- at the time that was our belief, that we could sell it with the liens attached and still be -- you know, fall in line with a confirmed bankruptcy plan.

Q. And this -- the exemption from the excise tax, that -- this is the provision that you're relying on for the sale of these properties as opposed to the membership interest, right?

A. Yes.

Q. So you rely on this for the benefit, the tax benefit, that CDC Properties

ERIC ORSE

I LLC received, correct?

A. Yes.

Q. So, you know, as you sit here today, sort of notwithstanding what -- strike that.

We've gone over the deed of trust, the deeds of trust that state that the Noteholder -- strike that -- that state that the CDC Properties I LLC cannot transfer the properties without consent of the Noteholder, correct?

MS. CAREY: Would you repeat that question, please.

MR. MONAHAN: I would be happy to.

Q. We just reviewed the provision of the deeds of trust --

A. Yes.

Q. -- that prohibits CDC Properties I LLC from transferring the properties without consent of the Noteholder, correct?

A. Yes.

Q. And we just reviewed the provision of the plan that prohibits the transfer of the properties only if they are free and clear of

ERIC ORSE

all liens and encumbrances, correct?

A. Yes.

MS. CAREY: Counsel, are you asking him for a legal opinion or what is his opinion?

MR. MONAHAN: I'm asking him just what we were just talking about. I'm just orienting him with where we are.

Q. In light of these provisions, how do you reconcile those provisions with your statement in the purchase agreement that you were authorized to effect the sale of these properties on behalf of CDC Properties I LLC?

A. Again, I'm not going to give a legal opinion obviously, but when we did this transaction, we thought we were in compliance with section 6 of the confirmed bankruptcy plan.

Q. What about the deeds of trust?

A. Again, we relied on section 6 here.

Q. Was an analysis performed——without giving me the contents of what that analysis was——as to the deeds -- as to whether the transfer was in compliance with the provisions

ERIC ORSE

of the deeds of trust?

A. I can't answer that. I would have to ask counsel. I didn't do it myself, but, again, I was relying on the confirmed bankruptcy plan, section 6 --

Q. So as --

A. -- at the time of the transaction.

Q. As you sit here today, you don't know whether a -- an analysis of the deeds of trust was performed in connection with the transaction?

A. Well, I didn't do it myself, but that's why I have counsel.

Q. No. Understood.

And you, sitting here today, just simply don't recall?

A. Don't recall.

MR. MONAHAN: Can we take five minutes?

MS. CAREY: Sure.

MR. MONAHAN: Does that work?

THE VIDEOGRAPHER: The time is 2:41 p.m. We're off the record.

(Recess taken from 2:41 p.m. to

ERIC ORSE

2:54 p.m.)
THE VIDEOGRAPHER: The time is
2:54 p.m. We're on the record.
BY MR. MONAHAN:
Q. If we can turn back to the plan,
Exhibit 9 --
A. Yes.
Q. -- you mentioned that you felt that
section 6 gave you the authority to effectuate
the sale of the properties held by CDC
Properties I LLC.
A. Yes.
Q. Do you remember that testimony?
What provision gave you that
authority? Can you point me to the language
that you were relying on for that authority?
A. Can you show me which page it's on
again? Is it 19 --
Q. Yeah, it's 20 -- 20 of 28.
A. 20 of 28?
Q. And just before, just to clarify
the record, you mentioned section 6. The plan
is organized in various bolded headings.
There's a section 6 on page 19 that is source

ERIC ORSE

of plan payments. We've been referring to
section 6 colloquially here as what I believe
is section 7, means for execution of the plan,
paragraph 19 -- I mean, paragraph 6.
And I just want to make sure that
when you reference section 6, you're referring
to this paragraph 6 on page 20 of 28.
A. That's correct.
Q. Okay.
A. Part of Roman numeral VII,
paragraph 6.
Q. Exactly, yes.
A. So we -- when we looked at this, we
looked at the claims, classes 1 to 5, and we
were told by the lender that all the unsecured
creditors had been paid. We made the
assumption that class 3 and 4, which is the
secured lender, we sold subject to the liens.
And classes 1 and 2, which is
Centrum, we assumed, since the properties were
in receivership, that he was out -- out of
that -- out of the picture at that point,
since the properties went to -- into a
receivership. That's what we relied on.

ERIC ORSE

Q. So just I'm struggling to
understand that because I -- you know, I
follow you that if the -- the language is if
the proceeds of the sale or refinance are
sufficient to pay all of the allowed claims in
classes 1 through 5. And class 3 and 4 is the
Noteholder --
A. Yes.
Q. -- correct?
A. Yes.
Q. And the transaction that was
consummated, the sale of the properties by CDC
Properties I LLC, did not pay the claims for
the Noteholder, correct?
A. The hundred thousand dollars did
not pay the claim of the Noteholders, that is
correct.
Q. So I'm struggling to understand how
this reference that requires the claims in
classes 1 through 5, including the Noteholder
class 3 and 4, is satisfied or authorized the
sale that we've been talking about.
MS. CAREY: Mr. Monahan, Mr. Orse
has -- you've asked that question

ERIC ORSE

previously, and Mr. Orse has given you
his view of why he thought he was
authorized.
MR. MONAHAN: And I'm drilling down
on his -- what his view is based on when
he's talking about class 3 and 4.
MS. CAREY: He's given you that
answer.
MR. MONAHAN: You can enter the
objection, but I still want an answer to
my question.
MS. CAREY: Under the objection,
you may answer the question.
A. We sold them subject to the liens.
Q. But you agree with me that no
payment whatsoever out of this transaction was
paid to the Noteholder, correct?
A. Of the hundred thousand dollars,
no. The money is sitting in escrow.
Q. And no payment out of this sale was
paid to the Noteholder, correct?
A. That's right. Yes.
Q. You've been mentioning that you
sold the properties subject to the liens,

ERIC ORSE

1  correct?
2  A. Yes.
3  Q. What provision in section 7,
4  paragraph 6, or anywhere else in the plan,
5  authorized you to sell the properties subject
6  to the liens?
7  A. Well, again --
8  Q. Where do you get that "subject to
9  the liens" language?
10  A. We relied on this section 6 in
11  selling the properties and selling the
12  properties subject to the secured lenders'
13  liens was the position we took with regards to
14  number 6 here.
15  Q. But you agree with me, it doesn't
16  say if the proceeds are sufficient of the sale
17  or refinance are sufficient to pay all allowed
18  claims or are subject to the liens?
19  A. It does not say that.
20  Q. Subject to the liens is not
21  anywhere in that paragraph and isn't anywhere
22  in the plan, correct?
23  A. It is not in there.
24  Q. So where did you -- you keep saying

ERIC ORSE

1  we transferred the properties subject to the
2  liens. Which -- what provision -- where are
3  you getting that from? Where -- where are you
4  getting that authority from that you were
5  entitled to transfer it subject to the liens?
6  A. Again, I'm just going to repeat
7  myself. We sold it subject to the liens which
8  we felt was in compliance with section 6.
9  Q. So after the agreement is executed,
10  the purchase agreement -- which we marked as
11  Exhibit 9?
12  A. Yes. Or --
13  MS. CAREY: No.
14  THE WITNESS: No.
15  MR. MONAHAN: Is that right? Or is
16  it 10?
17  A. 7?
18  Q. That was -- oh, you're right.
19  You're right. Doing badly on my number now.
20  MS. CAREY: It's Number 7.
21  MR. MONAHAN: Thank you.
22  Q. So the purchase agreement, Exhibit
23  Number 7, called for a purchase price of a
24  hundred thousand dollars, correct?

ERIC ORSE

1  A. Yes.
2  Q. And was that ultimately paid?
3  A. Yes.
4  Q. And how was that paid?
5  A. A wire transfer, I believe. It was
6  a wire transfer to Karr Tuttle Campbell's
7  escrow account.
8  Q. And at the time the purchase
9  agreement, Exhibit 7, was signed, had the
10  purchaser or its representatives been provided
11  with the CDC plan?
12  A. I don't know the answer to that.
13  It was done around that time. I don't know
14  the exact date.
15  MR. MONAHAN: Can you mark this as
16  10, if that's the number.
17  (Exhibit 10 was marked for
18  identification.)
19  A. (Reviewing.)
20  Q. Now, Mr. Orse, have you seen the
21  document marked as Exhibit 10 --
22  A. Yes.
23  Q. -- before?
24  And -- and what is it?

ERIC ORSE

1  A. It is a declaration of Michael
2  Feinberg dated December 2, 2016.
3  Q. And if you'll turn to what's
4  Exhibit A of that -- of that document, you'll
5  see an email dated August 3, 2016, from
6  Mr. Feinberg. It copies you.
7  Do you recall receiving that email?
8  A. I don't.
9  Q. Is that your email,
10  eorse@orseco.com?
11  A. It is.
12  Q. Do you have any reason to believe
13  that you didn't receive the email on or about
14  August 3?
15  A. No reason to believe I did not
16  receive it.
17  Q. And if you'll see, Mr. Feinberg is
18  emailing Robyn Tuerk the deeds of trust and
19  the confirmed bankruptcy plan.
20  Do you see that?
21  A. I do.
22  Q. And is it your understanding that
23  the deeds of trust and the plan are -- were
24  available for download at that link?

ERIC ORSE

A. Yes.

MR. MONAHAN: And, Ms. Carey, I'll just ask you to confirm. Your document production included this email with the link but not the documents themselves.

Are you able to make a supplemental production of the documents showing the transmittal? Or will you --

MS. CAREY: I think after a certain period of time that link is broken. And I'd have to do a whole new link. I've just gone through this recently in another document production, and that link is no longer there.

So I can do that, but it will not obviously be the same -- it will not be a replication of this.

MR. MONAHAN: And maybe we can talk about this offline if it needs more than that, but are you able to attest that these documents were available at that link?

MS. CAREY: I can attest to that.

MR. MONAHAN: Thank you.

ERIC ORSE

Q. And if you'll turn now to the following page, to Exhibit B, you'll see an email from Ms. Carey saying: See paragraph 6 of the attached plan of reorganization.

A. The attached plan actually is on that one, .pdf.

Q. And do you understand her to be referring to the paragraph 6 that we've been discussing?

A. Yes.

Q. So do these documents refresh your recollection that the purchaser had been provided with copies of the plan of reorganization and all of the deeds of trust at the time that the -- that the agreement was signed --

A. Yes.

Q. -- the purchase agreement was signed?

A. Yes.

MR. MONAHAN: Mark that as 11.

(Exhibit 11 was marked for identification.)

Q. Now, Mr. Orse, does this refresh

ERIC ORSE

your recollection that the -- that hundred-thousand-dollar wire came in on or about September 15, 2016?

A. Yes.

Q. And you'll notice in Ms. Tuerk's email of September 15, which has been marked as Exhibit 11, she says: I still owe you entity names.

Do you know what that was in reference to?

A. I do not.

Q. At this point, you know, the money's in the bank. The agreement's signed. Did you understand who the properties were being conveyed to, what individual or entity?

A. Well, at this point, my understanding was whatever the purchase or sale agreement says. So CDC Member LLC.

Q. And the due diligence you had conducted on CDC Member LLC at that point may have included some Google searches, correct?

A. Yeah.

Q. And nothing more than that?

A. Right.

ERIC ORSE

Q. So at this point in time, you know, the money's in the bank, the agreement's signed. Are you in a position to close at that point? Is there anything -- what's the status of the deal, basically?

A. I think there was a couple days of heavy paperwork done by Marti Munhall, who was a Karr Tuttle Campbell paralegal, just pulling all the documents together for closing. But otherwise, yes, we were ready to close.

Q. So the other documents would be really just the quitclaim deeds, correct?

A. Yeah.

Q. Any other documents that you can specifically recall?

A. I don't recall.

MR. MONAHAN: 12?

(Exhibit 12 was marked for identification.)

Q. And have you seen this document before?

A. (Reviewing.)
Yes.

Q. And what is it?

Case 17-04120-BDL    Doc 5-12    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 19 of 50

ERIC ORSE

A. It's a side letter with regards to the transfer of the money, it looks like.

Q. This governed the terms of Ms. Carey's firm holding the hundred thousand dollars in escrow?

A. Yes.

Q. And at this point, did you have any understanding of who Ms. Linda Greenfield was?

A. No.

Q. As you sit here today, do you have any idea who she is?

A. Only that she's the signer on the CDC membership interest, as well as the -- I think -- yeah, the CDC membership interest -- LLC interest. Sorry.

(Exhibit 13 was marked for identification.)

Q. Now, Mr. Orse, you can just take a moment to review Exhibit 13.

A. (Reviewing.) Yes.

Q. And have you seen Exhibit 13 before today?

A. You mean all the emails in it or...

ERIC ORSE

Q. Yeah, the email chain in general.

A. It's a -- looks like a string -- yeah, a chain. Yeah, I'm sure I have, yes.

Q. That's your email there in the cc?

A. Yes.

Q. And you have no reason to dispute that you received that email on or about September 22, 2016?

A. No reason to dispute it.

Q. And if -- you'll see here Ms. Tuerk, at the beginning of this email, states: The buyer is a tenancy in common consisting of the following entities.

And then she lists the four debtors in this bankruptcy case.

A. Yes.

Q. Was this -- to refresh your recollection from Ms. Tuerk's prior email that was Exhibit 11, was this the first time that you were informed of the entities that would be the ultimate transferees or purchasers of the properties?

A. Yes.

Q. So this late in the game, you know,

ERIC ORSE

the money's in the bank, the agreements are all signed. Was it odd or peculiar that you're just now learning who the transferees would be?

A. I think the agreement allows for the assignment, you know, the purchaser to be a CDC member or -- I think the purchase and sale agreement allows for the buyer to be CDC membership -- I'm sorry -- the CDC LLC or assignee.

It was a little unusual but it was allowed and I -- in the Prium case I had a lot of tenant in common setups, not in CDC but in other portfolios. So, I mean, didn't shock me but, yeah, it's a little late. It was a little late.

Q. Did you, you know, ever ask any questions about these four entities?

A. I didn't personally, no.

Q. Do you know if your counsel did?

MS. CAREY: That's attorney-client privilege.

A. I don't know.

Q. Did you -- was any due diligence

ERIC ORSE

conducted with respect to the four entities, to your knowledge?

A. No.

MS. CAREY: No -- no, to your knowledge? Or no, you don't know? Which --

A. Did I do any due diligence? No.

Q. Did you direct anyone to do any due diligence on your behalf?

A. No.

Q. Did you find it odd at all that the four entities were incorporated in four separate states, Florida, Virginia, Delaware, and New York?

A. Again, I didn't -- I didn't focus on that.

Q. So you -- did you just not notice it or you -- you didn't ask -- ask any questions --

A. I just didn't notice it. I didn't -- it was not something I was focusing on.

Q. As you sit here today, do you find it odd that it's four different jurisdictions

ERIC ORSE

for the tenants in common?

A. Yes, probably.

Q. And you'll see here at the bottom of this email, second -- third to last sentence, Ms. Tuerk says: Closing is anticipated Monday.

So we're in the home stretch, right?

A. Yes.

Q. In the course of these discussions, did you ask for certificates of good standing for the four entities?

A. I didn't.

Q. Did you direct anyone to ask for those on your behalf?

A. I did not.

Q. Did you ever seek to determine who the purchasers, the ultimate purchasers of the property were, the owners of the four entities?

A. No.

Q. Did you direct anyone to find that out on your behalf?

A. No.

ERIC ORSE

Q. As you sit here today, what do you know about the four LLC purchasers?

A. I -- I don't know -- I just know some names that have been asked of me, David New's deposition, and I didn't know any of those people.

The only -- one piece of due diligence we did was we did confirm that none of the entities were associated with Tom Price or Hyun Um, which I had to do as a trustee.

Q. And do you recall when that inquiry was made?

A. I don't know the exact date, but it was made right around this time.

Q. Was it before or after closing?

A. I don't know the answer to that.

Q. Are you familiar with an entity called Consulting Solutions Group LLC?

A. I am not.

Q. Are you familiar with a -- an entity called Superior Note Solutions LLC?

A. I am not.

Q. As you sit here today, do you know who owns these four entities, who owns the

ERIC ORSE

debtors?

A. I do not.

Q. So at this time, sir, you're on the verge of closing. You know, what did you know about Robyn Tuerk?

A. That she was the attorney for the buyer.

Q. Anything more than that?

A. No.

Q. Do you know -- at this time did you know what Philips International was?

A. Not -- a law firm, I thought.

Q. Did you understand Ms. Tuerk to be acting on behalf of Philips International?

A. Only because her -- that was her signature on her emails.

Q. Did you conduct any due diligence with respect to Philips International?

A. No.

Q. What was your understanding of who Ms. Tuerk represented in this transaction?

A. I just understood she represented the buyer.

Q. So that would be CDC Member LLC?

ERIC ORSE

A. Yes.

Q. Would that include Seahawk Portfolio LLC? The four debtors as well?

A. Yes.

Q. Did she ever tell you explicitly who she represented in this matter?

A. I never talked to her.

Q. All --

A. So the only thing we have are the email -- that I was involved in were the emails.

Q. Upon Mr. Yamaguchi's approach to you and the closing --

A. Yes.

Q. -- were all communications and negotiations with respect to this purchase and sale conducted through Ms. Tuerk as the represent- -- as the representative of the purchaser?

A. Will you please reask that.

Q. Sure.

Did -- were there communications with anyone else aside from Ms. Tuerk on behalf of the buyers in connection with this

Case 17-04120-BDL    Doc 5-12    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 21 of 50

ERIC ORSE

transaction?

A. After the initial --

Q. After --

A. -- email?

Q. -- Mr. Yamaguchi's initial --

A. Not that I'm aware of but -- not that I had.

Q. But your counsel may have had --

A. May have.

Q. -- had email or other communications that you weren't a party to?

A. Could be, yes.

Q. As you sit here today, what do you know about Philips International? Anything more than what you knew at the time?

A. No. I don't know anything else.

Q. Do you know who a gentleman named Michael Pilevsky is?

A. I do not.

Q. Did you -- had you heard his name at any time prior to closing?

A. Yeah. Let me restate that.

I've heard all these names post closing. I didn't know any of these people at

ERIC ORSE

the time we were doing the transaction.

Q. Understood.

And other than questions that may have been asked of you in connection with your prior deposition --

A. Right.

Q. -- do you know anything other than Mr. Michael Pilevsky, other than those questions that were asked of you?

A. Yeah. No, I've never heard of him.

Q. With respect to a gentleman named Seth Pilevsky, at the time of closing and prior -- at the time of closing, had you ever heard the name Seth Pilevsky?

A. No.

Q. Other than questions that were asked of you in connection with the Washington state court deposition that you gave, have you heard of Seth Pilevsky?

A. No.

Q. At the time of closing, did you know who the gentleman named Scott Switzer was?

A. No.

ERIC ORSE

Q. Even outside of the context of this transaction, just bankruptcy restructuring generally, had you ever heard of Mr. Switzer?

A. No.

Q. Since closing, did you -- were you subsequently told about who Mr. Switzer was?

A. No. I mean, I've heard his name and I've seen him in emails, but I don't -- I haven't Google searched him or anything or...

Q. You say you've heard his name in -- have you heard Mr. Switzer's name other than in connection with the inquiry of you at your prior deposition or in communication with counsel?

A. No.

Q. Are you aware of Mr. Switzer's reputation within the restructuring and bankruptcy community in Washington?

A. No.

Q. Are you aware of his reputation within the real estate community in Washington?

A. No.

Q. Are you aware of his reputation

ERIC ORSE

with bankruptcy judges in the state of Washington?

A. No.

Q. Are you aware that Mr. Switzer was involved with this deal?

A. After?

Q. As you sit here today, are you aware that Scott Switzer was involved with this deal?

A. I'm only aware that his name has come up as -- as somebody asked -- somebody asked -- I guess David New asked me about him. So I don't know anything else other than that.

I assumed he was -- must be if people are asking me those questions. But again, I do not know who the gentleman is.

Q. Are you aware of -- strike that.

Are you aware that Mr. -- as you sit here today, are you aware that Mr. Switzer was involved in this deal? Other than your assumption from the questions.

A. No.

Q. At the time of closing or any time prior, had you conducted any due diligence on

ERIC ORSE

Mr. Yamaguchi?

A.  I think when we originally got the inquiry we Googled him and found his name associated with an entity.  I don't remember the name of it.  But I think that was about the extent of our due diligence.  It was probably whatever his email address was.

Yeah, S -- SNS.

Q.  Yeah.  As I -- I did the same extensive due diligence in advance of this deposition.

A.  Right.

(Exhibit 14 was marked for identification.)

A.  Can I restate something about Scott Switzer?

Q.  You certainly may.

A.  So I should retract what I said before.  I read some of the pleadings in the New York case, and I think there's reference to Scott Switzer in there.  I don't recall what it was but -- so I do -- I am aware that he's part of that, only through reading those pleadings in the New York case.

ERIC ORSE

Q.  So only through pleadings and questioning from attorneys representing my client?

A.  Right.

But the only knowledge I would have with him associated is what was put in the pleadings.

Q.  Understood.

A.  Okay.

Q.  So turning back to my private investigator work here --

A.  Yes.

Q.  -- I did what I assume is the same thing, a Google search of SNS LLC, which is -- you understood to be Mr. Yamaguchi's entity, correct?

A.  Right.

Q.  And -- and then his name.  And then --

MS. CAREY:  Go ahead.  Answer -- ask your question.

Q.  And then click through to the following page of this exhibit, which is the first -- the first page --

ERIC ORSE

A.  Yeah.

Q.  -- which is the -- if you'll turn the page to the following page or the page subsequent.

Do you have a page that looks like this?

A.  Oh, sorry.  There's a third page.  Yeah.

Q.  Do you recall seeing this page in connection with that search?

MS. CAREY:  Objection.  I don't think you've established that he has done the exact same search that you did.

MR. MONAHAN:  Okay.  Understood.

MS. CAREY:  He said he did a Google search, but he did not indicate what exactly.

MR. MONAHAN:  Understood.  I think the testimony will speak for itself but...

Q.  Have you seen this page before?

A.  I don't recall seeing it, no.

Q.  And you had earlier mentioned that you had searched for Mr. Yamaguchi's entity,

ERIC ORSE

correct?

A.  Yes.  Well, I don't know if I searched for his entity, but I think I looked up his name and his entity came up.

Q.  And that entity was SNS LLC, correct?

A.  Yes.

Q.  Do you have any reason to believe it would be anything other than this website, snsll.com, which lists Mr. Yamaguchi as an analyst?

A.  Yeah, I don't know.  I can't recall.

Q.  Other than -- strike that.

Did you ever have any direct communications with Mr. Yamaguchi?

A.  No.  I mean, you mean via email or via --

Q.  Either/or.

Did you send an email --

A.  Well --

Q.  -- to Mr. Yamaguchi directly?  Or did he email you directly?  Or was it all done through Ms. Carey or her firm?

ERIC ORSE

A. I believe you've seen everything that was exchanged between myself and Mr. Yamaguchi. Which, by the way, I didn't even know was a Mr. Yamaguchi until you said that.

Q. I think it may be an assumption on my part as well.

In the course of this deal, did you ever come to an understanding of what Mr. Yamaguchi's intent was with respect to the party -- with respect to the properties?

A. No.

Q. Did you ever come to an understanding of what CDC Member LLC or the debtors, what their intent was with respect to the properties?

A. No.

MR. MONAHAN: Just one second. 15?

(Exhibit 15 was marked for identification.)

Q. Mr. Orse, have you seen the documents I had placed before you as Noteholder Exhibit 16?

ERIC ORSE

A. I would say yes, since I signed it.

Q. That's your signature on each of these quitclaim deeds?

A. Yeah.

Q. And I believe I misspoke. It's Exhibit 15, not 16, correct?

A. That's correct.

Q. Thank you.

Was any consideration paid to CDC Properties I LLC, other than the hundred thousand dollars, to sign these quitclaim deeds?

A. No.

Q. So at this point when these quitclaim deeds were filed -- so the first one is filed on September 28. I believe we'll go to an email momentarily, but others were subsequently filed in the day or so after.

Did you consider the deal done?

A. Yes.

Q. So everything had been closed at that point?

A. Yes.

Q. Nothing else needed to occur to

ERIC ORSE

consummate the -- the deal?

A. You mean after we filed the quitclaim deed?

Q. Correct.

A. Yes.

MR. MONAHAN: Okay.

THE VIDEOGRAPHER: This is the end of tape number 1 of the deposition of Eric Orse. The time is 3:32 p.m. We're off the record.

(Recess taken from 3:32 p.m. to 3:38 p.m.)

THE VIDEOGRAPHER: This is the beginning of tape 2 of the deposition of Eric Orse. The time is 3:39 p.m. We're on the record.

BY MR. MONAHAN:

Q. So before the break, we had just discussed momentarily the quitclaim deeds filed sort of beginning on or about September 28, 2016, the deals closed, right?

A. Yes.

MR. MONAHAN: Can we have this as 16, please.

ERIC ORSE

(Exhibit 16 was marked for identification.)

Q. Now, Mr. Switzer -- my apologies. Mr. Orse, if I can have you turn to ORSE 158, which is an email from Mr. Yamaguchi to Ms. Carey, copying Scott Switzer.

A. Okay.

Q. Have you seen this document before today?

A. What's this refer to?

(Reviewing.)

I don't recall but -- this is on September 28?

(Reviewing.)

I don't -- I mean, I don't recall, but it could have possibly come my way.

Q. Now, I added the ORSE Bates stamps, but I will represent that this document was produced by your counsel.

A. Right.

Q. This came from either your counsel or your counsel's files, is that your understanding?

A. Yes.

ERIC ORSE

Q. And at or about this time on September 28, were you made aware of Mr. Switzer's involvement in this deal?

A. Again, I -- not that I -- if I was, it didn't register. I mean, I don't -- if I saw it, I saw it, but it didn't register.

Q. Understood.

A. Not knowing who he is.

(Exhibit 17 was marked for identification.)

Q. Now, Mr. Orse, have you seen this email before today?

A. Well, it was cc'd to me so...

Q. And that email there, orsecoeric@gmail.com, is that another email you use for Orse & Co. business?

A. It could be. Yes. I don't know the answer. I do have two or three other emails, but I don't usually read the Gmail one.

Q. But is -- is the Gmail -- is your Gmail address orsecoeric@gmail.com?

A. I don't know the answer.

Q. Yeah --

ERIC ORSE

A. I know that sounds ridiculous but --

Q. If you could take a moment to check, I'd appreciate it.

A. Yeah.

(Reviewing.)

THE WITNESS: Well, if -- Diana, if you have it in your email, it must be, right?

A. Yes, it is.

Q. And do you have any reason to believe that you didn't receive that email on or about September 30, 2016?

A. I have no reason why I wouldn't have received it, no.

Q. And if you'll see, it's an email from Ms. Carey to Ernie Velton and a number of other folks at a jshproperties.com email address. Is that -- that's the receiver, correct?

A. That's correct, yes.

Q. And you'll see Ms. Carey goes on to say: Please take note that as of at least September 30, 2016, Eric Orse, as management

ERIC ORSE

representative of Prium Development -- Dev. -- no longer has an ownership interest in the real properties of CDC Properties, Inc.

Is it your understanding that she's making the statement because the transaction, the sale, had -- of those properties had closed?

A. Yes.

Q. And she goes on to say: The contact person for the new owner is June Diamant, Esquire.

And it gives a phone number and an email address.

A. Okay. Yes.

Q. Do you understand who Ms. Diamant is?

A. I do not.

Q. Had you ever heard the name before you received this email?

A. I don't recall. The name doesn't ring a bell with me but...

Q. Do you know if you or your counsel had any contact with her in connection with the sale of the properties or the negotiation?

ERIC ORSE

A. I do not.

Q. And if you'll just flip quickly to the quitclaim deeds, which is Exhibit 15 --

A. Yes.

Q. -- you'll see that Ms. Diamant is who the deeds are meant to be returned to after recording, on the top left.

Do you see that?

A. Yes.

Q. Do you have any understanding of -- do you know what that address in Cedarhurst, New York, is --

A. I do not.

Q. -- or what it's to?

And so other than Ms. Diamant's name on the recording or the email here from your counsel, do you have any understanding of who Ms. Diamant was or her role in this transaction?

A. I do not.

MR. MONAHAN: Mark this as 18.

(Exhibit 18 was marked for identification.)

Q. Now, Mr. Orse, have -- if I can

Case 17-04120-BDL   Doc 5-12   Filed 12/12/17   Ent. 12/12/17 13:51:59   Pg. 25 of 50

ERIC ORSE

have you turn to ORSE 77.

A. Okay.

Q. And it's an email from Ms. Carey to Robyn Tuerk and Ms. Diamant. States: Can you please give me assurances that Tom Price and Hyun Um are not involved as parties or owners in the TICS which acquired the CDC real properties? We want -- we do not want to be accused of failure to disclose/investigate here.

A. Yes.

Q. Is this what you were referring to earlier about the inquiry regarding their ownership --

A. Yes.

Q. -- of the properties?

A. Yes.

Q. Do you think this was a little late in the game to be doing this type of due diligence or asking these questions?

A. Ideally you'd like to do it before the transaction, yes.

Q. Before the closing, correct?

A. Before closing, yes.

ERIC ORSE

Q. Other than this email -- I believe this was one of the emails you referenced or one of the things you mentioned as due diligence you did with respect to the purchasers --

A. Yes.

Q. -- on the transaction.

Had you done any other due diligence or made any other inquiries of the purchasers in connection with the transaction?

A. No.

Q. And if you'll just go with me to ORSE 76 --

A. Yes.

Q. -- you'll see that Ms. Carey sends an email on Wednesday, October 5, at 2:11 p.m. which copies you at eorse@orseco.com.

Do you see that?

A. Yes.

Q. Do you have any reason to believe that you didn't receive that email, which would include the email chain below?

A. No. I should have received it.

(Exhibit 19 was marked for

ERIC ORSE

identification.)

Q. Mr. Orse, was this letter sent on your behalf by counsel John Rizzardi, counsel in the Prium Companies LLC -- I'm sorry -- as counsel for Prium Companies LLC?

A. Yes.

Q. Was this letter sent at your direction?

A. Yes.

(Exhibit 20 was marked for identification.)

Q. Now, Mr. Orse, I'm actually going to ask you questions about the letter that was attached to this email as ORSE 70, but before I do that, if you can just confirm for me that that's your email that appears here in the cc line and you have no reason to believe that you did not receive the December 7, 2016, email from Ms. Carey here.

A. Yes, that's my email, and I believe I would have received it, yes.

Q. And if you'll turn to ORSE 70 --

A. Okay.

Q. -- you'll see it's a letter from

ERIC ORSE

Ms. Carey to a Mr. Rick Wathen.

A. Um-hum.

Q. Do you understand who Mr. Wathen is?

A. I do.

Q. And who is he?

A. He is an attorney that represents Derek Edmonds/Centrum.

Q. And was this letter sent on your behalf?

A. This is a letter -- yes.

Q. And --

A. It's a response to Rick's letter to us, yes.

Q. It was sent with your approval and authority, correct?

A. Yes.

Q. And if you look at the first sentence of the third paragraph there, Ms. Carey says: CDC was not in any position to contest the foreclosure.

A. Um-hum.

Q. What do you understand Ms. Carey to be referencing by "the foreclosure" in there?

ERIC ORSE

A. I'm trying to define what CDC --
okay. So CDC Prop- -- okay.

So CDC was not in any position to
contest the foreclosure, the planned
foreclosure or the scheduled foreclosure
around September 20 or so.

Q. And this is in connection with the
state court action that was filed, correct?

A. Yes.

Q. And what do you understand that
Ms. Carey meant by CDC was not in any position
to contest that foreclosure?

A. That we were not going to contest
it.

Q. We're not --

A. We meaning CDC, as management
representative for CDC.

Q. You mean the CDC -- that you on
behalf of CDC had determined that you were not
going to contest it or that CDC had no basis
to contest it?

A. I -- I don't know which one. So
say it again.

MS. CAREY: Could you separate that

ERIC ORSE

question.

MR. MONAHAN: Yeah. Yeah, of
course.

Q. At the time -- when you were in
control of the properties on behalf of CDC and
the foreclosure was noticed, did you, on
behalf of CDC Properties I LLC, intend to
contest that foreclosure?

A. I think what we're referring to
here is, when we say what -- that we weren't
in any position, we weren't in any position to
do it financially, enter any more litigation,
because we were trying to wrap up the Prium
cases. So I think that's what we're referring
to here.

I don't know if that answers your
question but that was the intent, I believe.

Q. Do you know if you had conducted
any analysis or had directed any analysis to
be conducted as to whether there was any basis
for CDC Properties I LLC to contest the
foreclosure?

A. I -- I didn't do any analysis of
that.

ERIC ORSE

Q. Had you directed your counsel to do
so?

A. No.

Q. If you look at the fourth
paragraph, now, here, the last sentence of
that paragraph, it says: Contrary to your
assertions, we had no knowledge that any
purchasers were affiliated with Scott Switzer.
Michael Feinberg, Eric Orse, and I had never
heard of Scott Switzer until his name was
raised by lenders' counsel, David New, after
the sale closed.

Do you recall -- strike that.

Do you know what Ms. Carey is
referencing when she mentions that Scott
Switzer's name was raised by lenders' counsel,
David New, after the sale closed?

A. That would have been when we were
subpoenaed for the deposition. In mid October
after closing is when Scott Switzer's name
came up. That's what I believe she's
referring to.

Q. And notwithstanding the email we
discussed earlier with Mr. Switzer copied on

ERIC ORSE

it, other than that, you had no knowledge of
Mr. Switzer --

A. No. I mean --

Q. -- until -- until that --

A. Yeah.

Q. -- deposition and litigation came
up?

A. Right. Did any of us see Scott
Switzer's name cc'd on an email string? I --
I didn't -- maybe I saw it. I didn't pay
attention to it because I didn't know who he
was.

Obviously now, based on everything
that you're telling me, we know who it is.
But we didn't -- it didn't, like -- I remember
all of us sitting down saying we don't know
who Scott Switzer is. And I just -- and now,
obviously, we sat down and not -- it didn't
catch any of our eyes, that -- that cc line.

Q. If you go to Ms. Carey's -- the
second page of the -- of the letter, the first
paragraph of that second page, the second
sentence. It indicates: Orse had no
direction communication with the buyers.

ERIC ORSE

You agree with that statement, correct?

A. Yeah.

Q. Would it surprise you to know that Mr. Switzer testified at the 341 meeting of creditors in this case that he spoke with you over the phone before you put him on to your attorneys in connection with this transaction?

A. It would surprise me, yes.

Q. That would be a lie, right?

A. I don't recall ever talking to Mr. Switzer.

Q. And if he were to say the opposite, that would be untrue, correct?

A. That would be true -- or untrue, yes.

Q. And when Ms. Carey indicates you had no direct communication with the buyers, all communications would have been through Ms. Carey or Mr. Feinberg, through your lawyers?

A. Yes.

Q. And Ms. Carey goes on in the second paragraph of this sentence to say: Olympia

ERIC ORSE

Office LLC, one of the TIC transferees, filed for bankruptcy protection in New York immediately prior to the scheduled foreclosure action.

Were you made aware of the bankruptcy proceedings sort of at or about the time they were initiated?

A. I think that night Diana sent me an email. My attorney, Diana Carey, sent me an email when it happened.

Q. And what was your -- what was your reaction when you found out about that?

A. I was surprised.

Q. Did you think it raised any issues of the intention of the buyers with respect to the purchase?

A. I mean, again, I'm not an attorney, so I don't quite grasp all the ins and outs. But, yeah, it was surprising that -- that that was the strategy, obviously, at that point. I didn't know it until then but...

Q. Just some quick...

Are you familiar with a company called GMC-CMI Inc.?

ERIC ORSE

A. No.

Q. Are you aware that they are an engineering services firm here in Washington?

A. I don't know who that is.

Q. You've never heard of them?

A. No.

Q. And you obviously had no interaction with them in connection with this transaction, correct?

A. No.

Q. Are you familiar with the company Kidder Matthews?

A. Yes.

Q. What do they do?

A. They're a commercial broker.

Q. Do you understand that they do appraisal services in --

A. Yes.

Q. -- connection with their brokerage services as well?

A. Sure.

Q. Did you have any interaction with Kidder Matthews in connection with this matter, this transaction?

ERIC ORSE

A. Yeah. I've used Kidder Matthews throughout the whole Prium case, in all the portfolios.

Q. Did -- in connection with the sale to the purchasers here, did Kidder Matthews conduct any work in connection with the sale, from Yamaguchi's approach to you to the closing?

A. Not that I recall.

Q. Do you understand that Kidder Matthews undertook any efforts with respect to an appraisal of the properties on behalf of the purchasers in connection with this transaction? Were you ever made aware of that?

A. No.

Q. Are you familiar with the law firm Lazer Aptheker Rosella & Yedid --

A. No.

Q. -- out of New York? Obviously you had no interaction with them in connection with this deal?

A. No.

Q. Are you familiar with the

ERIC ORSE

1  
2  accounting services company Margolin Winer &
3  Evens --
4     A.  No.
5     Q.  -- also out of New York?
6     A.  No.
7     Q.  And, again, obviously no
8  interaction with them in connection with this
9  deal?
10     A.  No.
11     MR. MONAHAN:  If I can just take
12  five minutes for a little housekeeping
13  and then should be...
14     THE VIDEOGRAPHER:  The time is
15  4:03 p.m.  We're off the record.
16     (Recess taken from 4:03 p.m. to
17  4:06 p.m.)
18     THE VIDEOGRAPHER:  The time is
19  4:06 p.m.  We're on the record.
20  BY MR. MONAHAN:
21     Q.  Mr. Orse, as I just mentioned off
22  the record, I have just a quick housekeeping
23  piece, which is if you can turn to Exhibit 4,
24  which I placed on top of the stack in front of
25  you, again.

ERIC ORSE

1  
2     This July 27, 2016, email from Kazu
3  Yamaguchi, that was sent to you at or about
4  that time to your email, your Gmail account
5  that we discussed earlier, correct?
6     A.  Correct.  Yes.
7     Q.  And in connection with that email,
8  you also received the -- on the second page of
9  that chain, ORSE 589, you received the email
10  dated Monday, July 25, 2016, at 8:03 p.m.?
11     A.  Yes.
12     Q.  You received that as well, correct?
13     A.  Yes.
14     Q.  And then included in that chain,
15  obviously, is the email on page 591 dated
16  Thursday, July 21, 2016, at 12:36 p.m.
17     You received that as well, correct?
18     A.  I received it as part of the chain?
19     Q.  As part of the chain, exactly.
20     A.  Yes.  Yes.
21     MR. MONAHAN:  Okay.  I have no
22  further questions.
23     THE WITNESS:  Can I correct one
24  item?
25     MS. CAREY:  Mr. Orse would like to

ERIC ORSE

1  
2  correct -- or not, correct --
3     THE WITNESS:  Amend.
4     MS. CAREY:  -- supplement one of
5  his answers.
6  BY MR. MONAHAN:
7     Q.  That would be fine.
8     A.  It was associated with -- I don't
9  know what exhibit it is now but it's the
10  letter that we sent to Rick Wathen.  Do you
11  know what exhibit that is?
12     Q.  Yeah.  I can get that for you.
13     MS. CAREY:  It's Exhibit 20.
14     MR. MONAHAN:  Counsel is quicker
15  than me on these numbers, as she has
16  been all day.
17     MS. CAREY:  And it's ORSE 070.
18     THE WITNESS:  That's why.  It's the
19  really big one.
20  BY MR. MONAHAN:
21     Q.  It's the last two pages --
22     A.  Yeah.  Right.
23     Q.  -- is the letter.
24     A.  So you asked the question about CDC
25  was not in any position to contest the

ERIC ORSE

1  
2  foreclosure.  And I was -- Diana reminded me.
3  So we -- we weren't in the
4  position.  However, we felt we actually had,
5  and had actually prepared in the spring of
6  2016 a motion——because of the fact that we
7  couldn't reconcile the accounting that we
8  talked about earlier with the lender——to
9  object to the receivership and the
10  foreclosure.
11     But based on Judge Snyder's urgency
12  in getting the case over with and the fact
13  that we didn't have a lot of resources——i.e.,
14  money to litigate in the Prium estate——that we
15  weren't in a position to move forward with
16  that.  The judge made it very clear that we --
17  he didn't want any more litigation and he
18  wanted us to move forward.
19     Q.  And this amendment to your answer
20  was something that came off the top of your
21  head?  Or it was something you came up with in
22  connection with counsel during a meeting --
23     A.  Well, she reminded me that prior to
24  the receivership, in that spring, we had been
25  preparing, when we couldn't get the corrected

Case 17-04120-BDL   Doc 5-12   Filed 12/12/17   Ent. 12/12/17 13:51:59   Pg. 29 of 50

ERIC ORSE

accounting of Paul Martin and David New, that
we were going to move down that path. But
then it became very clear, per Judge Snyder,
that he didn't want to spend any more
resources on it.

I bring that up because you asked
me that question of why we thought there
was -- we weren't in any position to contest
the foreclosure.

Q. And that not being in any position
also may have dealt with, obviously, the
merits of that objection, correct?

A. No.

Q. It had nothing to do with the
merits of the -- of the potential objection?

A. No.

Q. Was that potential objection, was
that draft objection ever filed?

A. No.

Q. What state was it in when it was
abandoned?

A. I don't -- you want me to give you
a percentage done? Or I don't --

Q. Sure.

ERIC ORSE

A. -- I don't know. I don't recall,
but probably 80 percent, 90 percent done.

Q. But it was -- doing the other
20 percent wasn't worth the resources, given
the likely outcome?

A. No. The 20 percent would have been
probably okay. It would have been the
litigation that followed and stopping the
receivership and/or stopping the foreclosure
that the estates didn't have the resources
for.

Q. In any event, the foreclosure was
never contested by CDC?

A. It was not.

Q. And as it says here, CDC was not in
a position to do so?

A. That's correct.

MR. MONAHAN: And with that, I have
no further questions.

THE WITNESS: Great. Thank you.

MR. MONAHAN: Thank you.

THE VIDEOGRAPHER: Cross?

MS. CAREY: I have no questions.

THE VIDEOGRAPHER: This concludes

ERIC ORSE

today's video-recorded deposition of
Eric Orse, consisting of two tapes.

The time is 4:11 p.m. We're off
the record.

(Time noted 4:11 p.m.)

_____
Eric Orse

Subscribed and sworn to before me this _____
day of _____, 2017.

_____

C E R T I F I C A T E

STATE OF WASHINGTON  )
                     )  SS.:
COUNTY OF ISLAND     )

I, GWEN S. BRASS, a Certified
Shorthand Reporter within and for the state of
Washington, do hereby certify:

That Eric Orse, the witness whose
deposition is hereinbefore set forth, was duly
sworn by me and that such deposition is a true
record of the testimony given by such witness.

I further certify that I am not
related to any of the parties to this action
by blood or marriage; and that I am in no way
interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto
set my hand this 13th day of March, 2017.

_____
Gwen Brass, CCR 1908

- INDEX TO WITNESSES -

WITNESS                          PAGE

Eric Orse
    EXAM BY MR. MONAHAN................... 7


- INDEX TO EXHIBITS -

EXHIBIT    DESCRIPTION          PAGE

Exhibit 1    Amended Ex Parte Order ........ 22
    Amending Order on Debtor's
    Motion for Approval of
    Revised Settlement and
    Compromise of Spokane Rock
    Litigation and Claims;
    Debtor's Motion to Ratify
    Management Authority and
    Payment Mechanism; Debtor's
    Application to Retain Karr
    Tuttle Campbell PS as its
    General Counsel; and Spokane
    Rock I LLC's Motion for
    Relief from Stay

Exhibit 2    Email from kazu@snsll.com, .... 33
    Sent Tuesday, July 19, 2016,
    Subject CDCI

Exhibit 3    Email from kazu@snsll.com ..... 37
    Sent Monday, July 25, 2016,
    Subject RE: CDC I Receiver's
    financial reports

Exhibit 4    Email from kazu@snsll.com ..... 39
    Sent Wednesday, July 27,
    2016, Subject RE: CDC I
    Receiver's financial reports

Exhibit 5    Email from Robyn Tuerk, Sent .. 42
    Friday, August 19, 2016,
    Subject RE: CDC

Exhibit 6    Email from Diana K. Carey, .... 48
    Sent Tuesday, August 30,
    2016, Subject FW: CDC I
    Receivership Order

Exhibit 7    Purchase Agreement............. 50

Exhibit 8    Deed of Trust with Security ... 53
    Agreement, Assignment of
    Leases and Rents and Fixture
    Filing

Exhibit 9    Order Confirming Plan.......... 55

Exhibit 10    Declaration of Michael M. ..... 68
    Feinberg

Exhibit 11    Email from Robyn Tuerk, Sent .. 71
    Thursday, September 15, 2016,
    Subject CDC Properties

Exhibit 12    Email from Diana K. Carey, .... 73
    Sent Wednesday, September 21,
    2016, Subject 2296_001 side
    Letter for return of monies

Exhibit 13    Email from Robyn Tuerk, Sent .. 74
    Thursday, September 22, 2016,
    Subject RE: CDC Properties I
    Sale

Exhibit 14    Google search for sns llc ..... 86
    kazu yamaguchi

Exhibit 15    Quit Claim Deed................ 90

Exhibit 16    Email from Diana K. Carey, .... 93
    Sent Thursday, September 29,
    2016, Subject RE: Assignment
    of Membership Interests

Exhibit 17    Email from Diana K. Carey, .... 94
    Sent Friday, September 30,
    2016, Subject CDC I real
    properties

Exhibit 18    Email from Marti Munhall, ..... 97
    Sent Monday, October 10,
    2016, Subject FW: The TICS in
    CDC transaction

Exhibit 19    Letter via email, dated ....... 99
    November 23, 2016, to Jordan
    C. Pilevsky from John R.
    Rizzardi

Case 17-04120-BDL    Doc 5-12    Filed 12/12/17    Ent. 12/12/17 13:51:59    Pg. 31 of 50

1    Exhibit 20   Email from Diana K. Carey, ....100
2    Sent Wednesday, December 7,
3    2016, Subject CDC Transaction

ERRATA SHEET FOR THE TRANSCRIPT OF:

Case Name:   In re: Olympia Office LLC

Dep. Date:   March 9, 2017

Deponent:   Eric Orse

CORRECTIONS:

Pg.  Ln.  Now Reads   Should Read   Reason

_____

Signature of Deponent

SUBSCRIBED AND SWORN BEFORE ME

THIS ____ DAY OF _____, 2017.

_____

(Notary Public) MY COMMISSION EXPIRES: _____

**A**

$100,000 (1)
38:22
$4 (1)
31:11
a.m (1)
39:20
abandoned (1)
114:22
ability (2)
48:23 57:9
able (4)
30:12 46:10 70:7,21
absolute (1)
54:17
acceptable (1)
39:21
acceptance (3)
39:24 40:2,9
accepted (2)
18:21 42:22
account (2)
68:8 111:4
accounting (7)
15:2 26:9 30:13,18
110:2 113:7 114:2
accurate (1)
31:25
accused (1)
98:10
acquire (1)
24:5
acquired (2)
13:2 98:8
acquisition (5)
12:23 13:8,19 14:3
45:23
acting (1)
80:15
action (6)
28:20,22 56:4 102:9
107:5 117:15
added (2)
37:12 93:18
addition (1)
8:16
address (5)
86:8 94:23 95:20
96:14 97:12
Administration (1)
1:8
Administrative (1)
57:6
advance (2)
28:20 86:11
advisor (1)

17:4
affiliated (2)
41:14 104:9
afternoon (3)
5:6 7:3,4
agencies (1)
23:6
ago (3)
7:5 34:6 56:7
agree (5)
30:7 52:6 65:16 66:16
106:2
agreed (1)
30:8
agreed-upon (1)
29:23
agreement (31)
21:9 43:3 44:4,8
47:14 50:2,5,7,9,10
50:11,13,23 51:3,7
51:9,12,14 52:20
60:12 67:10,11,23
68:10 71:16,19
72:19 76:6,9 119:24
120:2
agreement's (2)
72:14 73:3
agreements (3)
27:2 28:24 76:2
ahead (1)
87:21
al (2)
1:5 5:10
Alan (2)
3:18 6:7
Albert (2)
4:19 5:20
allowed (5)
55:19 56:22 64:6
66:18 76:13
allows (2)
76:6,9
Amend (1)
112:3
Amended (1)
118:10
Amending (1)
118:11
amendment (1)
113:19
amount (5)
30:7,16,17 47:3,3
analyses (1)
40:16
analysis (7)
14:17 60:22,23 61:10

103:20,20,24
analyst (1)
89:12
analyze (1)
40:10
and/or (2)
30:23 115:10
answer (20)
9:9,16,22 10:10 28:16
28:18 32:2,23 45:16
57:23 61:3 65:9,11
65:14 68:13 79:17
87:21 94:19,24
113:19
answered (1)
52:8
answering (1)
10:7
answers (2)
103:17 112:5
anticipated (1)
78:7
apart (1)
50:9
apologies (1)
93:4
APPEARING (2)
4:14,18
appears (5)
44:17 53:19 54:6,7
100:17
Application (1)
118:19
applications (2)
21:13,20
appoint (2)
19:10,14
appointed (3)
17:17 18:14 19:11
appointing (1)
22:13
appraisal (2)
108:18 109:13
appreciate (1)
95:5
approach (2)
81:13 109:8
approached (1)
26:16
appropriate (2)
52:5 57:25
approval (2)
101:16 118:12
approved (8)
20:12,14 21:12,14
26:20 28:25 29:2,4

103:20,20,24
approximately (1)
5:18
Aptheker (1)
109:19
arising (1)
44:5
arrive (1)
29:23
aside (1)
81:24
asked (11)
52:8 64:25 79:5 83:5
83:10,18 85:12,13
85:13 112:24 114:7
asking (7)
23:19 35:6 36:20 60:4
60:7 85:16 98:21
asks (1)
43:21
assertions (1)
104:8
assets (2)
26:15 35:18
assignee (1)
76:11
assignment (3)
76:7 120:2 121:8
assisting (1)
17:8
associated (4)
79:10 86:5 87:7 112:8
association (1)
5:25
assume (2)
9:17 87:14
assumed (4)
9:17,18 63:21 85:15
assumption (3)
63:18 85:22 90:7
assumptions (2)
30:22,24
assurances (1)
98:6
AST (8)
1:6,7,7,8 5:13,13,13
5:14
attached (8)
36:12 38:9,10 57:16
58:15 71:5,6 100:15
attachment (3)
33:23 38:11 48:16
attachments (1)
37:7
attention (4)
37:12 39:18 54:11
105:12

attest (3)
35:6 70:21,24
attorney (9)
33:8 36:19 43:21,21
55:17 80:7 101:8
107:10,18
attorney-client (1)
76:22
attorneys (7)
3:5,14 4:2,10 43:17
87:3 106:9
auditor (1)
14:14
aughts (1)
14:7
August (5)
19:10 69:6,15 119:16
119:20
authority (12)
20:17,20 39:9 51:5,6
51:11 62:10,16,17
67:5 101:17 118:17
authorize (1)
39:23
authorized (4)
60:13 64:22 65:4 66:6
available (2)
69:25 70:22
Avenue (5)
2:7 4:3,11 5:16,23
avoid (1)
28:9
avoided (1)
47:17
aware (17)
45:6 52:18 82:7 84:17
84:21,25 85:5,9,11
85:18,19,20 86:23
94:3 107:6 108:3
109:15

**B**

b (2)
57:3 71:3
back (6)
14:2,15 26:11 33:20
62:6 87:11
background (1)
16:10
badly (1)
67:20
balance (9)
26:8 29:17,21,23 30:6
30:8 31:17,24 32:3
bank (3)
72:14 73:3 76:2

bankruptcies (1)
21:2
bankruptcy (40)
1:1 5:11 7:17,21
11:17 13:23 14:18
16:2,14 17:5 18:10
18:13,15,17 20:15
20:23 21:21 23:22
23:23 27:7 32:15
48:5 51:20,21,22
52:22 55:19 56:6
57:3,5 58:17 60:18
61:6 69:20 75:16
84:3,19 85:2 107:3
107:7
base (2)
10:22 42:7
based (4)
31:16 65:6 105:14
113:11
basically (4)
13:15 23:9 32:13 73:6
basis (3)
25:25 102:21 103:21
Bates (2)
37:12 93:18
beat (1)
42:11
beginning (6)
16:2 38:7 56:17 75:12
92:15,21
behalf (17)
6:8,21 43:5,6 45:13
60:14 77:10 78:16
78:24 80:15 81:25
100:4 101:11
102:20 103:6,8
109:13
belief (1)
58:14
believe (24)
20:13 30:8 33:9 37:2
39:9 43:19 45:25
51:13 52:9 63:3
68:6 69:13,16 89:9
90:2 91:6,17 95:13
99:2,21 100:18,21
103:18 104:22
bell (1)
96:22
benefit (5)
35:9,21 36:8 58:25,25
Berg's (1)
17:5
best (2)
9:13 23:10

bestowed (1)
17:21
better (1)
28:8
big (1)
112:19
bind (1)
51:12
blood (1)
117:16
boat (2)
21:23,24
bolded (1)
62:24
books (2)
30:25 31:4
Borrower (1)
54:14
bottom (3)
37:13 56:11 78:4
box (1)
25:15
Brass (5)
1:24 2:8 5:24 117:7
117:24
break (1)
92:19
breakdown (1)
11:19
Brief (1)
24:9
briefly (1)
10:23
bring (1)
114:7
bringing (1)
35:25
broader (1)
22:20
broken (1)
70:11
broker (1)
108:16
brokerage (1)
108:20
building (2)
26:19 32:19
buildings (5)
22:25,25 23:8 26:17
27:4
business (7)
11:10 12:18 22:23
23:3 45:11 52:4
94:17
busy (1)
16:2

buyer (8)
26:19 28:25 36:19
44:15 75:13 76:9
80:8,24
buyer's (1)
36:20
buyers (4)
81:25 105:25 106:19
107:16
buying (1)
27:4

C

C (4)
3:1 117:1,1 121:23
calculations (2)
30:9 31:7
CALIFORNIA (1)
2:11
call (2)
14:16 50:13
called (8)
5:2 17:2,7,11 67:24
79:19,22 107:25
calls (1)
26:24
Campbell (5)
4:1 6:11 43:8 73:9
118:20
Campbell's (1)
68:7
candidate (1)
18:19
capacity (1)
19:3
Carey (6)
4:5 6:10,10 24:16
28:10 33:8,22,24
34:8,16 37:22 38:3
39:23 43:20 45:16
49:18 52:8 59:13
60:4 61:21 64:24
65:8,13 67:14,21
70:3,10,24 71:4
76:22 77:5 87:21
88:12,16 89:25 93:7
95:18,23 98:4 99:16
100:20 101:2,21,24
102:12,25 104:15
106:18,21,24
107:10 111:25
112:4,13,17 115:24
119:19 120:15
121:6,11 122:1
Carey's (2)
74:5 105:21

case (27)
1:5 9:6 17:16 26:3,12
26:13 27:13 28:5
29:18 30:14 31:19
32:21 35:7,8 39:7
40:13 41:24 51:13
51:17 75:16 76:13
86:21,25 106:7
109:3 113:12 123:2
cases (1)
103:15
cash (2)
30:21 31:17
casual (1)
10:14
catch (1)
105:20
cc (3)
75:5 100:17 105:20
cc'd (2)
94:14 105:10
CCR (2)
1:24 117:24
CDC (93)
6:13 19:23 20:3 21:18
21:21 22:15,20,22
23:15,23 24:6 26:15
27:23 28:13,13
29:12 30:14 31:9
32:8,24 33:3 35:14
35:15 38:25 40:12
41:6 44:11,13 45:8
45:11,15,24 46:7,11
46:15 47:4 48:4,22
49:14 51:21,23
52:17,23 53:2,17
54:21 55:13 57:8
58:25 59:10,19
60:14 62:11 64:13
68:12 72:19,21
74:14,15 76:8,10,10
76:14 80:25 90:15
91:11 96:4 98:8
101:21 102:2,3,4,12
102:17,18,19,20,21
103:6,8,22 112:24
115:14,16 119:7,12
119:17,21 120:13
120:22 121:13,19
122:3
CDC's (1)
48:24
CDCI (1)
119:3
Cedarhurst (1)
97:12

Centrum (2)
27:3 63:21
certain (2)
19:18 70:10
certainly (1)
86:18
certificates (1)
78:12
Certified (3)
2:8,10 117:7
certify (2)
117:9,14
CFO (3)
12:25,25 13:20
chain (7)
75:2,4 99:23 111:9,14
111:18,19
challenges (1)
31:15
change (2)
46:18,20
changed (4)
25:8 47:10,13,14
Chapter (10)
1:4 4:10 6:21 7:17
12:2 17:18 18:23
19:9 20:13,17
check (1)
95:5
chief (3)
11:17 17:4,9
claim (2)
64:17 121:4
claims (10)
30:16 56:22 57:10,11
63:15 64:6,14,20
66:19 118:15
clarified (1)
24:20
clarify (1)
62:22
class (4)
63:18 64:7,22 65:7
classes (5)
56:22 63:15,20 64:7
64:21
classic (1)
23:3
clear (9)
31:22 48:9 56:25
57:22 58:5,11 59:25
113:16 114:4
click (1)
87:23
client (2)
28:17 87:4

close (3)
39:12 73:4,11
closed (6)
39:7 91:22 92:22 96:8
104:13,18
closing (19)
35:4 40:13 41:24
73:10 78:6 79:16
80:5 81:14 82:22,25
83:13,14,22 84:6
85:24 98:24,25
104:21 109:9
co-owners (1)
15:10
Code (3)
57:3,5,6
collectively (1)
7:25
colloquially (2)
28:3 63:3
com (2)
13:22 14:6
come (12)
11:4,4 19:6 20:20
28:15 32:25 33:5
43:18 85:12 90:10
90:14 93:17
comes (2)
12:6,13
coming (1)
40:8
commenced (1)
7:18
commercial (3)
22:25 23:3 108:16
COMMISSION (1)
123:25
common (3)
75:13 76:14 78:2
communicate (1)
25:3
communicated (1)
25:2
communication (3)
84:14 105:25 106:19
communications (7)
43:15 45:4 81:16,23
82:12 89:17 106:20
community (2)
84:19,22
companies (19)
12:25 13:20 17:16
18:10 19:4,7,13,15
19:20,22 20:19 21:5
22:15 23:12 32:14
32:20,21 100:5,6

company (10)
11:2,3,9,15 13:21
17:2,10 107:24
108:12 110:2
compensation (3)
21:6,10,11
complete (1)
39:10
completely (1)
22:2
compliance (3)
60:17,25 67:9
component (1)
56:20
Compromise (1)
118:14
concept (1)
36:11
concludes (1)
115:25
conduct (3)
45:14 80:18 109:7
conducted (6)
72:21 77:2 81:18
85:25 103:19,21
confirm (3)
70:4 79:9 100:16
confirmation (1)
30:20
confirmed (7)
48:25 55:19 56:6
58:16 60:18 61:5
69:20
Confirming (1)
120:6
connected (1)
43:22
connection (25)
7:17 8:6 17:19 20:25
23:13 61:11 81:25
83:5,18 84:13 88:11
96:24 99:11 102:8
106:9 108:9,20,24
109:5,7,14,23 110:8
111:7 113:22
consent (5)
54:16,16 55:15 59:11
59:21
consider (3)
40:10 42:7 91:20
consideration (2)
36:7 91:10
consisting (2)
75:14 116:3
Consulting (1)
79:19

consummate (2)
51:7 92:2
consummated (1)
64:13
contact (5)
37:23 43:18,22 96:11
96:24
contacted (1)
18:17
contemplated (1)
51:8
contents (1)
60:23
contest (10)
101:22 102:5,13,14
102:21,22 103:9,22
112:25 114:9
contested (1)
115:14
context (1)
84:2
continued (1)
28:23
Contrary (1)
104:7
control (1)
103:6
controlling (2)
38:24 46:6
conversation (3)
9:5,23,24
conversations (2)
29:22 31:6
convey (1)
39:24
conveyance (1)
50:14
conveyed (5)
72:16
copied (2)
34:8 104:25
copies (3)
69:7 71:14 99:18
copy (1)
34:12
copying (1)
93:7
corporate (1)
14:17
correct (61)
25:18,19 27:16,20,21
27:24 29:9,13 36:6
37:18 40:4 44:3
46:16 48:6 49:15
52:7,13,17 54:9,25
58:7,12,13 59:2,12

59:21 60:2 63:9
64:10,15,18 65:18
65:22 66:2,23 67:25
72:22 73:13 87:17
89:2,7 91:7,8 92:5
95:21,22 98:24
101:17 102:9 106:3
106:15 108:10
111:5,6,12,17,23
112:2,2 114:13
115:18
corrected (1)
113:25
CORRECTIONS (1)
123:5
correctly (1)
32:17
counsel (23)
6:2 41:10 44:24 47:21
60:4 61:4,14 76:21
82:9 84:15 93:20,22
96:23 97:18 100:4,4
100:6 104:2,12,17
112:14 113:22
118:21
counsel's (1)
93:23
County (2)
54:8 117:5
couple (1)
73:7
course (5)
18:25 24:8 78:11 90:9
103:4
court (17)
1:1 2:9 5:3,11,24 6:3
7:9,21,23 8:7 10:17
18:4 53:11 55:25
56:4 83:19 102:9
covered (2)
8:11 36:13
crash (2)
13:22 14:7
created (2)
13:21 46:14
creditor (1)
23:22
creditors (20)
18:3,4,7 23:12,15,18
24:2,4 35:10,21,25
36:3,5,8,10,13 41:2
41:5 63:17 106:7
CRO (1)
11:18
Cross (1)
115:23

CSR (1)
1:24
currently (1)
10:23
custodial (1)
28:21
cycle (2)
13:16 15:24

—————— D ——————
D (1)
51:9
Darren (1)
17:5
date (4)
30:20 68:15 79:14
123:3
dated (5)
69:3,6 111:10,15
121:21
David (5)
79:5 85:13 104:12,18
114:2
day (5)
91:19 112:16 116:13
117:19 123:22
day-to-day (2)
29:8 32:6
days (3)
28:20 40:3 73:7
deal (15)
16:16 26:14 45:23
49:9,19 73:6 85:6
85:10,21 90:9 91:20
92:2 94:4 109:23
110:9
deals (1)
92:22
dealt (1)
114:12
debt (1)
26:8
debtor (1)
56:18
Debtor's (3)
118:11,16,18
debtors (8)
1:6 4:10 6:22 7:25
75:15 80:2 81:4
90:16
December (4)
26:18 69:3 100:19
122:2
decision (2)
49:9,10
declaration (2)

69:2 120:8
**deed (11)**
50:15 54:7,22,24 55:4
55:8,12 59:7 92:4
120:1 121:4
**deeds (21)**
51:20,22 52:16,25
53:16 59:8,17 60:20
60:24 61:2,10 69:19
69:24 71:15 73:13
91:4,13,16 92:20
97:4,7
**default (5)**
30:9,10,11 31:14,15
**define (2)**
41:5 102:2
**defined (1)**
24:17
**definition (1)**
25:7
**definitions (1)**
28:9
**degree (4)**
14:16,20,24,25
**degrees (2)**
14:23 15:3
**Delaware (1)**
77:14
**deliver (2)**
51:7,12
**Dep (1)**
123:3
**depending (1)**
32:3
**Depends (1)**
15:24
**Deponent (2)**
123:4,20
**deposed (1)**
8:5
**deposition (24)**
1:12 2:5 5:8,15 8:6,11
8:12,17,22 27:7
56:4 79:6 83:6,19
84:14 86:12 92:9,15
104:20 105:7 116:2
117:11,12
**Derek (3)**
23:20 27:3 101:9
**DESCRIPTION (1)**
118:9
**determine (2)**
26:8 78:18
**determined (1)**
102:20
**Dev (1)**

96:2
**Development (1)**
96:2
**devoted (3)**
11:11 13:4,6
**Diamant (5)**
96:12,16 97:6,19 98:5
**Diamant's (1)**
97:16
**Diana (14)**
4:5 6:10 33:8 36:18
43:20 95:8 107:9,10
113:2 119:19
120:15 121:6,11
122:1
**differ (1)**
20:9
**different (5)**
21:6,7 23:6 31:16
77:25
**differs (1)**
20:11
**diligence (13)**
45:14 72:20 76:25
77:8,10 79:9 80:18
85:25 86:7,11 98:21
99:5,10
**direct (7)**
37:11 48:19 77:9
78:15,23 89:16
106:19
**directed (3)**
38:3 103:20 104:2
**direction (2)**
100:9 105:25
**directly (3)**
50:6 89:23,24
**directs (1)**
37:22
**disclose/investigate ...**
98:10
**discretion (1)**
54:18
**discussed (3)**
92:20 104:25 111:5
**discussing (2)**
22:16 71:10
**discussions (2)**
29:16 78:11
**dispute (3)**
14:17 75:7,10
**District (3)**
1:2 5:12 7:21
**document (12)**
22:10 42:22 43:25
46:14 53:21 68:22

69:5 70:4,14 73:21
93:9,19
**documents (8)**
70:6,8,22 71:12 73:10
73:12,15 90:24
**doing (8)**
13:14,18,23 14:5
67:20 83:2 98:20
115:4
**dollars (5)**
64:16 65:19 67:25
74:6 91:12
**door (2)**
12:7,13
**dot (2)**
13:22 14:6
**download (1)**
69:25
**draft (1)**
114:19
**drag (1)**
16:3
**drilling (1)**
65:5
**drone (1)**
10:5
**due (13)**
45:14 72:20 76:25
77:8,9 79:8 80:18
85:25 86:7,11 98:20
99:4,9
**duly (2)**
5:3 117:11
**duties (3)**
17:21,24 20:21
**duty (1)**
18:6

──────────
E
──────────
**E (4)**
3:1,1 117:1,1
**earlier (5)**
88:24 98:14 104:25
111:5 113:8
**early (2)**
13:19 14:7
**Eastern (3)**
1:2 5:11 7:20
**Edmonds (2)**
23:21 27:3
**Edmonds/Centrum...**
101:9
**education (1)**
14:23
**effect (1)**
60:13

**effectuate (1)**
62:10
**efforts (1)**
109:12
**either (2)**
47:22 93:22
**Either/or (1)**
89:20
**email (85)**
33:7,8,25 34:3,7,12
34:12,15,21 35:2
37:6,17 38:7,8,11
39:18,19 40:5 43:19
43:23 46:8 48:15
69:6,8,10,14 70:5
71:4 72:7 75:2,5,8
75:12,19 78:5 81:11
82:5,11 86:8 89:18
89:21,24 91:18 93:6
94:13,15,16 95:9,13
95:17,19 96:14,20
97:17 98:4 99:2,17
99:22,23 100:15,17
100:20,21 104:24
105:10 107:10,11
111:2,4,7,9,15
119:1,5,10,15,19
120:11,15,20 121:6
121:11,16,21 122:1
**email's (1)**
34:19
**emailing (1)**
69:19
**emails (10)**
26:24 36:17 45:3 46:2
74:25 80:17 81:12
84:9 94:20 99:3
**employed (1)**
10:23
**employees (2)**
15:5,13
**encumbrances (3)**
57:2,22 60:2
**ended (1)**
13:25
**engaged (2)**
12:4 19:2
**engagement (17)**
12:2,3,7,8,14 15:25
16:7 17:15,20 19:2
21:2,3,5,18,22
22:20,21
**engagements (9)**
11:14,23 15:18,21
16:14,16,21 17:12
17:13

**engineering (1)**
108:4
**enter (3)**
50:8 65:10 103:13
**entered (2)**
51:21 52:19
**entering (1)**
27:14
**entities (11)**
7:24 19:19 75:14,21
76:19 77:2,13 78:13
78:21 79:10,25
**entitled (1)**
67:6
**entity (13)**
7:10,12 17:7 72:9,16
79:18,22 86:5 87:16
88:25 89:4,5,6
**eorse@orseco.com ...**
69:11 99:18
**equity (5)**
31:8,9,18,22,24
**Eric (128)**
1:12 2:5 4:2 5:1,8 6:1
6:11 7:1 8:1 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1 20:1 21:1
22:1 23:1 24:1 25:1
26:1 27:1 28:1 29:1
30:1 31:1 32:1 33:1
34:1 35:1 36:1 37:1
38:1 39:1 40:1 41:1
42:1 43:1 44:1 45:1
46:1 47:1 48:1 49:1
50:1 51:1,9 52:1
53:1 54:1 55:1 56:1
56:4 57:1 58:1 59:1
60:1 61:1 62:1 63:1
64:1 65:1 66:1 67:1
68:1 69:1 70:1 71:1
72:1 73:1 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1 91:1
92:1,10,16 93:1
94:1 95:1,25 96:1
97:1 98:1 99:1
100:1 101:1 102:1
103:1 104:1,10
105:1 106:1 107:1
108:1 109:1 110:1
111:1 112:1 113:1
114:1 115:1 116:1,3
116:10 117:10

118:3 123:4
Ernie (1)
95:18
ERRATA (1)
123:1
escrow (5)
17:2,2 65:20 68:8
74:6
especially (1)
7:23
ESQ (4)
3:9,18 4:5,13
Esquire (1)
96:12
essentially (1)
9:3
established (1)
88:13
estate (12)
16:11,13,15,17,18
17:2 21:21 23:3
36:2 46:22 84:22
113:14
estates (1)
115:11
et (2)
1:5 5:10
Evens (1)
110:3
event (1)
115:13
Ex (1)
118:10
exact (4)
36:21 68:15 79:14
88:14
exactly (5)
23:19 38:13 63:13
88:18 111:19
EXAM (1)
118:4
examination (2)
6:24 10:21
examined (1)
5:3
examples (1)
16:20
exchanged (1)
90:3
excise (4)
46:22 49:2 57:4 58:19
execute (2)
51:6,11
executed (2)
51:23 67:10
execution (1)

63:4
exempt (1)
57:3
exemption (1)
58:18
exhibit (71)
22:5,9 33:12 37:3,19
39:15 42:15,18,23
44:2 46:7 48:12
50:11,19,22 53:9,12
55:23 56:3,5 62:7
67:12,23 68:10,18
68:22 69:5 71:3,23
72:8 73:19 74:17,20
74:23 75:20 86:14
87:24 90:21,25 91:7
93:2 94:10 97:4,23
99:25 100:11
110:23 112:9,11,13
118:9,10 119:1,5,10
119:15,19,24 120:1
120:6,8,11,15,20
121:1,4,6,11,16,21
122:1
exhibits (2)
43:20 118:8
experience (1)
6:17
expert (1)
47:20
EXPIRES (1)
123:25
explicitly (1)
81:6
expressly (2)
51:24 57:8
extend (1)
18:7
extended (1)
42:5
extensive (1)
86:11
extent (2)
45:16 86:7
eyes (1)
105:20

F

F (1)
117:1
fact (2)
26:18 27:2 51:19
113:6,12
failure (1)
98:10
fairly (2)

26:6 36:23
fall (2)
18:18 58:16
familiar (14)
8:13 10:4 17:20 22:10
53:5 54:24 55:3,7
79:18,21 107:24
108:12 109:18,25
far (1)
17:12
fee (2)
21:13,20
feel (1)
57:16
fees (1)
21:14
Feinberg (8)
43:9,10 69:3,7,18
104:10 106:21
120:9
Feld (3)
3:18 6:7 35:5
felt (6)
30:17 52:4 57:24 62:9
67:9 113:4
fiduciary (4)
18:2,6 20:21 35:23
Fifth (2)
2:6 4:3
figure (1)
23:10
file (1)
21:13
filed (10)
5:10 18:17 91:16,17
91:19 92:3,21 102:9
107:2 114:19
files (2)
40:15 93:23
Filing (1)
120:4
finance (2)
14:21 15:2
financial (5)
11:7 17:4,10 119:8,13
financially (1)
103:13
find (3)
77:12,24 78:23
fine (1)
112:7
finish (1)
32:13
firm (10)
10:24,25 43:5,6,7
74:5 80:13 89:25

108:4 109:18
firm's (2)
12:18 13:4
first (11)
8:24 14:11 38:11
39:18 48:21 75:20
87:25,25 91:16
101:19 105:22
five (5)
8:23 16:21 17:14
61:20 110:12
Fixture (1)
120:3
flip (1)
97:3
Florida (1)
77:14
flow (2)
30:21 31:17
focus (2)
16:5 77:16
focused (3)
12:15,18 15:21
focusing (1)
77:22
folks (1)
95:19
follow (1)
64:4
followed (1)
115:9
following (6)
27:11 44:18 71:3
75:14 87:24 88:4
follows (1)
5:4
football (1)
27:15
foreclosure (15)
101:22,25 102:5,6,6
102:13 103:7,9,23
107:4 113:2,10
114:10 115:10,13
forth (2)
26:11 117:11
forward (4)
7:10 28:2 113:15,18
forwarded (1)
33:7
found (2)
86:4 107:13
founded (2)
13:10,13
four (12)
7:24 75:15 76:19 77:2
77:13,15,25 78:13

78:20 79:3,25 81:4
fourth (5)
5:16 26:14 27:14,15
104:5
free (6)
49:2 56:25 57:21 58:4
58:11 59:25
frequently (1)
25:24
Friday (2)
119:16 121:12
front (2)
36:17 110:24
full (5)
48:20,20 51:10 53:14
54:13
further (3)
111:22 115:20 117:14
FW (2)
119:21 121:18

G

game (3)
27:15 75:25 98:20
gap (1)
30:16
general (2)
75:2 118:21
generally (5)
9:21 22:22 53:6,7
84:4
gentleman (5)
34:19 82:18 83:12,23
85:17
getting (5)
23:11 31:20 67:4,5
113:12
give (8)
6:16 10:2 16:20 26:4
36:7 60:15 98:6
114:23
given (6)
20:18 47:23 65:2,8
115:5 117:13
gives (1)
96:13
giving (2)
10:17 60:23
Gmail (4)
94:20,22,23 111:4
GMC-CMI (1)
107:25
go (7)
13:2,15 53:20 87:21
91:17 99:13 105:21
goes (3)

95:23 96:10 106:24
**going (16)**
7:9,10,24 9:3,6,7 28:2
28:2 42:3 55:11
60:15 67:7 100:13
102:14,21 114:3
**good (4)**
5:6 7:3,4 78:12
**Google (6)**
45:19 72:22 84:10
87:15 88:16 121:1
**Googled (1)**
86:4
**governed (1)**
74:4
**graduate (1)**
14:15
**grasp (1)**
107:19
**Great (3)**
10:19 37:10 115:21
**green (1)**
49:14
**Greenfield (4)**
44:17,20 45:4 74:9
**Greenfield's (1)**
45:8
**group (2)**
14:18 79:19
**guess (3)**
25:10 42:21 85:13
**Gwen (5)**
1:24 2:8 5:24 117:7
117:24

**H**

**HAMPTON (2)**
3:4,13
**hand (1)**
117:19
**happened (5)**
31:16 36:22 42:25
49:20 107:11
**happens (1)**
32:6
**happy (2)**
39:5 59:15
**Hartman (1)**
17:2
**head (1)**
113:21
**headings (1)**
62:24
**headquartered (1)**
5:22
**heard (13)**

34:21 82:21,24 83:11
83:15,20 84:4,8,11
84:12 96:19 104:11
108:6
**heavy (1)**
73:8
**held (11)**
2:5 5:15 19:20,20
24:6 27:23 53:2,16
58:5,8 62:11
**helping (1)**
12:25
**Herbst (2)**
4:9 6:20
**hereinbefore (1)**
117:11
**hereunto (1)**
117:18
**hesitated (1)**
30:7
**higher (2)**
14:20,22
**hit (2)**
13:23 14:4
**Hold (1)**
33:19
**holding (1)**
74:5
**home (1)**
78:8
**hopefully (1)**
9:14
**hourly (1)**
21:12
**housekeeping (2)**
110:12,22
**hundred (7)**
11:12,24 64:16 65:19
67:25 74:5 91:11
**hundred-thousand-...**
72:3
**Hyun (9)**
17:18 18:20,24 19:8
54:3,4,5 79:11 98:7

**I**

**i.e (1)**
113:13
**idea (3)**
45:22 49:8 74:12
**Ideally (1)**
98:22
**identification (20)**
22:6 33:13 37:4 39:16
42:16 48:13 50:20
53:10 55:24 68:19

71:24 73:20 74:18
86:15 90:22 93:3
94:11 97:24 100:2
100:12
**immediately (1)**
107:4
**implemented (2)**
49:21,24
**impression (2)**
31:19 55:18
**inaudible (1)**
10:3
**include (3)**
19:18 81:3 99:23
**included (3)**
70:5 72:22 111:14
**includes (1)**
57:11
**including (3)**
22:15 26:15 64:21
**incorporated (2)**
11:6 77:13
**incur (1)**
46:22
**INDEX (2)**
118:1,8
**indicate (1)**
88:17
**indicated (3)**
46:5 48:5 49:12
**indicates (2)**
105:24 106:18
**indicating (2)**
38:8 39:20
**individual (1)**
72:16
**individuals (2)**
18:17,20
**industries (1)**
16:6
**information (2)**
9:5 31:21
**informed (1)**
75:21
**initial (5)**
12:24 37:17 44:4 82:3
82:6
**Initially (1)**
26:2
**initiated (1)**
107:8
**inquiries (1)**
99:10
**inquiry (9)**
8:10 33:2,9 36:14,20
79:12 84:13 86:4

98:14
**ins (1)**
107:19
**instance (1)**
8:18
**instructions (1)**
10:6
**intend (1)**
103:8
**intent (10)**
38:9,10,12,16 40:6
46:5,5 90:11,16
103:18
**intention (1)**
107:16
**interact (2)**
23:14 25:25
**interacted (3)**
23:17,20 26:3
**interaction (7)**
23:25 24:3 25:12
108:9,23 109:22
110:8
**interactions (2)**
25:9 26:7
**interest (18)**
30:9,10,11 31:14
38:25 45:24 46:6,10
46:15,24 47:16 58:5
58:8,22 74:14,15,16
96:3
**interested (2)**
27:4 117:17
**Interests (1)**
121:9
**International (4)**
80:12,15,19 82:15
**interruption (1)**
24:9
**introduce (1)**
6:2
**investigator (1)**
87:12
**investment (1)**
46:25
**involved (5)**
81:11 85:6,9,21 98:7
**involvement (1)**
94:4
**IPO (4)**
12:24 13:5,8 14:2
**ish (1)**
14:8
**ISLAND (1)**
117:5
**issue (1)**

28:5
**issues (3)**
8:10 28:10 107:15
**it'll (1)**
9:16
**item (1)**
111:24

**J**

**jack (2)**
16:7,9
**January (1)**
40:2
**Jerusalem (1)**
4:11
**job (3)**
1:25 32:7 35:23
**John (2)**
100:4 121:23
**Joint (1)**
1:8
**Jordan (4)**
4:13 6:16,20 121:22
**jshproperties.com (1)**
95:19
**judge (7)**
19:11 21:14 35:6 42:2
113:11,16 114:4
**judges (1)**
85:2
**juggle (1)**
15:22
**July (12)**
33:9 39:19 40:3,6,9,9
111:2,10,16 119:2,6
119:11
**June (1)**
96:11
**junior (1)**
12:25
**jurisdictions (1)**
77:25

**K**

**K (5)**
119:19 120:15 121:6
121:11 122:1
**Karr (6)**
4:1 6:10 43:8 68:7
73:9 118:19
**kazu (5)**
34:20 43:21 46:8
111:2 121:2
**kazu@snsll.com (3)**
119:1,5,10
**keep (1)**

66:25
**Kidder (5)**
108:13,24 109:2,6,11
**kind (1)**
16:4
**knew (1)**
82:16
**know (79)**
8:5 9:22,25 10:13,20
11:14 12:24 15:25
22:9 25:14 26:6,10
28:17 33:15 34:23
35:18 40:14 42:5,5
43:13 44:20 45:22
50:23 57:24 58:16
59:4 61:10 64:3
68:13,14 72:10,13
73:2 75:25 76:7,18
76:21,24 77:6 79:3
79:4,4,6,14,17,24
80:5,5,11,12 82:15
82:17,18,25 83:8,23
85:14,17 89:3,13
90:5 94:18,24 95:2
96:23 97:12 102:23
103:17,19 104:15
105:12,15,17 106:5
107:22 108:5 112:9
112:11 115:2
**knowing (1)**
94:9
**knowledge (8)**
44:24 45:5,17 77:3,6
87:6 104:8 105:2
**known (1)**
19:3

— L —
**labeled (1)**
5:7
**LaMonica (2)**
4:9 6:20
**Lane (2)**
2:6 5:16
**language (3)**
62:16 64:4 66:10
**late (5)**
13:18 75:25 76:16,17
98:19
**law (4)**
43:5,6 80:13 109:18
**lawyers (1)**
106:22
**Lazer (1)**
109:19
**lead (1)**

43:10
**learning (1)**
76:4
**Leases (1)**
120:3
**left (1)**
97:8
**legal (3)**
5:21 60:5,16
**lender (19)**
23:18,20 24:19,21
25:2 26:20 27:5
29:2 30:23 31:22
32:4 54:16,17 55:15
58:2,2 63:16,19
113:8
**lenders (6)**
18:4 24:24 57:11 66:13
104:12,17
**lengthy (1)**
48:16
**lent (1)**
24:5
**letter (20)**
38:9,9,12,16 40:6
46:4,5 74:2 100:3,8
100:14,25 101:10
101:12,14 105:22
112:10,23 120:18
121:21
**letting (1)**
10:5
**lie (1)**
106:11
**lien (2)**
52:3 57:25
**liens (20)**
36:12,13 52:3 56:25
57:15,22 58:12,15
60:2 63:19 65:15,25
66:7,10,14,19,21
67:3,6,8
**light (1)**
60:10
**limit (1)**
8:9
**limited (1)**
45:18
**Linda (2)**
44:16 74:9
**line (1)**
23:22 58:16 100:18
105:20
**link (6)**
69:25 70:6,11,12,15
70:23

**lists (2)**
75:15 89:11
**litigate (1)**
113:14
**litigation (6)**
8:7 103:13 105:7
113:17 115:9
118:15
**little (8)**
31:23 32:24 45:21
76:12,16,17 98:19
110:12
**llc (79)**
1:5 3:6,15 5:10 6:9,13
7:8,18,19,19,20
19:7,13,16,23 20:3
20:19 21:19,21
22:15,21,22 23:15
24:6 27:23 28:13
29:12 31:9 32:9
38:24,25 41:7 44:11
44:14 45:8,11,15,24
46:7,10,11,15 47:16
48:4 49:14 51:23
52:17,23 53:3,17
54:21 55:14 59:2,10
59:20 60:14 62:12
64:14 72:19,21
74:16 76:10 79:3,19
79:22 80:25 81:4
87:15 89:6 90:15
91:11 96:4 100:5,6
103:8,22 107:2
121:1 123:2
**LLC's (3)**
47:4 57:9 118:22
**Ln (1)**
123:6
**loan (6)**
26:8 29:17,20,23 30:6
30:8
**loans (1)**
26:9
**lock (1)**
25:15
**long (1)**
57:25
**longer (2)**
70:15 96:3
**look (8)**
31:17 44:7 48:14 51:2
54:13 56:10 101:19
104:5
**looked (5)**
35:10 50:11 63:14,15
89:4

**looking (3)**
9:5 30:21 37:19
**looks (3)**
74:3 75:3 88:6
**lost (1)**
42:13
**lot (5)**
13:19 40:11,12,15
76:13 113:13
**lower (1)**
29:18

— M —
**M (2)**
13:7 120:8
**M&A (1)**
14:2
**Maimon (2)**
4:19 5:20
**main (1)**
25:12
**making (1)**
96:6
**managed (1)**
15:4
**management (21)**
6:12 19:12,15 20:2,6
20:7,9,12,15,16,18
21:3,14 22:14 29:11
32:8 51:9 55:13
95:25 102:17
118:17
**manager (2)**
41:13 48:22
**managing (1)**
29:8
**Maniscalco (2)**
4:9 6:21
**manufacturing (1)**
17:10
**March (5)**
1:14 2:1 5:18 117:19
123:3
**Margolin (1)**
110:2
**Mariners (1)**
7:19
**mark (10)**
9:8 10:9 22:3 33:10
36:25 39:14 50:17
68:16 71:22 97:22
**marked (25)**
22:5,8 33:12 37:3
39:15 42:15 48:12
50:19 53:9 55:23
56:3 67:11 68:18,22

71:23 72:7 73:19
74:17 86:14 90:21
93:2 94:10 97:23
99:25 100:11
**marriage (1)**
117:16
**Marti (2)**
73:8 121:16
**Martin (5)**
25:23,25 28:23 29:3
114:2
**match (1)**
42:8
**matter (6)**
5:9 8:8 24:18 81:7
108:25 117:17
**Matthews (5)**
108:13,24 109:2,6,12
**MBA (2)**
14:21 15:2
**mean (16)**
11:22 27:14 49:25
53:19 63:5 74:25
76:15 84:8 89:18,18
92:3 93:16 94:6
102:19 105:4
107:18
**meaning (1)**
102:17
**means (1)**
63:4
**meant (2)**
97:7 102:12
**Mechanism (1)**
118:18
**meeting (2)**
106:6 113:22
**member (11)**
28:13 44:11,13 45:8
45:11,15 72:19,21
76:8 80:25 90:15
**membership (8)**
45:24 46:15 50:10
58:21 74:14,15
76:10 121:9
**memory (1)**
37:21
**mentioned (15)**
7:5 19:25 20:5 24:25
25:16 28:11 29:15
35:12,20 36:4 62:9
62:23 88:24 99:4
110:21
**mentioning (1)**
65:24
**mentions (1)**
65:24

mentions (1)
104:16
mercy (3)
7:8,22 53:13
merger (3)
12:23 13:7,19
mergers (1)
14:2
merits (2)
114:13,16
Michael (6)
43:9 69:2 82:19 83:9
104:10 120:8
mid (2)
14:13 104:20
Midland (1)
25:18
million (2)
31:5,11
mindset (1)
35:3
minutes (2)
61:20 110:12
misspoke (1)
91:6
MLMT (4)
3:5,14 6:8 7:7
model (1)
16:4
modes (1)
23:10
moment (10)
7:5 12:19 22:7 33:14
34:6 37:5 42:18
56:7 74:20 95:4
momentarily (2)
91:18 92:20
Monahan (50)
3:9 6:6,7,14 7:2,6
22:3 24:24 33:10
36:25 39:13 42:13
48:11 50:17 52:9
53:8 55:22 59:15
60:7 61:19,22 62:5
64:24 65:5,10 67:16
67:22 68:16 70:3,19
70:25 71:22 73:18
88:15,19 90:19 92:7
92:18,24 97:22
103:3 110:11,20
111:21 112:6,14,20
115:19,22 118:4
Monday (4)
78:7 111:10 119:6
121:17
monetary (2)

57:2,22
money (6)
35:25 36:2 41:6 65:20
74:3 113:14
money's (3)
72:14 73:3 76:2
monies (1)
120:18
month (2)
25:14 26:4
month-to-month (1)
32:7
months (1)
21:13
motion (4)
113:6 118:12,16,22
move (5)
9:14 42:4 113:15,18
114:3
moving (1)
42:3
Mullin (3)
3:4,13 6:7
multiple (1)
26:24
Munhall (2)
73:8 121:16
mute (1)
6:19

—— N ——

N (1)
3:1
name (22)
5:20 25:12,21 44:16
82:21 83:15 84:8,11
84:12 85:11 86:4,6
87:19 89:5 96:19,21
97:17 104:11,17,21
105:10 123:2
name's (1)
7:6
named (4)
34:20 82:18 83:12,23
names (3)
72:9 79:5 82:24
natural (1)
9:24
nearing (3)
26:13,13 27:16
needed (2)
28:25 91:25
needs (1)
70:20
negative (1)
46:25

negotiation (1)
96:25
negotiations (1)
81:17
never (7)
30:11,12 81:8 83:11
104:10 108:6
115:14
new (24)
1:2 3:8,8,17,17 4:12
5:12,23,23 7:21
50:8 70:12 77:15
85:13 86:21,25
96:11 97:13 104:12
104:18 107:3
109:21 110:5 114:2
New's (1)
79:6
night (1)
107:9
nine (3)
27:19,24 28:3
nods (1)
10:3
normally (1)
26:7
Nos (1)
1:5
Notary (1)
123:25
note (5)
26:22 31:13,17 79:22
95:24
noted (1)
116:6
Noteholder (28)
7:10,16 22:8 24:17,21
25:5 29:25 30:16,19
41:15 42:8,23 50:22
53:12 55:16 56:2
57:12 58:6,9 59:9
59:11,21 64:8,15,21
65:18,22 90:25
Noteholder's (2)
31:3,24
Noteholders (1)
64:17
notes (1)
31:13
notice (4)
33:22 72:6 77:18,21
noticed (1)
103:7
notified (1)
28:19
notwithstanding (2)

59:5 104:24
November (1)
121:22
number (14)
5:7,12 31:3,4,5 57:18
66:15 67:20,21,24
68:17 92:9 95:18
96:13
numbered (1)
56:15
numbers (4)
37:12 42:14 56:10
112:15
numeral (1)
63:11

—— O ——

oath (1)
10:15
object (2)
29:4 113:9
objected (1)
29:5
objection (8)
24:16 65:11,13 88:12
114:13,16,18,19
objections (1)
28:9
obligation (1)
47:2
obviously (12)
8:4 57:10 60:16 70:17
105:14,19 107:21
108:8 109:22 110:7
111:15 114:12
occur (1)
91:25
occurred (2)
28:12 32:12
October (3)
99:17 104:20 121:17
odd (3)
76:3 77:12,25
offer (23)
35:9 36:21 37:23 38:2
38:4 39:4,5,8,12,20
40:4,8,10,23 41:2
41:10,15 42:5,9,22
44:5 55:4,8
offerings (1)
12:24
offers (2)
41:17,20
Office (8)
1:5 3:6,15 6:9 7:7,18
107:2 123:2

officer (2)
11:18 17:10
Offices (2)
2:6 5:10
offline (1)
70:20
oh (3)
17:6 67:19 88:8
okay (25)
8:24 10:19 21:25 25:6
34:2 37:9 38:14
42:20 44:9 48:10,17
54:19 57:17 63:10
87:10 88:15 92:7
93:8 96:15 98:3
100:24 102:3,3
111:21 115:8
Olympia (5)
1:5 5:9 7:18 106:25
123:2
once (3)
26:3 27:18 32:12
one-man (1)
15:15
ongoing (1)
27:9
open (1)
10:17
operating (1)
25:13
operations (1)
29:8
opinion (4)
47:23 60:5,6,16
opportunity (2)
23:14 50:21
opposed (2)
10:3 58:21
opposite (1)
106:14
order (11)
19:17,18 20:12,14
22:13,16 29:3
118:10,11 119:22
120:6
orders (1)
42:2
organization (1)
48:25
organized (1)
62:24
orienting (1)
60:9
original (1)
46:8
originally (2)

46:17 86:3
**Orse (173)**
1:12 2:5 4:2 5:1,9 6:1
6:11 7:1,3 8:1 9:1
10:1 11:1,2,3,15,20
12:1,22 13:1,10,13
14:1 15:1,4 16:1
17:1 18:1 19:1 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1
33:1 34:1 35:1 36:1
37:1,15,22 38:1,7
38:10 39:1 40:1,5
41:1 42:1,17,18
43:1,25 44:1,8,18
45:1 46:1 47:1 48:1
48:21,21 49:1 50:1
51:1,9 52:1 53:1
54:1 55:1,25 56:1,5
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
64:24 65:1,2 66:1
67:1 68:1,21 69:1
70:1 71:1,25 72:1
73:1 74:1,19 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:1 86:1 87:1
88:1 89:1 90:1,23
91:1 92:1,10,16
93:1,5,6,18 94:1,12
94:17 95:1,25 96:1
97:1,25 98:1,2 99:1
99:14 100:1,3,13,15
100:23 101:1 102:1
103:1 104:1,10
105:1,24 106:1
107:1 108:1 109:1
110:1,21 111:1,9,25
112:1,17 113:1
114:1 115:1 116:1,3
116:10 117:10
118:3 123:4
orsecoeric@gmail.c...
94:16,23
**outcome (2)**
115:6 117:17
**outs (1)**
107:19
**outside (1)**
84:2
**outstanding (1)**
29:24
**owe (1)**
72:8

**owed (3)**
29:25 30:7 41:6
**owned (1)**
19:8
**owner (1)**
96:11
**owners (3)**
15:6 78:20 98:7
**ownership (2)**
96:3 98:15
**owns (2)**
79:25,25

**P**

**P (2)**
3:1,1
**p.m (23)**
2:2 5:19 24:11,12,13
24:15 61:24,25 62:2
62:4 92:10,12,13,16
99:17 110:15,16,17
110:19 111:10,16
116:4,6
**page (28)**
37:13 39:19 44:7,18
48:21 53:21 54:12
56:10,13 62:18,25
63:8 71:3 87:24,25
88:4,4,4,6,8,10,22
105:22,23 111:8,15
118:2,9
**pages (1)**
112:21
**paid (8)**
23:24 56:23 63:17
65:18,22 68:3,5
91:10
**paperwork (1)**
73:8
**paragraph (17)**
48:25 51:3 56:15,18
63:5,5,8,12 66:5,22
71:4,9 101:20 104:6
104:7 105:23
106:25
**paralegal (1)**
73:9
**part (5)**
63:11 86:24 90:8
111:18,19
**Parte (1)**
118:10
**particular (2)**
16:5,10
**parties (6)**
12:11,12 15:8,9 98:7

117:15
**partners (2)**
15:6,11
**party (2)**
82:12 90:12
**passed (2)**
35:18 41:24
**path (1)**
114:3
**Paul (10)**
25:12,17,23 26:16,20
27:5 28:23 29:3,16
114:2
**pay (11)**
26:21,21 29:20 36:2
47:2 56:21 64:6,14
64:17 66:18 105:11
**paying (1)**
57:10
**payment (3)**
65:17,21 118:18
**payments (3)**
25:13,14 63:2
**payoff (1)**
31:20
**pdf (1)**
71:7
**peculiar (1)**
76:3
**penalties (1)**
10:16
**pending (1)**
7:20
**people (3)**
79:7 82:25 85:16
**percent (10)**
11:12,25 12:17 13:7,9
38:24 115:3,3,5,7
**percentage (3)**
13:4,6 114:24
**performed (2)**
60:22 61:11
**period (5)**
11:22 13:24 26:11
42:5 70:11
**perjury (1)**
10:16
**permit (1)**
54:15
**person (3)**
37:23 41:11 96:11
**personally (1)**
76:20
**perspective (1)**
52:4
**Petramalo (1)**

41:12
**Pg (1)**
123:6
**Philips (4)**
80:12,15,19 82:15
**phone (3)**
6:15 96:13 106:8
**picture (1)**
63:23
**piece (2)**
79:8 110:23
**Pilevsky (9)**
4:13 6:18,20 82:19
83:9,13,15,20
121:23
**pivoting (1)**
22:19
**place (1)**
27:3
**placed (4)**
53:11 56:2 90:24
110:24
**plan (32)**
23:23,23 30:20 48:4,5
48:8,25 51:20,21
52:7,12,23 55:19
56:7,24 58:17 59:24
60:19 61:6 62:6,23
63:2,4 66:5,23
68:12 69:20,24 71:5
71:6,14 120:6
**planned (1)**
102:5
**Plaza (2)**
3:7,16
**pleadings (4)**
86:20,25 87:2,8
**please (9)**
6:2 22:4 39:14 41:5
59:14 81:21 92:25
95:24 98:6
**point (15)**
32:22 35:4,15 43:11
62:16 63:23 72:13
72:17,21 73:2,5
74:8 91:15,23
107:21
**portfolio (10)**
7:19,19,20 26:5,25
31:9 32:19,24 33:3
81:4
**portfolios (4)**
16:18 23:8 76:15
109:4
**position (16)**
18:21 57:20 58:3

66:14 73:4 101:21
102:4,12 103:12,12
112:25 113:4,15
114:9,11 115:17
**possible (1)**
9:15
**possibly (2)**
41:12 93:17
**post (1)**
82:24
**potential (3)**
18:19 114:16,18
**Powell (2)**
2:6 5:16
**power (2)**
51:6,11
**pre (2)**
12:23 13:5
**precede (1)**
6:5
**prepare (2)**
12:25 43:2
**prepared (1)**
113:5
**preparing (1)**
113:25
**Press (1)**
17:11
**previously (3)**
24:18 56:3 65:2
**price (14)**
17:17,18 18:16,20,23
19:8 20:13,18 21:2
21:15 38:21 67:24
79:10 98:6
**Pricewaterhouse (1)**
14:13
**primarily (1)**
11:8
**Primary (1)**
23:4
**prior (14)**
12:21 27:7 34:20
43:20 46:2 54:16
75:19 82:22 83:6,14
84:14 85:25 107:4
113:23
**Prium (39)**
17:16 18:9,10,11,12
18:13,15 19:4,7,12
19:15,19,19 20:14
20:19 21:4,4,14,20
22:14,20 23:9,12
26:12 27:13 32:14
32:19,21 35:5,10
36:2 40:13 76:13

96:2 100:5,6 103:14
109:3 113:14
**private (1)**
87:11
**privilege (1)**
76:23
**probably (10)**
8:23 13:7 27:6 28:17
28:19 31:23 78:3
86:8 115:3,8
**problem (1)**
25:22
**proceeding (1)**
8:13
**proceedings (3)**
7:18 9:14 107:7
**proceeds (4)**
26:21 56:20 64:5
66:17
**process (7)**
10:5 27:8 32:15,20
40:13 41:23 43:24
**produced (1)**
93:20
**production (3)**
70:5,8,14
**prohibit (4)**
51:23,24 54:20 55:12
**prohibited (3)**
52:7,12,16
**prohibits (2)**
59:19,24
**Prop (1)**
102:3
**properties (101)**
3:6,15 6:9,13 7:7
19:23 20:3 21:18,21
22:15,21,22 23:15
24:6,6 27:19,23,24
28:3,4,5,13 29:6,12
31:9,10 32:9 36:12
38:25 40:17,21 41:7
47:4,15 48:3,4,22
49:14,20 50:6,8,14
51:22,23,25 52:2,12
52:15,17,23 53:2,2
53:16,17 54:21
55:14 57:8,16 58:11
58:21,25 59:10,11
59:19,20,25 60:14
60:14 62:11,12
63:21,24 64:13,14
65:25 66:6,12,13
67:2 72:15 75:23
90:12,17 91:11 96:4

96:4,7,25 98:9,17
103:6,8,22 109:13
120:13,22 121:14
**property (21)**
24:5 27:19 29:9,18,19
29:20 41:13 48:24
49:6 54:22 55:5,9
55:15 56:19,24 57:9
57:21 58:2,4,10
78:20
**proposal (2)**
46:13 49:18
**protection (1)**
107:3
**provided (3)**
30:19 68:11 71:14
**provision (7)**
57:8 58:19 59:16,23
62:15 66:4 67:3
**provisions (3)**
60:10,11,25
**PS (1)**
118:20
**public (3)**
12:24 13:2 123:25
**pulling (1)**
73:9
**purchase (22)**
27:2 28:24 33:3 38:12
38:16 43:3 46:6
47:14,15,16 50:10
60:12 67:11,23,24
68:9 71:19 72:18
76:8 81:17 107:17
119:24
**purchaser (6)**
43:14 44:11 68:11
71:13 76:7 81:20
**purchasers (9)**
75:22 78:19,19 79:3
99:6,11 104:9 109:6
109:14
**purpose (1)**
49:5
**purposes (1)**
49:25
**pursuant (3)**
48:24 57:2,4
**pushing (1)**
35:8
**put (5)**
9:7 10:9 31:14 87:7
106:8
**putting (1)**
21:20

**Q**

**quarter (3)**
26:14 27:14,15
**question (20)**
9:8,12,16,18,22,22
10:9 24:7,23 28:17
32:23 59:14 64:25
65:12,14 87:22
103:2,18 112:24
114:8
**questioning (1)**
87:3
**questions (18)**
9:4,7,11 10:9 27:11
48:16 76:19 77:20
83:4,10,17 85:16,22
98:21 100:14
111:22 115:20,24
**quick (3)**
27:10 107:23 110:22
**quicker (1)**
112:14
**quickly (3)**
9:15 36:23 97:3
**Quit (1)**
121:4
**quitclaim (8)**
50:14 73:13 91:4,12
91:16 92:4,20 97:4
**quite (2)**
28:16 107:19

**R**

**R (3)**
3:1 117:1 121:23
**raised (3)**
104:12,17 107:15
**rate (1)**
21:12
**Ratify (1)**
118:16
**reaction (3)**
34:25 39:3 107:13
**read (4)**
53:14 86:20 94:20
123:6
**reading (1)**
86:24
**Reads (1)**
123:6
**ready (2)**
33:16 73:11
**real (18)**
16:10,13,15,17,18,25
23:3 28:4 46:22
48:23 56:19,24

57:21 58:10 84:22
96:4 98:8 121:13
**realization (1)**
46:21
**really (4)**
9:4,23 73:13 112:19
**reask (2)**
24:7 81:21
**reason (12)**
30:6,10 69:13,16 75:7
75:10 89:9 95:12,15
99:21 100:18 123:6
**recall (24)**
25:20 31:2 36:21
45:19,25 47:22
49:23 61:17,18 69:8
73:16,17 79:12
86:22 88:03,23
89:14 93:13,16
96:21 104:14
106:12 109:10
115:2
**receive (9)**
30:12 34:11 38:15,18
69:14,17 95:13
99:22 100:19
**received (18)**
14:15 33:2,7 34:16
35:2 39:8 55:4 59:2
75:8 95:16 96:20
99:24 100:22 111:8
111:9,12,17,18
**receiver (10)**
16:25 17:3,8 29:6,7
35:17,19 40:22
41:25 95:20
**Receiver's (2)**
119:7,13
**receivership (21)**
11:16,16,20 12:3 17:6
27:8,22 28:12,20,21
29:3 32:6,10,12
40:21 63:22,25
113:9,24 115:10
119:22
**receiverships (1)**
16:24
**receiving (3)**
34:20 36:14 69:8
**Recess (4)**
24:12 61:25 92:12
110:16
**recognize (1)**
54:2
**recollection (4)**
49:4 71:13 72:2 75:19

**reconcile (5)**
30:12 31:21 57:19
60:11 113:7
**record (12)**
24:11,15 61:24 62:4
62:23 92:11,17
110:15,19,22 116:5
117:13
**recorded (1)**
54:8
**recording (2)**
97:8,17
**records (1)**
30:13
**recovery (1)**
14:17
**REET (3)**
46:22 47:3,17
**refer (4)**
7:9,24 28:3 93:11
**reference (4)**
63:7 64:20 72:11
86:21
**referenced (1)**
99:3
**referencing (4)**
7:12 34:4 101:25
104:16
**referring (8)**
56:7 63:2,7 71:9
98:13 103:10,15
104:23
**refinance (4)**
56:19,21 64:5 66:18
**refresh (4)**
49:4 71:12,25 75:18
**regarding (4)**
26:25 41:10,15 98:14
**regards (4)**
25:13 32:24 66:14
74:2
**register (2)**
94:6,7
**related (2)**
9:6 117:15
**relied (3)**
60:21 63:25 66:11
**Relief (1)**
118:23
**rely (1)**
58:24
**relying (3)**
58:20 61:5 62:17
**remember (6)**
25:11 40:20 45:20
62:14 86:5 105:16

reminded (2)
113:2,23
renegotiated (1)
50:24
Rents (1)
120:3
reorganization (2)
71:5,15
reorganized (1)
56:18
repeat (2)
59:13 67:7
rephrase (2)
9:12 24:22
replication (1)
70:18
Reported (1)
1:23
reporter (13)
2:9,11 5:3,24 6:4,23
7:9,23 12:12 15:9
53:11 56:2 117:8
reporting (3)
5:22,25 32:13
reports (2)
119:8,13
represent (4)
7:6,16 81:19 93:19
representations (1)
39:22
representative (19)
6:12 19:12,15 20:3,6
20:8,9,16,19 21:4
21:15 22:14 29:12
32:8 51:10 55:13
81:19 96:2 102:18
representatives (2)
33:2 68:11
represented (3)
80:22,23 81:7
representing (4)
6:11 25:4 43:14 87:3
represents (1)
101:8
reputation (3)
84:18,21,25
request (1)
38:3
requesting (2)
12:12 15:9
required (1)
56:23
requires (1)
64:20
requiring (1)
53:13

resources (4)
113:13 114:6 115:5
115:11
respect (15)
19:3 21:18 28:12
40:16 45:14 77:2
80:19 81:17 83:12
90:11,12,16 99:5
107:16 109:12
responded (2)
36:18,19
response (2)
37:24 101:14
responses (2)
10:2,3
responsibility (3)
18:2 47:4,6
restate (3)
9:12 82:23 86:16
restricts (1)
57:8
restructure (5)
13:9 23:9 26:25 49:8
49:19
restructured (3)
47:9,12 50:4
restructuring (13)
11:8,11,13,18 12:19
13:6,14 14:5,11
16:7,14 84:3,18
result (2)
30:3 47:8
Retain (1)
118:19
retains (1)
48:23
retract (1)
86:19
return (4)
23:11 35:24 46:25
120:18
returned (2)
14:16 97:7
returning (2)
23:10,11
review (7)
22:8 33:15 37:6 40:15
42:18 50:22 74:20
reviewed (5)
37:9 52:22,25 59:16
59:23
reviewing (14)
22:11,17 27:5 33:17
33:21 37:8 42:19
48:18 68:20 73:23
74:21 93:12,15 95:7

Revised (1)
118:13
RICHTER (2)
3:4,13
Rick (2)
101:2 112:10
Rick's (1)
101:14
ridiculous (1)
95:2
right (24)
11:12 32:4 34:9 44:2
51:11 53:8 58:22
65:23 67:16,19,20
72:25 78:9 79:15
83:7 86:13 87:5,18
92:22 93:21 95:10
105:9 106:11
112:22
ring (1)
96:22
Rizzardi (2)
100:4 121:24
Robyn (7)
43:16 69:19 80:6 98:5
119:15 120:11,20
Rock (2)
118:14,22
Rockefeller (2)
3:7,16
rodeo (1)
8:25
role (5)
20:5 23:7 32:13 45:8
97:19
rolling (1)
32:14
Roman (1)
63:11
Rosella (1)
109:19
Round (1)
31:5
running (1)
26:6

—— S ——

S (4)
1:24 3:1 86:9 117:7
sale (30)
27:2 28:24 29:17
33:22 46:23,24
48:24 49:6 56:21,24
57:21 58:10,20
60:13 62:11 64:5,13
64:23 65:21 66:17

72:19 76:9 81:18
96:7,25 104:13,18
109:5,7 120:23
sat (1)
105:19
satisfied (1)
64:22
saw (5)
27:6 35:8 94:7,7
105:11
saying (5)
48:7 57:13 66:25 71:4
105:17
says (13)
48:21 51:5 54:14,23
56:17 57:17,20 72:8
72:19 78:6 101:21
104:7 115:16
scheduled (2)
102:6 107:4
Scott (11)
83:23 85:9 86:16,22
93:7 104:9,11,16,21
105:9,18
Seahawk (2)
7:20 81:3
search (6)
45:19 87:15 88:11,14
88:17 121:1
searched (3)
84:10 88:25 89:4
searches (1)
72:22
Seattle (4)
1:13 2:7 4:4 5:17
second (10)
32:18 39:21 54:13
78:5 90:19 105:22
105:23,23 106:24
111:8
section (16)
54:12 57:2,4,5 60:18
60:21 61:6 62:10,23
62:25 63:3,4,7 66:4
66:11 67:9
secured (9)
18:7 24:4 36:8,10,13
57:11 58:2 63:19
66:13
security (2)
58:5 120:1
see (22)
34:15 37:21 38:6,21
40:4 42:8 44:16
69:6,18,21 71:3,4
75:11 78:4 95:17,23

97:6,9 99:16,19
100:25 105:9
seeing (2)
88:10,23
seek (1)
78:15
seen (11)
22:9 34:12 68:21
73:21 74:23 84:9
88:22 90:2,23 93:9
94:12
sell (9)
36:11 46:10 50:5,7
55:5,9 56:18 58:15
66:6
seller (2)
51:6,12
seller's (1)
47:6
selling (3)
26:16 66:12,12
send (1)
89:21
sends (1)
99:16
sense (2)
9:13,19
sent (22)
39:19 46:9 100:3,8
101:10,16 107:9,10
111:3 112:10 119:2
119:6,11,15,20
120:11,16,20 121:7
121:12,17 122:2
sentence (10)
39:21 48:20,20 54:14
57:20 78:6 101:20
104:6 105:24
106:25
separate (5)
21:5,22 50:9 77:14
102:25
September (15)
72:4,7 75:9 91:17
92:22 93:14 94:3
95:14,25 102:7
120:12,16,21 121:7
121:12
series (1)
9:4
serve (1)
37:22
servicer (2)
25:11,17 30:19,24
services (5)
11:7 108:4,18,21

110:2
**session (1)**
9:23
**set (3)**
37:6 117:11,19
**Seth (3)**
83:13,15,20
**setting (1)**
10:14
**Settlement (1)**
118:13
**settling (1)**
29:17
**setups (1)**
76:14
**shareholder (1)**
19:9
**SHEET (1)**
123:1
**Sheppard (3)**
3:4,13 6:7
**shock (1)**
76:15
**Shorthand (2)**
2:10 117:8
**show (2)**
15:15 62:18
**showing (1)**
70:8
**side (2)**
74:2 120:17
**sign (1)**
91:12
**signatory (1)**
44:10
**signature (5)**
44:17 54:3 80:17 91:3
123:20
**signed (14)**
28:24 50:9,24 51:14
52:17 53:21 55:8
68:10 71:17,20
72:14 73:4 76:3
91:2
**signer (1)**
74:13
**simply (1)**
61:17
**simultaneously (2)**
12:11 15:8
**sir (1)**
80:4
**sit (9)**
59:4 61:9 74:11 77:24
79:2,24 82:14 85:8
85:20

**sitting (3)**
61:16 65:20 105:17
**slowed (1)**
26:5
**sns (4)**
86:9 87:15 89:6 121:1
**snsll.com (1)**
89:11
**Snyder (4)**
19:11 35:6 42:2 114:4
**Snyder's (1)**
113:11
**sold (15)**
26:19 27:18 29:19
48:8 52:2 55:18
57:15,24 58:4,6,13
63:19 65:15,25 67:8
**sole (1)**
54:17
**solicit (1)**
41:17
**soliciting (1)**
41:19
**Solutions (2)**
79:19,22
**somebody (2)**
85:12,12
**sorry (10)**
6:18 13:11 24:7 25:7
25:20 28:13 74:16
76:10 88:8 100:5
**sort (12)**
14:7 15:22 18:9 21:23
22:19 25:24 27:10
30:15 31:2 59:5
92:21 107:7
**sounds (1)**
95:2
**source (1)**
62:25
**speak (11)**
8:25 9:25 12:12 15:9
40:22,25 41:9,14
44:22,25 88:20
**speaking (2)**
12:11 15:8
**special (4)**
25:11,16 30:19,23
**specialist (1)**
5:21
**specific (2)**
16:15,17
**specifically (2)**
23:16 73:16
**spend (1)**
114:5

**spending (1)**
40:12
**Spokane (2)**
118:14,21
**spoke (1)**
106:7
**spread (1)**
31:3
**spring (4)**
26:23 32:5 113:5,24
**SS (1)**
117:4
**stack (1)**
110:24
**stage (1)**
13:20
**stakeholders (1)**
18:3
**stamps (1)**
93:18
**standing (1)**
78:12
**start (2)**
5:7 11:5
**start-up (1)**
13:5
**started (5)**
13:23 27:23 28:22
31:20 43:2
**state (21)**
2:9,11 8:7,17 11:16
23:2,4,5,6 28:21
32:16 46:23 56:4
59:8,9 83:19 85:2
102:9 114:21 117:3
117:8
**statement (3)**
60:12 96:6 106:2
**states (6)**
1:1 5:11 46:9 75:13
77:14 98:5
**status (2)**
26:5 73:6
**Stay (1)**
118:23
**stayed (1)**
57:25
**steps (1)**
36:22
**stopping (2)**
115:9,10
**strategy (1)**
107:21
**stretch (1)**
78:8
**strict (1)**

42:2
**strike (7)**
30:4 49:17 59:5,9
85:18 89:15 104:14
**string (2)**
75:3 105:10
**structure (4)**
21:6,10,11 45:23
**structuring (1)**
49:5
**struggling (2)**
64:2,19
**subject (31)**
47:22,24 48:3,8 52:3
54:22 55:18 58:6
63:19 65:15,25 66:6
66:9,13,19,21 67:2
67:6,8 119:3,7,12
119:17,21 120:13
120:17,22 121:8,13
121:18 122:3
**submit (1)**
37:23
**subpoenaed (1)**
104:20
**Subscribed (2)**
116:12 123:21
**subsequent (1)**
88:5
**subsequently (2)**
84:7 91:19
**subsidiaries (1)**
19:20
**sufficient (4)**
56:21 64:6 66:17,18
**Suite (2)**
2:7 5:17
**sums (1)**
56:23
**Superior (1)**
79:22
**supplement (1)**
112:4
**supplemental (1)**
70:7
**sure (12)**
16:23 20:11 23:19,21
24:20 28:16 61:21
63:6 75:4 81:22
108:22 114:25
**surprise (2)**
106:5,10
**surprised (4)**
35:3,12,13 107:14
**surprising (1)**
107:20

**surrounding (1)**
26:9
**swear (1)**
6:4
**Switzer (17)**
83:23 84:4,7 85:5,9
85:20 86:17,22 93:4
93:7 104:9,11,25
105:3,18 106:6,13
**Switzer's (6)**
84:12,17 94:4 104:17
104:21 105:10
**sworn (6)**
5:3 6:23 10:15 116:12
117:12 123:21

_____T_____

**T (2)**
117:1,1
**take (17)**
11:23 12:4 16:3 22:7
33:14 37:5 39:6
42:3,17 48:14 50:21
53:18 61:19 74:19
95:4,24 110:11
**taken (10)**
8:6,12,18,22 16:13
19:9 24:12 61:25
92:12 110:16
**takes (1)**
11:24
**talk (3)**
10:8 28:23 70:19
**talked (3)**
41:12 81:8 113:8
**talking (5)**
22:2 60:8 64:23 65:7
106:12
**tape (3)**
5:7 92:9,15
**tapes (1)**
116:3
**tax (8)**
46:22 47:17,20 48:3
49:2 57:4 58:19,25
**technology (1)**
13:20
**TELEPHONICAL...**
4:14
**tell (2)**
22:21 81:6
**telling (1)**
105:15
**ten (3)**
22:24 24:5 25:14
**tenancy (1)**

75:13
**tenant (1)**
76:14
**tenants (3)**
23:2,4 78:2
**tenth (1)**
29:18
**term (4)**
24:19 25:8 31:12
38:21
**terms (2)**
56:24 74:4
**testified (2)**
5:4 106:6
**testimony (5)**
10:15,17 62:14 88:20
117:13
**Thank (7)**
10:12 18:12 67:22
70:25 91:9 115:21
115:22
**thereof (1)**
56:20
**they'd (1)**
42:8
**thing (2)**
81:10 87:15
**things (2)**
26:6 99:4
**think (25)**
36:16,17,18 41:19
46:4 48:7,9,15
70:10 73:7 74:15
76:6,8 86:3,6,21
88:13,19 89:4 90:7
98:19 103:10,15
107:9,15
**third (5)**
5:23 48:20 78:5 88:8
101:20
**THOMAS (1)**
3:9
**thought (10)**
32:3,4 35:9,14,20
39:6 60:17 65:3
80:13 114:8
**thousand (5)**
64:16 65:19 67:25
74:5 91:12
**three (1)**
94:19
**Thursday (5)**
1:14 111:16 120:12
120:21 121:7
**Thurston (1)**
54:8

**TIC (1)**
107:2
**TICS (2)**
98:8 121:18
**tie (1)**
30:21
**tied (1)**
30:13
**time (53)**
8:19 11:24,25 12:4
13:3,24 14:10 15:18
15:23 24:10,14
27:22 29:7 32:25
34:16 38:2,19 39:8
40:12,20 51:14
56:20 58:14 61:8,23
62:3 68:9,14 70:11
71:16 73:2 75:20
79:15 80:4,11 82:16
82:22 83:2,13,14,22
85:24,24 92:10,16
94:2 103:5 107:8
110:14,18 111:4
116:4,6
**times (1)**
8:21
**timing (1)**
30:10
**titled (1)**
54:12
**today (15)**
8:2,10 59:5 61:9,16
74:11,24 77:24 79:2
79:24 82:14 85:8,20
93:10 94:13
**today's (1)**
116:2
**told (3)**
47:21 63:16 84:7
**Tom (9)**
6:6 7:6 17:18 18:20
18:23 19:8 41:12
79:10 98:6
**top (4)**
48:15 97:8 110:24
113:20
**touch (1)**
10:22
**touching (1)**
42:7
**trades (2)**
16:8,9
**transaction (24)**
36:9 39:10 47:9 49:13
60:17 61:8,12 64:12
65:17 80:22 82:2

83:2 84:3 96:6
97:20 98:23 99:8,11
106:9 108:10,25
109:15 121:19
122:3
**transactions (2)**
16:17 51:8
**TRANSCRIPT (1)**
123:1
**transfer (18)**
46:14 48:2,23 49:20
51:24 52:11,15
54:13,15,15 57:9
59:10,24 60:25 67:6
68:6,7 74:3
**transferees (3)**
75:22 76:4 107:2
**transferred (1)**
67:2
**transferring (3)**
54:21 55:14 59:20
**transitioned (1)**
29:5
**transmittal (1)**
70:9
**transpired (1)**
32:9
**tried (1)**
31:21
**true (3)**
10:16 106:16 117:12
**trust (21)**
51:20,22 52:16,25
53:16 54:8,22,25
55:4,8,12 59:7,8,17
60:20 61:2,11 69:19
69:24 71:15 120:1
**trustee (27)**
11:17,20 12:2 17:5,12
17:13,15,18,19,22
18:14,18,19,23,25
19:11 20:10,13,17
20:22 21:16 33:6,22
34:8,17 46:9 79:11
**try (3)**
8:9 11:23 28:8
**trying (6)**
25:11 26:7,25 39:6
102:2 103:14
**TSG (2)**
5:21,25
**Tuerk (14)**
43:16,18 69:19 75:12
78:6 80:6,14,22
81:18,24 98:5
119:15 120:11,20

**Tuerk's (2)**
72:6 75:19
**Tuesday (2)**
119:2,20
**turn (14)**
12:12 15:9 39:17
54:11 55:21 56:9
62:6 69:4 71:2 88:3
93:5 98:2 100:23
110:23
**turned (1)**
45:19
**turning (2)**
18:9 87:11
**Tuttle (6)**
4:1 6:11 43:8 68:7
73:9 118:20
**two (9)**
11:23 15:17 16:24
21:13 31:13 40:3
94:19 112:21 116:3
**type (6)**
11:18 12:8,21 13:5,8
98:20
**types (5)**
11:14 12:7 16:21
17:20,24
**typically (4)**
11:15,21,23 15:17

_____
**U**
**ultimate (2)**
75:22 78:19
**ultimately (12)**
20:2 34:11 38:15
46:18,20 47:9 49:9
49:10,21,24 50:24
68:3
**Um (15)**
17:17,18 18:16,20,24
19:8 20:13,18 21:2
21:15 54:3,4,5
79:11 98:7
**Um-hum (2)**
101:3,23
**umbrella (2)**
21:19 32:20
**undergraduate (2)**
14:23,25
**understand (22)**
7:11 9:10 10:14 17:25
44:13 45:7,10 51:16
54:20 57:7,13 64:3
64:19 71:8 72:15
80:14 96:16 101:4
101:24 102:11

108:17 109:11
**understanding (14)**
20:7 31:8 48:2 52:14
69:23 72:18 74:9
80:21 90:10,15
93:24 96:5 97:11,18
**understood (13)**
7:15 9:18 24:24 29:24
36:24 61:15 80:23
83:3 87:9,16 88:15
88:19 94:8
**undertaking (1)**
15:20
**undertook (1)**
109:12
**unfettered (1)**
51:10
**United (2)**
1:1 5:10
**unsecured (5)**
18:4 24:2 35:24 36:5
63:16
**untrue (2)**
106:15,16
**unusual (1)**
76:12
**update (1)**
26:4
**urgency (1)**
113:11
**use (1)**
94:17
**usually (2)**
12:3 94:20

_____
**V**
**vacuum (1)**
22:2
**various (4)**
18:3 25:9 26:16 62:24
**Velton (1)**
95:18
**verbal (1)**
10:2
**verge (1)**
80:5
**versus (2)**
32:4 47:15
**video (1)**
5:21
**video-recorded (1)**
116:2
**Videographer (12)**
4:19 5:6 24:10,14
61:23 62:3 92:8,14
110:14,18 115:23

115:25
videotaped (1)
5:8
view (2)
65:3,6
VII (1)
63:11
Virginia (1)
77:14

**W**

WA (1)
7:19
want (9)
6:16 10:22 63:6 65:11
98:9,9 113:17 114:5
114:23
Wantagh (1)
4:12
wanted (2)
26:14 113:18
warranties (1)
39:22
Washington (27)
1:13 2:7,10 3:5,14 4:4
5:17 6:8 7:7 8:7,16
23:2,5,5,6 28:22
33:7 46:23 54:9
57:6 83:18 84:19,23
85:3 108:4 117:3,9
wasn't (3)
47:23 51:17 115:5
Water (1)
17:7
Wathen (3)
101:2,4 112:10
way (7)
31:12,16 36:22 43:23
90:4 93:17 117:16
we'll (3)
28:9 36:25 91:17
we're (14)
21:25 24:11,15 61:24
62:4 78:8 92:10,16
102:16 103:10,15
110:15,19 116:4
we've (5)
16:16 59:7 63:2 64:23
71:9
website (1)
89:10
Wednesday (4)
99:17 119:11 120:16
122:2
week-to-week (1)
32:7

Wenatchee (3)
26:19 27:18 29:19
went (6)
13:25 14:15 26:21
27:7,8 63:24
weren't (7)
8:10 82:12 103:11,12
113:3,15 114:9
western (1)
33:6
whatsoever (1)
65:17
WHEREOF (1)
117:18
Whoops (1)
33:19
Winer (1)
110:2
wire (3)
68:6,7 72:3
withhold (1)
54:17
witness (13)
5:2 6:4,23 67:15 95:8
111:23 112:3,18
115:21 117:10,13
117:18 118:2
WITNESSES (1)
118:1
word (1)
53:18
work (28)
7:13 8:2 10:7 11:7,17
11:18,20,20 12:22
12:23 13:4,5,8,8,14
13:19,20,23 14:2,5
14:11,18 16:6 21:22
28:6 61:22 87:12
109:7
worked (4)
14:12,14 16:22,24
working (2)
25:17 35:15
works (1)
8:14
world (2)
11:8,14
Worldwide (2)
17:7,11
worth (1)
115:5
wouldn't (1)
95:15
wrap (2)
35:8 103:14
wrapped (1)

35:7
wrapping (1)
32:21
written (1)
54:16

**X**

**Y**

yamaguchi (14)
34:20,21 37:18 38:8
40:5 86:2 89:11,17
89:23 90:4,5 93:6
111:3 121:2
Yamaguchi's (8)
44:5 46:13 81:13 82:6
87:16 88:25 90:11
109:8
yeah (36)
13:17 15:19 23:5
24:24 32:11 33:23
33:24 50:3,4 53:24
62:20 72:23 73:14
74:15 75:2,4,4
76:16 82:23 83:11
86:9,10 88:2,9
89:13 91:5 94:25
95:6 103:3,3 105:6
106:4 107:20 109:2
112:12,22
year (1)
13:11
years (3)
16:21 17:14 25:10
Yedid (1)
109:19
York (17)
1:2 3:8,8,17,17 4:12
5:12,23,23 7:21
77:15 86:21,25
97:13 107:3 109:21
110:5

**Z**

**0**

070 (1)
112:17

**1**

1 (12)
5:8 22:4,5,9 56:13,22
63:15,20 64:7,21
92:9 118:10
1:31 (1)
2:2

1:32 (1)
5:19
1:52 (2)
24:11,12
1:53 (1)
24:13
1:54 (1)
24:15
10 (6)
67:17 68:17,18,22
120:8 121:17
100 (3)
12:17 38:24 122:1
10112 (2)
3:8,17
104 (2)
53:21,23
11 (15)
1:4 4:10 6:21 7:17
12:2 17:18 18:23
19:9 20:13,17 71:22
71:23 72:8 75:20
120:11
11:30 (1)
39:20
113 (3)
53:22,23 54:12
1146 (1)
57:4
11793 (1)
4:12
119750 (1)
1:25
12 (3)
73:18,19 120:15
12:36 (1)
111:16
13 (4)
74:17,20,23 120:20
13th (1)
117:19
14 (2)
86:14 121:1
1420 (2)
2:6 5:16
15 (8)
72:4,7 90:20,21 91:7
97:4 120:12 121:4
158 (1)
93:6
16 (5)
90:25 91:7 92:25 93:2
121:6
16-74892 (2)
1:6 5:12
16-75515 (2)

1:7 5:13
16-75516 (2)
1:7 5:13
16-75517 (2)
1:8 5:14
17 (2)
94:10 121:11
18 (3)
97:22,23 121:16
18-month (1)
26:10
19 (7)
62:19,25 63:5 99:25
119:2,16 121:21
1908 (2)
1:24 117:24
1997 (2)
11:6 13:12

**2**

2 (8)
33:11,12 37:19 56:5
63:20 69:3 92:15
119:1
2:11 (1)
99:17
2:41 (2)
61:24,25
2:54 (2)
62:2,4
20 (11)
56:13 62:20,20,21
63:8 100:11 102:7
112:13 115:5,7
122:1
2001 (1)
14:9
2002 (1)
14:8
2003 (1)
14:8
2004 (1)
14:9
2005-MCP1 (2)
6:8 7:7
2009 (3)
12:20,21 14:4
2013 (1)
18:18
2014 (1)
19:10
2015 (1)
26:18
2015-MCP1 (2)
3:5,14
2016 (29)

26:23 32:5 33:9
40:3 69:3,6 72:4
75:9 92:22 95:14,25
100:19 111:2,10,16
113:6 119:2,6,12,16
119:21 120:12,17
120:21 121:8,13,18
121:22 122:3
**2017 (7)**
1:14 2:1 5:18 116:13
117:19 123:3,22
**21 (2)**
111:16 120:16
**22 (3)**
75:9 118:10 120:21
**2296_001 (1)**
120:17
**23 (1)**
121:22
**25 (5)**
13:9 40:6,9 111:10
119:6
**27 (5)**
39:19 40:3,9 111:2
119:11
**28 (9)**
56:13,13 62:20,21
63:8 91:17 92:22
93:14 94:3
**29 (1)**
121:7

---
**3**
**3 (10)**
37:2,3 46:7 63:18
64:7,22 65:7 69:6
69:15 119:5
**3:32 (2)**
92:10,12
**3:38 (1)**
92:13
**3:39 (1)**
92:16
**30 (7)**
3:7,16 28:20 95:14,25
119:20 121:12
**33 (1)**
119:1
**3305 (1)**
4:11
**341 (1)**
106:6
**363 (1)**
57:2
**37 (1)**
119:5

**382 (1)**
48:21
**39 (1)**
119:10

---
**4**
**4 (10)**
31:5 39:14,15 42:23
63:18 64:7,22 65:7
110:23 119:10
**4:03 (2)**
110:15,16
**4:06 (2)**
110:17,19
**4:11 (2)**
116:4,6
**42 (1)**
119:15
**4200 (2)**
2:7 5:17
**430 (1)**
44:8
**431 (1)**
44:18
**458-AIA-207 (1)**
57:5
**48 (1)**
119:19

---
**5**
**5 (11)**
42:13,15,18 44:2
50:11 56:22 63:15
64:7,21 99:17
119:15
**50 (1)**
119:24
**53 (1)**
120:1
**55 (1)**
120:6
**5784 (1)**
1:24
**589 (2)**
40:5 111:9
**591 (1)**
111:15
**596 (1)**
38:7

---
**6**
**6 (24)**
48:11,12,25 56:15,18
57:18 60:18,21 61:6
62:10,23,25 63:3,5
63:7,8,12 66:5,11

66:15 67:9 71:4,9
119:19
**600 (1)**
37:22
**603 (1)**
37:15
**605 (1)**
38:10
**68 (1)**
120:8

---
**7**
**7 (13)**
50:18,19,22 63:4 66:4
67:18,21,24 68:10
100:19 118:4
119:24 122:2
**7.1.1 (1)**
51:3
**70 (2)**
100:15,23
**701 (1)**
4:3
**71 (1)**
120:11
**72 (1)**
54:12
**73 (1)**
120:15
**74 (1)**
120:20
**747 (1)**
5:23
**75 (1)**
13:7
**76 (1)**
99:14
**77 (1)**
98:2

---
**8**
**8 (4)**
53:8,9,12 120:1
**8:03 (1)**
111:10
**80 (1)**
115:3
**86 (1)**
121:1

---
**9**
**9 (9)**
1:14 5:18 55:22,23
56:3 62:7 67:12
120:6 123:3
**9.02 (1)**

54:12
**90 (2)**
115:3 121:4
**90s (2)**
13:18 14:13
**93 (1)**
121:6
**94 (1)**
121:11
**97 (1)**
121:16
**98101 (2)**
2:8 5:17
**98104 (1)**
4:4
**99 (1)**
121:21
**9TH (1)**
2:1

RECORDING REQUESTED BY

AND

WHEN RECORDED RETURN TO:

*168682*

REAL ESTATE EXCISE TAX
EXEMPT
Chelan County Treasurer
David E. Griffiths, CFA

By _____ 1-8-16
Deputy

*21739*

SPACE ABOVE THIS LINE FOR RECORDER'S USE

### SPECIAL WARRANTY DEED

| | |
|---|---|
| Grantor: | CDC Properties I, LLC, a Delaware limited liability company acting through Eric Orse as Manager, pursuant to an order dated October 2, 2014, and amended February 27, 2015, in *In re Prium Companies, LLC*, Debtor, United States Bankruptcy Court for the Western District of Washington at Tacoma, Case No. 14-44512 |
| Grantee: | Confluence Health, a Washington non-profit corporation |
| Legal Description: | Lot 1, Blk 7, Wenatchee Park Addition, Lots 3-6, Peachey Addition, Lots 8-10, Blk 7, Columbia Bridge Addition Complete legal description on Exhibit "A". |

Assessor's Tax Parcel ID#s: 22 20 10 771 620 and 22 20 10 771 632

The CDC Properties I, LLC, a Delaware limited liability company ("GRANTOR"), acting through Eric Orse as Management Representative, pursuant to an order dated October 2, 2014, and amended February 27, 2015, in *In re Prium Companies, LLC*, Debtor, United States Bankruptcy Court for the Western District of Washington at Tacoma, Case No. 14-44512, hereby BARGAINS, SELLS AND CONVEYS to CONFLUENCE HEALTH, a Washington non-profit corporation ("GRANTEE"), for the sum of TEN AND NO/100 DOLLARS ($10.00) and other good and valuable consideration, the following parcel of real property located in City of Wenatchee, County of Chelan, State of Washington, and more particularly described on Exhibit A attached hereto by this reference and incorporated herein.

#1021311 v2 / 45640-001



EXHIBIT
F

IN WITNESS WHEREOF, the said Grantor has executed this instrument, as of January 7, 2016.

<div style="margin-left:40%;">

CDC PROPERTIES I, LLC
a Delaware limited liability company

By: _____

Eric Orse, as Management Representative

</div>

STATE OF WASHINGTON )
                         ) ss.
COUNTY OF KING )

    I certify that I know or have satisfactory evidence that Eric Orse, Management Representative of CDC Properties I, LLC, is the person who appeared before me, and said person acknowledged that he signed this instrument and acknowledged it to be his free and voluntary act for the uses and purposes mentioned in the instrument.

    DATED: January 7, 2016.

*Ashley R. Gordon*
NOTARY PUBLIC in and for the State
of Washington, Residing at *Seattle, WA*

*Ashley R. Gordon*
(Printed or Stamped Name of Notary)
My appointment expires 10-19-18

#1021311 v2 / 45640-001

## EXHIBIT A

## LEGAL DESCRIPTION

A parcel of land in Lot 1, Block 7, Wenatchee Park Addition, according to the plat thereof recorded in Volume 2 of Plats, Page 42; Lots 3 through 6, inclusive, Block 7, Peachey Addition to Wenatchee, according to the plat thereof recorded in Volume 1 of Plats, Pages 69 and 70; and Lots 8 through 10, inclusive, Block 7, Columbia Bridge Addition, according to the plat thereof recorded in Volume 2 of Plats, Pages 9 and 10, all in Sections 10 and 11, Township 22 North, Range 20, E.W.M., Chelan County, Washington, more particularly described as follows:

Commencing at the City monument at the intersection of Mission Street and Ferry Street in said City; thence North 61°00' East, along the center line of said Ferry Street for 39.12 feet; thence North 29°00' West for 35 feet to the intersection of the Northerly line of said Ferry Street and the Easterly line of said Mission Street; thence North 15°40' West along said Easterly line of Mission Street for 289.16 feet to the True Point of Beginning for this description; thence continuing North 15°40' West along said Easterly line for 173.98 feet to the Southerly line of Bridge Street; thence North 61°03' East along said Southerly line for 283.13 feet; thence South 29°00' East for 10.00 feet; thence North 61°00' East for 7.00 feet; thence South 29°00' East for 116.41 feet; thence South 61°00' West for 231.14 feet; thence South 29°00' East for 42.64 feet; thence South 61°00' West for 99.15 feet to the True Point of Beginning, including those parts of all vacated streets and alleys lying within the above described boundaries,

AND TOGETHER WITH that portion of the Southerly half of Bridge Street lying adjacent to said premises as vacated by City of Wenatchee Ordinance No. 2557, recorded November 1, 1984, under Auditor's No. 8411010098,

EXCEPT the Westerly 10 feet for Mission Street 1958 improvements as deeded to the City of Wenatchee, Auditor's No. 681998, recorded July 30, 1968.

#1021311 v2 / 45640-001